No. 25-2487
(consolidated with No. 25-2461)

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————

AMERICAN ALLIANCE FOR EQUAL RIGHTS,

Plaintiff

and

UNITED STATES OF AMERICA,

Intervening Plaintiff-Appellant

v.

STATE OF ILLINOIS, *et al.*,

Defendants-Appellees

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION
District Court No. 1:25-cv-669-SJC
The Honorable Sharon Johnson Coleman

———————————

BRIEF FOR THE UNITED STATES
AS INTERVENING PLAINTIFF-APPELLANT

———————————

(*See inside cover for continuation of counsel*)

STANLEY WOODWARD JR.
  Associate Attorney General

ABHISHEK S. KAMBLI
  Deputy Associate Attorney
  General

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General

DAVID N. GOLDMAN
  Attorney
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-9405

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................1

STATEMENT OF JURISDICTION.........................................2

STATEMENT OF THE ISSUE................................................4

STATEMENT OF THE CASE .................................................5

    A.    Illinois Enacts S.B. 2930..........................................5

    B.    Procedural Posture...................................................7

SUMMARY OF ARGUMENT .................................................14

ARGUMENT

    I.    Standard of review ..................................................19

    II.    The United States has standing to enforce the
        Equal Protection Clause against the defendants by
        challenging S.B. 2930...............................................19

        A.    The United States always suffers an injury
            when it can satisfy the prerequisites of 42
            U.S.C. 2000h-2. ...............................................21

        B.    The United States always suffers an injury
            when state actors violate Americans'
            constitutional rights. .....................................24

            1.    Violations of federal law constitute an
                injury to the United States' sovereignty............25

2. The United States has a quasi-sovereign interest in protecting its citizens' rights as *parens patriae*. ......................................................33

C. The defendants' contrary argument confuses standing with the merits. ............................................38

III. In the alternative, the district court erred in dismissing the United States' Complaint insofar as the United States sought the same relief as AAER if AAER had standing. ..........................................................42

CONCLUSION ...................................................................................44

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

SHORT APPENDIX

# TABLE OF AUTHORITIES

**CASES:**                                                    **PAGE**

*Acheson Hotels, LLC v. Laufer*, 601 U.S. 1 (2023) ............................22-23

*Air Lines Stewards & Stewardesses Ass'n, Local 550 v.
American Airlines, Inc.*, 455 F.2d 101 (7th Cir. 1972)....................8

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*,
458 U.S. 592 (1982) .............................................................*passim*

*Allen v. Wright*, 468 U.S. 737 (1984) .................................................15, 24

*Arizona v. United States*, 567 U.S. 387 (2012) .......................................32

*Asset Allocation & Mgmt. Co. v. Western Emps. Ins. Co.*,
892 F.2d 566 (7th Cir. 1989) .............................................................3

*Bost v. Illinois State Bd. of Elections*,
114 F.4th 634 (7th Cir. 2024), *cert. granted*, No. 24-568 ..............41

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) ....................38

*Casillas v. Madison Ave. Assocs., Inc.*,
926 F.3d 329 (7th Cir. 2019) ......................................................19-20

*City of South Miami v. Governor*, 65 F.4th 631 (11th Cir. 2023) ......40-41

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)...............................40

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ........................20

*DeFunis v. Odegaard*, 416 U.S. 312 (1974) (per curiam)........................22

*Diamond Alternative Energy, LLC v. EPA*,
145 S. Ct. 2121 (2025) .....................................................................40

**CASES (continued):**                                          **PAGE**

*Edelman v. Jordan*, 415 U.S. 651 (1974)...............................................37

*FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024) ..................41

*FEC v. Cruz*, 596 U.S. 289 (2022) ............................................................39

*FEC v. Wisconsin Right to Life*, 551 U.S. 449 (2007)..........................37-38

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
　　528 U.S. 167 (2000) ...........................................................................23

*In re Debs*, 158 U.S. 564 (1895)........................................................27, 30

*Jamie S. v. Milwaukee Pub., Schs.*, 668 F.3d 481 (7th Cir. 2012).........3-4

*L. Singer & Sons v. Union Pac. Rail Co.*, 311 U.S. 295 (1940)...............28

*Lamar Advert. of Penn, LLC v. Town of Orchard Park*,
　　356 F.3d 365 (2d Cir. 2004)..............................................................3-4

*Little Sisters of the Poor Saints Peter & Paul Home v.*
　　*Pennsylvania*, 591 U.S. 657 (2020) ............................................42-43

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............15, 24, 28, 31

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ................................24

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ...........................................33

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ............................25, 28, 34

*Newman v. United States ex rel. Frizzell*, 238 U.S. 537 (1915) ........29, 41

*Norwood v. Harrison*, 413 U.S. 455 (1973)..............................................10

**CASES (continued):** PAGE

*Parents Protecting Our Children, UA v.
Eau Claire Area Sch. Dist.*, 95 F.4th 501 (7th Cir. 2024)............. 41

*Pasadena City Bd. of Educ. v. Spangler*,
427 U.S. 424 (1976) ............................................................. *passim*

*Preston v. Thompson*, 589 F.2d 300 (7th Cir. 1978)................................ 10

*Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*,
626 F.3d 973 (7th Cir. 2010) ............................................................ 3

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ........................................... 36

*Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015).................................... 39

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966)........................ 34-35

*Spangler v. United States*, 415 F.2d 1242 (9th Cir. 1969) .............. 8-9, 36

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).............. 23, 39

*Students for Fair Admissions, Inc. v.
President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) .......... 10

*Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433 (2017) .......... 11, 19, 42

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ..................... 19, 24, 40

*United States v. American Bell Tel. Co.*,
128 U.S. 315, 355 (1888) ......................................................... 25-26

*United States v. Raines*, 362 U.S. 17 (1960)...................................... 17, 35

*United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888) ................... 26

*United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977)....................... 27

**CASES (continued):**          **PAGE**

*United States v. Yarbrough*, 452 F. App'x 186 (3d Cir. 2011) ............... 31

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
     529 U.S. 765 (2000) ............................................................ *passim*

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................... 39

*Western Pac. Cal. R. Co. v. South Pac. Co.*, 284 U.S. 47 (1931) ............. 28

*Wisconsin Right to Life, Inc. v. Schober*,
     366 F.3d 485 (7th Cir. 2004) ............................................................ 19

## CONSTITUTION:

U.S. Const. Amend. XIV ............................................................................ 34

U.S. Const. Amend. XV ........................................................................ 34-35

U.S. Const. Art. III ................................................................................... 19

U.S. Const. Art. VI ............................................................................... 2, 32

## STATUTES:

Civil Rights Act of 1964
     42 U.S.C. 2000e-5(f)(1)-(2) ............................................................. 33
     42 U.S.C. 2000h-2 ............................................................... *passim*

Pregnancy Workers Fairness Act
     42 U.S.C. 2000gg-2(a)(1) ............................................................... 33

Voting Rights Act
     52 U.S.C. 10101(c) .................................................................... 33, 35

18 U.S.C. 241 ........................................................................................ 33

**STATUTES (continued):** PAGE

18 U.S.C. 242 ...............................................................33

18 U.S.C. 249 ...............................................................33

28 U.S.C. 1292(a)(1).......................................................3

28 U.S.C. 1331 ..............................................................2

28 U.S.C. 1343(a) ..........................................................2

31 U.S.C. 3730(b)(1).....................................................30

Ill. Comp. Stat. Ann.
    225 ILCS 460/4 (West 2025) ...................................5
    805 ILCS 105/114.05 (West 2025) ..........................5
    805 ILCS 105/114.10 (West 2025) ..........................5
    805 ILCS 105/114.15(a) (West 2025)......................6-7
    805 ILCS 105/114.15(b) (West 2025) ......................6
    805 ILCS 105/114.15(c) (West 2025) ......................6
    805 ILCS 105/116.05(d) (West 2025) .....................7

Transportation Act of 1920,
    Pub. L. No. 66-152, § 402, 41 Stat. 456 .....................28

**LEGLISLATIVE HISTORY:**

*Civil Rights, H.R. 7152, As Amended By Subcommittee No. 5:*
    *Hearings Before the H. Comm. on the Judiciary,*
    88th Cong., 1st Sess. 2656 (1963) ...............................36

P.M. Downing, Cong. Res. Serv., *The Civil Rights Act of 1964:*
    *Legislative History; Pro and Con Arguments* (Aug. 1965)............38

H.R. Rep. No. 2187, 84th Cong., 2d Sess. (1956) ..................36

**RULES:**                                                              **PAGE**

Fed. R. Civ. P. 24(a)(1) ..............................................................8

Fed. R. Civ. P. 24(b)(1) ..............................................................9

**MISCELLANEOUS:**

E.A. Hartnett, *The Standing of the United States:*
  *How Criminal Prosecutions Show That Standing*
  *Doctrine Is Looking for Answers in All the Wrong Places,*
  97 Mich. L. Rev. 2239 (1999) ..........................................31

Illinois Dep't of Hum. Rts., Legal,
  *Posting Standards for Charitable Corporations re.*
  *Public Act 103-0635,*
  https://perma.cc/FC4E-76AR (last visited Oct. 20, 2025)..........6, 40

MacArthur Found.,
  *Illinois Public Act 103-0635 for Directors and Officers,*
  https://perma.cc/4654-Q5KZ (last visited Oct. 20, 2025)...............40

T.L. Grove, *Standing As an Article II Nondelegation Doctrine,*
  11 U. Pa. J. Const. L. 781 (2009) ....................................27

T.L. *Grove, Standing Outside of Article III,*
  162 U. Pa. L. Rev. 1311 (2014) ........................................1

L.W. Yackle, *A Worthy Champion for Fourteenth Amendment*
  *Rights: The United States in* Parens Patriae,
  92 Nw. U. L. Rev. 111 (1997) ..........................................37

# INTRODUCTION

As sovereign, the United States has well-established legal interests, both in enforcing federal law and in protecting its citizens' federal rights. The Supreme Court has accordingly endorsed the Government's standing to protect the public from violations of federal law for well over a century. "Indeed, the Court has *never* denied [the United States] standing when it had statutory author[ity]." T.L. Grove, *Standing Outside of Article III*, 162 U. Pa. L. Rev. 1311, 1324 (2014) (emphasis added); *see id.* at 1324-1328.

But that is precisely what the district court did here.

As part of the Civil Rights Act of 1964, Congress empowered the Attorney General to intervene on behalf of the United States in any federal lawsuit alleging a violation of the Equal Protection Clause of the Fourteenth Amendment based on, among other things, racial discrimination. 42 U.S.C. 2000h-2. The United States invoked that authority to intervene in this lawsuit challenging Illinois's new race-based reporting requirements for charitable organizations.

The district court denied the United States' Motion for a Preliminary Injunction and dismissed its Complaint for lack of standing.

It did so without addressing the variety of Supreme Court precedents recognizing that violations of federal law inherently injure the United States' sovereignty or the United States' longstanding role as protector of its citizens' rights as *parens patriae*. Indeed, it failed to cite a single decision in which a court has found that the United States lacked standing to enforce any federal law, let alone the "supreme Law of the Land," U.S. Const. Art. VI.

This Court should reverse.

## STATEMENT OF JURISDICTION

This is an appeal from a denial of the United States' Motion for a Preliminary Injunction. The district court had subject-matter jurisdiction under 28 U.S.C. 1331 and 1343(a). Both the plaintiff and plaintiff-intervenor's standing are in dispute. The district court denied the United States' Motion for a Preliminary Injunction on August 20, 2025. App. 2, 20-21.[1] The United States filed a timely Notice of Appeal

---

[1] "App. __" refers to the page number of the Joint Appellants' Appendix. "Doc. __, at ___" refers to the docket entry and ECF page number of documents filed in the district court, No. 1:25-cv-669-SJC (N.D. Ill.).

on August 25, 2025.  Doc. 104.  This Court has jurisdiction under 28 U.S.C. 1292(a)(1).

The "scope" of that jurisdiction includes the dismissal of the United States' Complaint.  *Asset Allocation & Mgmt. Co. v. Western Emps. Ins. Co.*, 892 F.2d 566, 568-569 (7th Cir. 1989).  The district court denied the request for injunctive relief as "moot" based solely on its concurrent decision to dismiss the United States' Complaint for lack of standing.  App. 17-20.  Interlocutory review of the denial of injunctive relief thus "brings up with it for . . . review" the dismissal "on which the validity of the [denial of] the injunction turns."  *Asset Allocation & Mgmt.*, 892 F.2d at 568-569.

Even if the dismissal were merely "related but not essential to the validity of" the denial of injunctive relief so as to implicate this Court's "discretion," *Asset Allocation & Mgmt.*, 892 F.2d at 569, "compelling reasons" require review of both aspects of the district court's order now.  *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 492 (7th Cir. 2012) (citation omitted).  Both pieces of the order "concern the same single issue," *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010), and are "inextricably intertwined."  *Lamar*

*Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 372 (2d Cir. 2004) (Sotomayor, J.) (reviewing summary-judgment ruling on standing and mootness where injunctive relief was denied "for the very same reasons"). Moreover, review of the denial of injunctive relief would be "meaningless" if the United States' Complaint remained dismissed. *Jamie S.*, 668 F.3d at 492-493.

## STATEMENT OF THE ISSUE

The Attorney General may "intervene" "for or in the name of the United States" in any federal lawsuit "seeking relief from the denial of equal protection of the laws under the fourteenth amendment to the Constitution on account of race." 42 U.S.C. 2000h-2. Plaintiff American Alliance for Equal Rights (AAER) filed this lawsuit seeking relief from Senate Bill 2930 (S.B. 2930)—an Illinois statute that AAER alleges denies its members equal protection of the laws on the basis of race. The Attorney General intervened on behalf of the United States to challenge S.B. 2930 as violative of the Equal Protection Clause.

The question presented is whether, when Congress grants the United States an explicit cause of action to enforce the Fourteenth

Amendment's Equal Protection Clause, the United States has Article III standing to do so.

## STATEMENT OF THE CASE

### A. Illinois Enacts S.B. 2930

For non-profits in Illinois, some reporting comes with the territory. Illinois requires non-profit corporations organized in the State to file annual reports with basic information, such as the name of the corporation, its address, the names of its directors and officers, and the character of the corporation's affairs. 805 Ill. Comp. Stat. Ann. (ILCS) 105/114.05 (West 2025). Those annual reports are delivered to, and filed by, the Secretary of State. *Id.* § 114.10. If the corporation registers as a charitable organization and receives a threshold level of contributions, then it must also file with the Attorney General an annual report regarding its financial operations. 225 ILCS 460/4 (West 2025).

In 2024, the General Assembly added a reporting requirement that injects race-based requirements into an otherwise race-neutral reporting regime. Effective January 1, 2025, Senate Bill 2930 (S.B. 2930) requires a non-profit corporation that "reports grants of $1,000,000 or more to other charitable organizations" to compile "demographic information"

from its directors and officers. 805 ILCS 105/114.15(a) (West 2025). Demographic information must "includ[e]" the following categories for officers and directors: "race, ethnicity, gender, disability status, veteran status, sexual orientation, and gender identity." *Ibid.*

The Illinois Department of Human Rights must publish and update "a standardized list of demographic classifications" within each category—for example, a list of races and ethnicities from which an officer or director may select. 805 ILCS 105/114.15(b) (West 2025); *see* Illinois Dep't of Hum. Rts., Legal, *Posting Standards for Charitable Corporations re. Public Act 103-0635*, https://perma.cc/FC4E-76AR (*Posting Standards for Charitable Corps.*) (last visited Oct. 20, 2025). Charitable organizations may not *force* any officer or director "to disclose any or all personal demographic information." 805 ILCS 105/114.15(c) (West 2025). But assuming at least one officer or director complies with the request for information, the organization must "post" the demographic information and make it "accessible on the corporation's

publicly available website for at least 3 years." *Id.* § 114.15(a).[2] Failure to fulfill the reporting requirement is a Class C misdemeanor. *Id.* § 116.05(d).

## B. Procedural Posture

1. a. Plaintiff AAER brought a pre-enforcement challenge against defendants Kwame Raoul, in his official capacity as the Attorney General of Illinois; James Bennett, in his official capacity as the Director of the Illinois Department of Human Rights; and Alexi Giannoulias, in his official capacity as Secretary of the State of Illinois. App. 23. AAER argued that S.B. 2930 is unlawful because it violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution by "encourag[ing] charitable organizations . . . to discriminate based on race." App. 39, ¶ 45; *see* App. 38-40, ¶¶ 42-50. Additionally, AAER contended that S.B. 2930 contravenes the Free Speech Clause of the First Amendment. App. 40-43, ¶¶ 51-60. AAER prayed for a declaratory

---

[2] The parties dispute whether, if no officer or director provides the requested information, the non-profit must so state on its website. *Compare* Doc. 73, at 2 (defendants), *with* Doc. 80, at 4 (AAER).

judgment to that effect as well as an injunction against implementation and enforcement of S.B. 2930.  App. 43, ¶ 61.

b.  In any district-court case in which a party "seek[s] relief from the denial of equal protection of the laws under the fourteenth amendment to the Constitution on account of race," the Attorney General of the United States "may intervene" "in the name of the United States." 42 U.S.C. 2000h-2.  The Attorney General must first "certif[y] that the case is of general public importance" and file a "timely application" with the court.  *Ibid.*  Once those prerequisites are met, the "right to intervention by the United States . . . is an absolute and not a permissive one." *Spangler v. United States*, 415 F.2d 1242, 1244 (9th Cir. 1969); *Air Lines Stewards & Stewardesses Ass'n, Local 550 v. American Airlines, Inc.*, 455 F.2d 101, 103 n.2 (7th Cir. 1972).

Invoking 42 U.S.C. 2000h-2, the United States filed a timely motion to intervene as of right.  Doc. 17, at 2, ¶¶ 4-5; Fed. R. Civ. P. 24(a)(1). Deeming the case one of "general public importance" (Doc. 17-1), the United States declined "to sit idly by while its citizens are denied equal protection by a state."  Doc. 18, at 2.  The United States added as defendants Governor J.B. Pritzker and the State of Illinois.  Doc. 17, at

2, ¶ 3; *see Spangler*, 415 F.2d at 1244 (holding that the United States as intervenor may seek broader relief than the plaintiff and collecting cases). In the alternative, the United States moved for permissive intervention, noting that it sought to raise a similar equal-protection claim to AAER's and that intervention would not "unduly delay or prejudice" the action. Doc. 18, at 5; Fed. R. Civ. P. 24(b)(1). The district court granted the unopposed motion. App. 22.

The United States alleged that S.B. 2930 "pressures nonprofits to consider candidates' race when selecting officers and directors." App. 46. "This encouragement by the State of Illinois for nonprofits to discriminate on the basis of race when selecting directors and officers is forbidden by the Equal Protection Clause of the Fourteenth Amendment." App. 47. Accordingly, the United States entered the lawsuit to "protect its citizens and ensure that the Constitution's guarantee of equal protection is enforced." *Ibid.* Like AAER, the United States requested a declaratory judgment that S.B. 2930 violates the Equal Protection Clause and an injunction prohibiting defendants from implementing or enforcing S.B. 2930. App. 10.[3]

---

[3] The United States did not bring a First Amendment claim.

2.  The United States then moved for a preliminary injunction, as did AAER.  Docs. 44, 49.  Because the Equal Protection Clause prohibits "governmentally imposed discrimination based on race," and a State "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish" on its own, the United States argued that it was likely to succeed in showing that S.B. 2930's coercive measures are unconstitutional.  Doc. 50, at 6 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) and *Norwood v. Harrison*, 413 U.S. 455, 465 (1973)).  S.B. 2930 imposes "race-based requirements" that must be measured against, but could not satisfy, strict scrutiny.  *Id.* at 7-9.  The United States further argued that enforcement of S.B. 2930 would constitute a continuing deprivation of constitutional rights and thus cause irreparable harm.  *Id.* at 9-10 (citing *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)).  Finally, the balance of equities and the public interest weighed in favor of preventing a constitutional violation by granting preliminary relief.  *Id.* at 10-11 (citing *Preston*, 589 F.2d at 303 n.3).

Defendants opposed and moved to dismiss the United States'
Complaint. Docs. 73, 85. Because the United States sought a
preliminary injunction that would bind defendants Pritzker and the
State of Illinois (and AAER did not), defendants argued that the United
States must have standing to seek that relief. *See Town of Chester v.
Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Defendants contended that
the United States lacked standing because its theory of a constitutional
violation rests "on a tenuous chain of hypothetical events to make the
claim that this race-neutral law nonetheless violates the Fourteenth
Amendment by encouraging private parties to discriminate based on
race." Doc. 73, at 6; Doc. 86, at 4-5. Accordingly, defendants moved to
dismiss the United States' Complaint and argued that the United States
was not entitled to a preliminary injunction. Doc. 73, at 20; Doc. 86, at
12-13.

In reply, the United States argued that it had standing on at least
two bases. First, the United States represents its citizens as *parens
patriae* and may sue to protect their constitutional rights. Doc. 81, at 3-
4; Doc. 92, at 3-4. Second, the United States suffers an injury to its
sovereignty whenever a state government acts in a manner that violates

federal law.  Doc. 81, at 4; Doc. 92, at 4.  The United States further responded that the defendants' standing argument confused the merits of the United States' claim with the United States' standing to bring that claim.  Doc. 81, at 2; Doc. 92, at 4.

3.  After a hearing on the motions for preliminary injunctive relief (Doc. 91), the district court granted the defendants' Motion to Dismiss the United States' Complaint and denied the United States' Motion for a Preliminary Injunction as moot.  App. 20.[4]

a.  Before addressing the United States' request for relief, the district court determined that AAER established standing for some, but not all, of its claims.  In particular, the court concluded that AAER had standing to challenge S.B. 2930's mandate that corporations speak with their officers and directors and request demographic information as a violation of the First Amendment.  App. 15.  However, the court reached the opposite conclusion with regard to AAER's standing to challenge S.B. 2930's requirement that corporations publicly disclose that demographic

---

[4]  Briefing on the defendants' Motion to Dismiss was not complete at the time of the hearing.  *See* Doc. 91; Doc. 95, at 50.

information as a violation of the First and Fourteenth Amendments. App. 10-15.

b. The district court then turned to the United States.

Rejecting the United States' standing arguments, the district court first announced without further explanation that it was "neither bound, nor persuaded" by the authorities provided in support of the United States' *parens patriae* standing. App. 18. Then the court asserted that it "ha[d] been presented with no binding authority stating that, where there is no case or controversy"—presumably in reference to its holding that AAER lacked standing to pursue an equal-protection claim—"the mere fact that the United States is a party is sufficient to bestow standing. And under current Article III standing jurisprudence, the United States has failed to allege injury-in-fact." *Ibid.* Besides an observation in the margin (App. 18 n.5) that "the United States does not allege that SB 2930 interferes with certain activities carried out by the federal government," that was the end of the analysis. *See* App. 17-19.

The district court accordingly granted the defendants' Motion to Dismiss the United States' Complaint and denied the United States' Motion for a Preliminary Injunction as moot. App. 20.

# SUMMARY OF ARGUMENT

**1.** The district court denied the United States' Motion for a Preliminary Injunction and dismissed the United States' Complaint based on its conclusion that the United States lacks Article III standing. This Court reviews that legal conclusion de novo.

**2.** Standing requires plaintiffs (or intervenors, when they seek new relief) to show an injury that is traceable to the defendant's conduct and redressable by a favorable judicial decision. At issue in this appeal is whether the United States suffers an injury when a State infringes on individuals' constitutional rights.

The United States is always injured when a State denies "equal protection of the law[]" to people "on account of race, color, religion, sex or national origin"—the precise circumstances when intervention is permitted under 42 U.S.C. 2000h-2. The Supreme Court has implicitly recognized as much, and rightly so given that any violation of federal law harms the United States' sovereignty, and a deprivation of citizens' constitutional rights provides the United States *parens patriae* standing.

**a.** In *Pasadena City Board of Education v. Spangler*, the Supreme Court held that the United States' intervention under 42 U.S.C. 2000h-2

in a lawsuit to desegregate Pasadena schools sufficed to maintain a "case or controversy" under Article III even though, but for the United States' intervention, the case would have been moot.  427 U.S. 424, 429-430 (1976).  All the individual plaintiffs had graduated and thus no longer had a stake in the action.  By holding that the United States' presence preserved the Article III case or controversy, the Court necessarily concluded that the United States—the only remaining party opposing the school district—had standing.

*Pasadena* resolves this case.  But first principles yield the same conclusion, as discussed next.

**b.**  The law of standing requires that courts decide only the rights of individuals and, to that end, mandates that private plaintiffs allege an injury that is "personal" to them.  *Allen v. Wright*, 468 U.S. 737, 751, 754-755 (1984).  Private plaintiffs must, in other words, have more than an "undifferentiated public interest" in seeing that the laws are obeyed.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576-577 (1992).

However, the United States stands on different footing than a private plaintiff.  A violation of federal law is, on its own, an injury to the

United States, and violations of Americans' federal rights independently provide the United States *parens patriae* standing.

**i.** The United States has a sovereign interest in creating and enforcing a legal code within its jurisdiction. For well over a century, the Supreme Court has explained, and then explained again, that the United States may invoke the jurisdiction of the federal courts to protect the public from violations of the law.

Modern precedents confirm this longstanding view in the language of Article III standing doctrine. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), the Court upheld the constitutionality of *qui tam* actions—suits in which a private party sues to recover money on behalf of the United States based on a fraud on the Government. In coming to this conclusion, the Court found it to be "beyond doubt" that the *Government* would have standing based solely on the defendant's "violation of [federal] laws," which constitutes "an injury to the United States," namely to its "sovereignty." *Id.* at 771.

In this case, the United States alleges that defendants' actions in carrying out S.B. 2930 violate the Equal Protection Clause of the Fourteenth Amendment. Just as when an individual violates federal

statutes, the United States suffers an injury to its sovereignty when state actors flout the United States Constitution. That is sufficient for standing.

**ii.** Besides the United States' sovereign interest in enforcing federal law, the Government has *parens patriae* standing to protect Americans' constitutional rights. *Parens patriae* standing requires that the Government bring suit to pursue a quasi-sovereign interest, which includes the "health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 607 (1982).

The Supreme Court has already heard, and rejected, the argument that the United States cannot seek an injunction to protect its citizens from unconstitutional racial discrimination. In *United States v. Raines*, where the United States brought a civil suit to secure voters' Fifteenth Amendment rights, the Court explained that "there is the highest public interest in the due observance of all the constitutional guarantees" and that Congress acts well within its authority in "authoriz[ing] the United States to be the guardian of that public interest in a suit for injunctive relief." 362 U.S. 17, 27 (1960). The Nation's quasi-sovereign interest in

protecting Americans' rights under the Fourteenth Amendment is equally strong.

**c.** Defendants' contrary arguments below collapsed standing—the only issue in the Government's appeal—with the merits of the United States' claims against them. But the Supreme Court has said time and again that standing is separate from the merits. None of the legal authorities that the defendants offered up are on point, because their logic cannot be applied to the United States as a plaintiff.

**3.** In the alternative, if AAER has standing to bring its claim against defendants Bennett, Raoul, and Giannoulias, then the district court erred in dismissing the United States' Complaint, and denying its Motion for a Preliminary Injunction, against those defendants. Because only one plaintiff must demonstrate standing for each form of relief sought, the district court should have allowed the United States' Complaint and request for injunctive relief against these three defendants to move forward.

# ARGUMENT

## I. Standard of review

The district court dismissed the United States' Complaint for lack of standing and consequently denied the United States' Motion for a Preliminary Injunction as moot. App. 20. Because the district court reached these conclusions without making factual findings, review is de novo. *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004).

## II. The United States has standing to enforce the Equal Protection Clause against the defendants by challenging S.B. 2930.

Federal courts may only adjudicate "Cases" and "Controversies." U.S. Const. Art. III, § 2. Among other requirements, a case or controversy requires that the plaintiff invoking the jurisdiction of a federal court have "standing" to seek judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "The elements of standing are well settled: the plaintiff must allege an injury in fact that is traceable to the defendant's conduct and redressable by a favorable judicial decision." *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.); *see Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (requiring that intervenors establish standing for any new relief).

If "the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Casillas*, 926 F.3d at 333.

No one contests that the United States' asserted injury in this lawsuit is traceable to at least some of the defendants' conduct and would be redressed by a favorable judicial decision: The official-capacity defendants are charged with executing and enforcing aspects of S.B. 2930. App. 48-49, ¶¶ 7-10.[5] And a court order enjoining defendants from enforcing S.B. 2930 would "[p]lainly" redress that injury. *County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991).

This appeal, then, comes down to whether the United States suffers a cognizable injury when a State has infringed individuals' constitutional rights as guaranteed by the Fourteenth Amendment. The United States is always injured when the conditions for intervention under 42 U.S.C. 2000h-2 are satisfied, *i.e.*, when a State has allegedly denied "equal

---

[5] Defendants argued below that Pritzker and Giannoulias should be dismissed from the lawsuit. Doc. 86, at 10-11. The district court did not address whether Pritzker was properly named but held that Giannoulias was. App. 15-17. Because the United States' Complaint was dismissed, and its Motion for a Preliminary Injunction denied, against all defendants, this Court need not decide whether any given defendant should be dismissed.

protection of the law[]" to people "on account of race, color, religion, sex or national origin." The Supreme Court has implicitly recognized as much, and the conclusion follows from two independent principles: any violation of federal law is an affront to the United States' sovereignty, and a deprivation of citizens' constitutional rights provides the United States *parens patriae* standing. The district court erred in concluding otherwise.

## A. The United States always suffers an injury when it can satisfy the prerequisites of 42 U.S.C. 2000h-2.

Following *Pasadena City Board of Education v. Spangler*, 427 U.S. 424 (1976), the answer to the question presented in this case is straightforward: the United States has standing whenever "an action has been commenced . . . seeking relief from the denial of equal protection of the laws under the fourteenth amendment," 42 U.S.C. 2000h-2.

In *Pasadena*, several students in the Pasadena Unified School District and their parents sued the District and several of its officials, seeking an injunctive order to desegregate the District's schools. 427 U.S. at 427. Invoking 42 U.S.C. 2000h-2, the United States intervened and likewise sought injunctive relief. 427 U.S. at 427. Years after the requested desegregation orders were granted, the case came back to life

when the District and its officials moved for relief from, and modification to, the injunction. *Id.* at 428. By the time the issue reached the Supreme Court, "all the original student plaintiffs ha[d] graduated" and, as the district court had never certified the suit as a class action, defendants contended that the case had become moot. *Id.* at 429-430.

"Except for the intervention of the United States," the Court concluded that "this case would clearly be moot." *Pasadena*, 427 U.S. at 430; *see DeFunis v. Odegaard*, 416 U.S. 312, 319-320 (1974) (per curiam). However, because 42 U.S.C. 2000h-2 "authorize[s] the United States to continue as a party plaintiff in this action," "so long as such participation serves the statutory purpose," the United States' continued participation "ensures that this case is not moot." *Pasadena*, 427 U.S. at 431. The Court therefore had a "case or controversy sufficient to support [its] jurisdiction" under Article III. *Id.* at 429-431.

Though *Pasadena* did not address "standing" in so many terms, the Court implicitly blessed the United States' standing to bring the suit. "As an analytical matter," standing to bring suit "is logically antecedent to whether" a suit has become moot. *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 8-9 (2023) (Thomas, J., concurring in the judgment). The Court

may determine either pre-requisite for jurisdiction is lacking in order to dismiss a case, *id.* at 4 (majority opinion), but "ha[s] an obligation to assure" itself that both are present in order to proceed to the merits, *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). By directly assuring itself of Article III jurisdiction and proceeding to the merits, *Pasadena* signaled that the United States "had Article III standing at the outset of the litigation." *See ibid.*; *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) (warning against reliance on "drive-by jurisdictional rulings" where jurisdiction is "assumed by the parties" and "assumed without discussion by the Court").

This case is on all fours with *Pasadena*. A private plaintiff sought injunctive relief to secure its constitutional rights under the Equal Protection Clause. App. 43, ¶ 61. The United States intervened under 42 U.S.C. 2000h-2 and requested similar injunctive relief. App. 55. The United States became a proper party plaintiff and presented a case or controversy capable of judicial resolution. *Pasadena*, 427 U.S. at 431.

\*\*\*

Even if *Pasadena* does not resolve the matter, though, first principles dictate the same result, as the United States will discuss next.

## B. The United States always suffers an injury when state actors violate Americans' constitutional rights.

"The 'law of [Article] III standing is built on a single basic idea—the idea of separation of powers.'" *TransUnion*, 594 U.S. at 422 (citation omitted). "Congress and the Chief Executive" "[v]indicat[e] the public interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576 (1992) (emphasis omitted). The Judiciary, by contrast, "decide[s] on the rights of individuals." *Ibid.* (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803)). To ensure that continued demarcation, standing doctrine requires that private plaintiffs allege an injury that is "personal" to them—not just that the defendant "is violating the law." *Allen v. Wright*, 468 U.S. 737, 751, 754-755 (1984). They must, in other words, have more than an "undifferentiated public interest" in seeing that the laws are obeyed. *Lujan*, 504 U.S. at 577.

But the United States is not like a private plaintiff. Violation of federal law is, on its own, an "an injury to the United States." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771

(2000) (*Stevens*).  The United States may also sue as *parens patriae* to secure the federal rights of its citizens.  *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923).  In sharp contrast to private plaintiffs, the United States has standing to vindicate the public interest in obedience to federal law.

### 1. Violations of federal law constitute an injury to the United States' sovereignty.

The United States has an interest in "exercis[ing its] sovereign power over individuals and entities within [its] jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 601 (1982) (*Snapp*).  And "[i]t is beyond doubt" that a "violation of [the Nation's] laws" constitutes "an injury to the United States" sufficient to provide the United States standing in federal court.  *Stevens*, 529 U.S. at 771.

a.  The Supreme Court has long observed the United States' unique standing to protect the public interest, even before the distillation of modern Article III standing doctrine.

i.  As early as *United States v. American Bell Telephone Co.*, the United States' "duty to correct" a "fraud upon the public" and seek a

judicial "remedy" was "so clear that it need[ed] no argument." 128 U.S. 315, 355, 370 (1888). The defendant had secured two patents based on alleged fraud but argued that the United States lacked the ability to impeach the patents in court. *Id.* at 350-351. The Supreme Court disagreed.

To be sure, "the right of the government of the United States to institute" a suit to protect its *non*-sovereign interests (*e.g.*, pecuniary interest in a contract) was limited to those situations when it could satisfy "the same general principles which would authorize a private citizen to apply to a court of justice." *American Bell Tel. Co.*, 128 U.S. at 367 (quoting *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888)). But that limitation did not apply to the case at hand. *Ibid.* When, as in *American Bell Telephone Co.*, "[t]he essence of the right of the United States to interfere . . . is its obligation to protect the public," the case is "not excluded from the jurisdiction of the court by want of interest in the government of the United States." *Id.* at 367-368.

A few years later, the Court again endorsed the United States' broad interest in going to court to protect the public—not just its own property or pecuniary interests. When the United States sued to enjoin

interference with the mails, the Court upheld the Government's "interest in the subject-matter" of the suit independent of the United States' "property in the mails, the protection of which was one of the purposes of this [suit]." *In re Debs*, 158 U.S. 564, 583 (1895). Rather than rest on this property theory of standing, the Court relied on the United States' "obligations . . . to promote the interest of all and to prevent the wrongdoing of one, resulting in jury to the general welfare." *Id.* at 584. That "obligation[]" is "often of itself sufficient to give [the United States] standing in court." *Ibid.*[6]

ii.  The Supreme Court has also long distinguished the United States' singular obligation to protect the public from the interests of private parties when construing express statutory causes of action. The explanations will sound familiar to any student of modern Article III standing precedents.

---

[6] Critics of *Debs* have questioned the scope of the Court's holding that the United States may seek equitable relief without a statutory cause of action—not, as relevant here, the United States' standing when it has an express cause of action. *See United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977); *see also* T.L. Grove, *Standing As an Article II Nondelegation Doctrine*, 11 U. Pa. J. Const. L. 781, 793 n.36 (2009) ("Courts have doubted the Executive Branch's standing to bring suit only when it lacked express congressional approval.").

*L. Singer & Sons v. Union Pacific Rail Co.*, for example, involved the Transportation Act of 1920. 311 U.S. 295 (1940). That statute provided a cause of action for injunctive relief by the United States, various federal and state agencies, and any "party in interest." Pub. L. No. 66-152, § 402 ¶ 20, 41 Stat. 456, 478; *L. Singer*, 311 U.S. at 303. Citing now-foundational Article III standing precedent, the Supreme Court had previously interpreted "party in interest" under the Transportation Act to require "something more than a common concern for obedience to law." *Western Pac. Cal. R. Co. v. South Pac. Co.*, 284 U.S. 47, 51 (1931) (citing *Mellon*, 262 U.S. at 488); *see Lujan*, 504 U.S. at 574 (discussing *Mellon*). The party in interest had to have "some definite legal right possessed [that was] seriously threatened" or show that the defendant's action "may directly and adversely affect the complainant's welfare." *Western Pac. Cal.*, 284 U.S. at 51. By contrast, the United States' authority to seek an injunction under the same provision was satisfied by the sovereign's duty to "protect[]" the "general or common interest" in obedience to federal law. *L. Singer*, 311 U.S. at 303-304.

A similar rationale explained why, under the former federal D.C. Code, the Attorney General had free range to seek a writ of quo warranto

to oust an improperly appointed D.C. official, but a private citizen needed "some personal and direct interest in the subject of the litigation" to do the same. *Newman v. United States ex rel. Frizzell*, 238 U.S. 537, 549-550 (1915). "In a sense—in a very important sense—every citizen and every taxpayer is interested in the enforcement of law, in the administration of law, and in having only qualified officers execute the law." *Id.* at 547. But that is "a public interest" and, "[b]eing such, it is to be represented by the Attorney General or the district attorney" just as "they are expected to institute proceedings against any other violator of the law." *Ibid.* "[U]surpation of office [is] a public wrong which can be corrected only by proceeding in the name of the government itself." *Id.* at 546.

b. Modern Article III precedent confirms the United States' unique standing to protect the public from violations of federal law. In *Stevens*, the Court assessed the standing of "a private individual [to] bring suit in federal court on behalf of the United States against a State (or state agency) under the False Claims Act." 529 U.S. at 768. The False Claims Act allows a "private person (the relator) [to] bring a *qui tam* civil action 'for the person and for the United States' . . . 'in the name of the

Government'" against someone who has committed fraud against the United States. *Id.* at 769 (quoting 31 U.S.C. 3730(b)(1)). In evaluating the source of the relator's Article III standing, the Court first turned to whether he could be seen as "suing to remedy an injury in fact suffered by the United States." *Id.* at 771.

"It [was] beyond doubt that the complaint assert[ed] an injury to the United States—*both* the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government) *and* the proprietary injury resulting from the alleged fraud." *Stevens*, 529 U.S. at 771 (emphasis added). As in *Debs*, the Court eschewed reliance on the type of harm that would equally give a private litigant standing—property interest in the mail in *Debs*, proprietary interest in fraudulent payments in *Stevens*. *See ibid.*; *Debs*, 158 U.S. at 583-584. Rather, the "violation of [federal] laws" was, on its own, an independent source of "injury to the United States," namely an "injury to its sovereignty." *Stevens*, 529 U.S. at 771. And that "injury in fact" (independent of the Government's proprietary injury) "suffice[d] to confer standing" on the relator under an assignment theory. *Id.* at 773-774.

c. If further confirmation is necessary, consider the reference to "criminal lawsuit[s]" in *Stevens*. 529 U.S. at 771. Like civil lawsuits, criminal prosecutions must fall within Article III's "Cases" or "Controversies" to be susceptible to judicial resolution. And "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560.

Yet "no federal judge, if pressed, would seriously contend that Article III requires that the United States must suffer an injury in fact that is 'personal,' 'concrete and particularized,' and 'actual or imminent, not conjectural or hypothetical'" to pursue a prosecution—at least in the sense required for private civil plaintiffs. E.A. Hartnett, *The Standing of the United States: How Criminal Prosecutions Show That Standing Doctrine Is Looking for Answers in All the Wrong Places*, 97 Mich. L. Rev. 2239, 2245 (1999) (citation omitted); *see, e.g.*, *United States v. Yarbrough*, 452 F. App'x 186, 189 (3d Cir. 2011) (calling the argument "frivolous"). The source of the United States' standing to prosecute is simple: violations of federal criminal law constitute an "injury to [the Nation's] sovereignty" that "suffices to support a criminal lawsuit by the Government." *Stevens*, 529 U.S. at 771. So too in civil suits. *Ibid.*

d. The United States' standing in this case to enforce federal law is "beyond doubt." *Stevens*, 529 U.S. at 771; *see also Arizona v. United States*, 567 U.S. 387, 398 (2012) ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."). The United States has alleged that defendants' actions in carrying out S.B. 2930 threaten an imminent and ongoing violation of the Fourteenth Amendment's Equal Protection Clause. App. 53-55, ¶¶ 28-40. No less than enforcing a federal statute, the United States has a sovereign interest in ensuring that the Constitution, as "the supreme Law of the Land," U.S. Const. Art. VI, Cl. 2, is abided and respected by the States. *See Snapp*, 458 U.S. at 601.

The district court's contrary conclusion would kneecap the core "sovereign power" of the United States to "enforce a legal code" within its territory. *Snapp*, 458 U.S. at 601. Though short on explanation, the district court's opinion suggests that the United States must allege "interfere[nce] with certain activities carried out by the federal government" to establish an injury. App. 18 n.5. The potential consequences of such a ruling are not limited to the United States'

standing to intervene pursuant to 42 U.S.C. 2000h-2, which are serious enough. *See* pp. 36-38, *infra*.

Even if focusing only on the civil-rights arena, the United States enforces numerous statutes—civil and criminal—that do not require proof of direct interference with a Federal Government program. *See, e.g.*, 52 U.S.C. 10101(c) (Voting Rights Act); 42 U.S.C. 2000e-5(f)(1)-(2) (Title VII), 2000gg-2(a)(1) (Pregnancy Workers Fairness Act); 18 U.S.C. 241-242 (deprivation of constitutional rights), 249 (hate crimes). The United States has both the power and duty to enforce these, and all, federal laws.

### 2. The United States has a quasi-sovereign interest in protecting its citizens' rights as *parens patriae*.

Quite apart from vindicating the United States' sovereign interest in enforcing federal law, the Government has standing as *parens patriae* to pursue its quasi-sovereign interest in protecting its citizens' well-being. *See Massachusetts v. EPA*, 549 U.S. 497, 526 (2007) (upholding *parens patriae* standing under Article III). "*Parens patriae* means literally 'parent of the country.'" *Snapp*, 458 U.S. at 600. For more than a century, there has been little "doubt[]" that "the United States . . . represents [its citizens] as *parens patriae*" and may "enforce their

[federal] rights" in court in that capacity. *Mellon*, 262 U.S. at 485-486 (emphasis added); *see South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966).

a. *Parens patriae* standing requires that the Government bring suit to vindicate "a quasi-sovereign interest." *Snapp*, 458 U.S. at 607. Protection of the "health and well-being—both physical and economic—of [American] residents in general" qualifies as such an interest. *Ibid.* If an "alleged injury to the health and welfare of" the citizenry is one that the United States "would likely attempt to address through its sovereign lawmaking powers," that injury "suffices to give" the United States "standing to sue as *parens patriae*." *Ibid.*

The United States not only "would," but has, "address[ed]" state-sanctioned racial discrimination through its "sovereign lawmaking powers." *Snapp*, 458 U.S. at 607; *see, e.g.*, U.S. Const. Amend. XIV, § 1; 42 U.S.C. 2000h-2. Besides the Fourteenth Amendment's Equal Protection Clause at issue here, the Fifteenth Amendment to the Constitution instructs that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const.

Amend. XV, § 1. Congress has authorized the Attorney General to institute "a civil action or other proper proceeding for preventive relief" to stop an "act or practice" that would violate this guarantee. 52 U.S.C. 10101(c). The State of Georgia once unsuccessfully contended that Congress could not "authorize the United States" to seek this relief "in support of private constitutional rights." *United States v. Raines*, 362 U.S. 17, 27 (1960). But "there is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights," and Congress has every power "to authorize the United States to be the guardian of that public interest in a suit for injunctive relief." *Ibid.*

So too here with enforcement of the Fourteenth Amendment through 42 U.S.C. 2000h-2. The Government has the same quasi-sovereign interest as in *Raines*, and the United States has Article III standing as "the ultimate *parens patriae* of every American citizen," *South Carolina*, 383 U.S. at 324, to secure the fundamental right guaranteed by the Equal Protection Clause. *See Raines*, 362 U.S. at 27.

b. The district court's brush-aside of the United States' *parens patriae* standing under 42 U.S.C. 2000h-2 makes bad policy in addition

to bad law. The goal of the provision is "to promote the strong public interest in obtaining compliance with the equal protection clause of the constitution." *Spangler v. United States*, 415 F.2d 1242, 1246 (9th Cir. 1969). Section 2000h-2 "goes back to the civil rights bill proposed in 1957," which sought "to give the Federal Government a responsibility and power to give effect to substantive constitutional rights denied American citizens"—particularly to ensure access to "equal educational . . . opportunity." *Civil Rights, H.R. 7152, As Amended By Subcommittee No. 5: Hearings Before the H. Comm. on the Judiciary*, 88th Cong., 1st Sess. 2656 (1963) (*Hearing*) (statement of Attorney General Kennedy); *see* H.R. Rep. No. 2187, 84th Cong., 2d Sess. 7-8 (1956). Though the Civil Rights Act of 1957, as passed, ultimately lacked this predecessor provision, the "concept" of civil-rights enforcement by the Attorney General "bec[a]me a symbol for those favoring faster Federal action to end racial discrimination." *Hearing* 2656 (statement of Attorney General Kennedy).

American society has made remarkable strides since the Civil Rights Act of 1964, *see Shelby County v. Holder*, 570 U.S. 529, 545-550 (2013), but the Federal Government retains a critical role in ensuring

that the guarantees of the Equal Protection Clause remain a reality. *See* L.W. Yackle, *A Worthy Champion for Fourteenth Amendment Rights: The United States in* Parens Patriae, 92 Nw. U. L. Rev. 111, 148 (1997) ("If not to the United States itself, then to what champion can citizens look to safeguard them from state overreaching?"). Particularly where, as here, "the Attorney General challenges the validity of a state statute, . . . the interests of the general population are clearly at stake." *Id.* at 146.

By stepping into the fold, the United States can overcome barriers that may hamper private litigants' ability to enforce their own rights. Yackle 112. For example, sovereign immunity and the Eleventh Amendment preclude private parties from suing certain defendants and obtaining certain forms of relief. *See, e.g.*, *Edelman v. Jordan*, 415 U.S. 651, 662-668 (1974). But those barriers do not affect the United States. *Id.* at 669. As another example, some constitutional violations may evade review in the sense that a judicial decree comes too late to prevent the harm, and damages are either unavailable or inadequate as a remedy. *See, e.g.*, *Pasadena*, 427 U.S. at 429-430. Even if the suit is not mooted by the passage of time, *see FEC v. Wisconsin Right to Life*, 551 U.S. 449,

462 (2007), a private litigant may lack the financial resources and sustained incentive to seek judicial resolution through sustained litigation. *See* P.M. Downing, Cong. Res. Serv., *The Civil Rights Act of 1964: Legislative History; Pro and Con Arguments; Text*, at LRS-40 to LRS-41 (Aug. 1965). The United States' ability and incentive to enforce the Constitution, however, remain constant.

## C. The defendants' contrary argument confuses standing with the merits.

The crux of the defendants' standing objection below was that the United States has no injury "because it has failed to show that any person will be injured due to a violation of the Fourteenth Amendment." Doc. 86, at 4. In other words, there is no constitutional violation at all. More specifically in their view, the United States' claim relies on "a tenuous chain of hypothetical events . . . to make the claim that this race-neutral law nonetheless violates the Fourteenth Amendment by encouraging private parties to discriminate based on race." Doc. 73, at 5. That argument boils down to whether action by "private parties" (*ibid.*) have a sufficient nexus with S.B. 2930 to be considered state action—a merits question. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724-725 (1961). But "standing in no way depends on the merits of the

plaintiff's" claim, *Warth v. Seldin*, 422 U.S. 490, 500 (1975), and "the absence of a valid (as opposed to arguable) cause of action does not implicate" standing, *Steel Co.*, 523 U.S. at 89.

To defeat standing, the State must show that, *assuming* the United States is correct that S.B. 2930 violates the Fourteenth Amendment, then the United States will suffer no injury. *FEC v. Cruz*, 596 U.S. 289, 298 (2022). The United States has standing so long as S.B. 2930 plausibly harms *anyone*, because (as alleged) any application of S.B. 2930 violates *someone's* Fourteenth Amendment rights and contravenes federal law. *See* Part II.B, *supra*.

As the United States plausibly alleged, *see Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015), S.B. 2930 will harm Americans: the law's "gathering and posting requirements pressure" and "encourage[]" non-profits to select officers and directors "on the basis of race" (App. 51, ¶¶ 21-22; *see* App. 52-53, ¶¶ 23-27), and are "likely to cause nonprofits to give candidates for directors and officers preferential treatment based on their race" (App. 54, ¶ 33). As the district court observed, "SB 2930 may have the effect of altering the behavior of covered not-for-profit organizations *now*," even if not AAER's Members A and B. App. 14; *see,*

*e.g.*, MacArthur Found., *Illinois Public Act 103-0635 for Directors and Officers*, https://perma.cc/4654-Q5KZ (last visited Oct. 20, 2025) (explaining anticipated changes in demographic reporting based on S.B. 2930). And it strains credulity to think that S.B. 2930—a brand new law vigorously defended by the State's Attorney General—will be applied to no one. *See Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2139 (2025) ("[G]overnments do not usually . . . defend [laws] that have no continuing effect."); *see also Posting Standards for Charitable Corps.* (publishing the required standardized list of demographic identifiers under S.B. 2930).

The State's cited authorities (Doc. 73, at 7; Doc. 86, at 5) are inapposite because their logic does not apply to the United States as a plaintiff. In each, the plaintiffs (all private parties) failed to differentiate themselves from other members of the public and thereby show a "personal stake" in the case. *TransUnion*, 594 U.S. at 423. Plaintiffs in *Clapper v. Amnesty International USA* and *City of South Miami v. Governor* could not show that they (or their members) were likely to be "targeted" by challenged law-enforcement operations. *Clapper*, 568 U.S. 398, 410-411 (2013); *City of S. Miami*, 65 F.4th 631, 637 (11th Cir. 2023).

The plaintiff association in *Parents Protecting Our Children, UA v. Eau Claire Area School District* failed to allege "that even one of the association's members" had a child to whom the challenged school guidance would be applied. 95 F.4th 501, 505-506 (7th Cir. 2024). And in *Bost v. Illinois State Board of Elections*, the court held that candidates for federal office inadequately pleaded that challenged election procedures would impact *their* races in particular. 114 F.4th 634, 642 (7th Cir. 2024), *cert. granted*, No. 24-568 (argument held Oct. 8, 2025). In short, the courts found that plaintiffs in each case failed to set themselves apart from the general public. *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

The United States does not need to set itself apart from the general public. *See Newman*, 238 U.S. at 546-547. Violation of federal law—against anyone at any time—is an injury to the Nation's sovereignty. *Stevens*, 529 U.S. at 771; Part II.B.1, *supra*. And an infringement on Americans' federal rights—any group of Americans—triggers the United States' quasi-sovereign interest as *parens patriae*. *Snapp*, 458 U.S. at 600; Part II.B.2, *supra*. The same reasoning that often prevents plaintiffs

from showing that they will be targeted by government action simply does not apply when the United States is on the left side of the "*v.*"

## III. In the alternative, the district court erred in dismissing the United States' Complaint insofar as the United States sought the same relief as AAER if AAER had standing.

Even if the United States lacks standing, its claim against defendants Bennett, Raoul, and Giannoulias should move forward so long as AAER has standing to pursue its claim against those defendants.

An "intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017). However, insofar as an intervenor seeks relief identical to that of a plaintiff with standing, no independent standing is necessary. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020).

Both AAER and the United States prayed for a declaration that S.B. 2930 violates the Equal Protection Clause and an injunction against State officials barring them from enforcing S.B. 2930. App. 43, 55. The United States, however, sought relief running against five defendants—the State, Pritzker, Bennett, Raoul, and Giannoulias—whereas AAER

sought relief running against the latter three defendants only.  App. 18.

If AAER has standing to pursue its claim against Bennett, Raoul, and

Giannoulias, then the United States can join forces to seek the same relief

without establishing its own standing.  *Little Sisters*, 591 U.S. at 674 n.6.

Accordingly, if this Court concludes that AAER has standing to

pursue its claim, then the district court had no basis to dismiss the

United States' Complaint in its entirety.  *Little Sisters*, 591 U.S. at 674

n.6.  And the district court likewise erred by denying the United States'

Motion for a Preliminary Injunction against those three defendants as

moot.

## CONCLUSION

For the foregoing reasons, this Court should: reverse the district court's order insofar as the district court dismissed the United States' Complaint; vacate the order insofar as the district court denied the United States' Motion for a Preliminary Injunction as moot; and remand for consideration of the United States' motion on its merits.

Respectfully submitted,

STANLEY WOODWARD JR.
  Associate Attorney General

HARMEET K. DHILLON
  Assistant Attorney General

ABHISHEK S. KAMBLI
  Deputy Associate Attorney
  General

JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General

s/ David N. Goldman
DAVID N. GOLDMAN
  Attorney
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 616-9405

## STATEMENT REGARDING ORAL ARGUMENT

The United States requests oral argument.  This appeal raises an important question regarding when the United States may seek to enforce federal law, including the U.S. Constitution, in court.  Oral argument is likely to assist the Court in resolving the question presented.

s/ David N. Goldman

DAVID N. GOLDMAN
 Attorney

Date:  October 20, 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Seventh Circuit Rule 32(c) because it contains 8,545 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6), and Seventh Circuit Rule 32(b), because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ David N. Goldman
DAVID N. GOLDMAN
Attorney

Date: October 20, 2025

# SHORT APPENDIX

# SHORT APPENDIX TABLE OF CONTENTS

**PAGE**

Seventh Circuit Rule 30(d) Statement

Memorandum Opinion and Order,
    filed August 20, 2025 (Doc. 100) .................................................... SA1

**SEVENTH CIRCUIT RULE 30(d) STATEMENT**

This Short Appendix contains all the materials required by Seventh Circuit Rule 30(a). The Joint Appellants' Appendix, filed by Plaintiff-Appellant American Alliance for Equal Rights on October 20, 2025, contains all the materials required by Seventh Circuit Rule 30(a) and (b).

s/ David N. Goldman
DAVID N. GOLDMAN
    Attorney

Date: October 20, 2025

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN ALLIANCE FOR, EQUAL RIGHTS, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 25 CV 00669 |
| v. | ) ) | Judge Sharon Johnson Coleman |
| KWAME RAOUL, JAMES BENNETT, and ALEXI GIANNOULIAS, in their official capacities, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Intervenor-Plaintiff, | ) ) | |
| v. | ) ) | |
| STATE OF ILLINOIS, JB PRITZKER, JAMES BENNETT, KWAME RAOUL, and ALEXI GIANNOULIAS, in their official capacities, | ) ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

American Alliance for Equal Rights ("American Alliance") brings this action against Illinois Attorney General Kwame Raoul, Illinois Department of Human Rights Director James Bennett, and Illinois Secretary of State Alexi Giannoulias (collectively, "Defendants") seeking a declaration from this Court that Senate Bill 2930, which the Illinois General Assembly passed into law, violates the First and Fourteenth Amendments of the U.S. Constitution. The United States intervened in this action, filing its own Complaint in Intervention against the State of Illinois, Governor Pritzker, Attorney

1

SA1

General Raoul, Director Bennett, and Secretary Giannoulias (collectively, "Intervenor-Defendants"), claiming that Senate Bill 2930 violates the Fourteenth Amendment.

Before the Court are Defendants' motion to dismiss American Alliance's Amended Complaint [68]; Intervenor-Defendants' motion to dismiss the United States' Amended Complaint in Intervention [85]; American Alliance and the United States' motions for preliminary injunction [44, 49], which seek to temporarily bar enforcement of Senate Bill 2930; and Defendants' motion to strike unsworn anonymous declarations from American Alliance's motion for preliminary injunction [71].

For the following reasons, the Court (1) grants in part and denies in part Defendants' motion to dismiss American Alliance's Amended Complaint; (2) grants Intervenor-Defendants' motion to dismiss the United States' Amended Complaint in Intervention; (3) denies Defendants' motion to strike; (4) denies American Alliance's motion for preliminary injunction; and (5) denies the United States' motion for preliminary injunction as moot.

## I.     Background

On June 30, 2024, Illinois Governor JB Pritzker signed into law Senate Bill ("SB") 2930.  *See* 805 Illinois Compiled Statutes ("ILCS") 105/114.15.  This first-of-its-kind law requires each domestic not-for-profit corporation registered in Illinois that reports grants of $1,000,000 or more to other charitable organizations[1] to "post on its publicly available website, if one exists, the aggregated demographic information of [its] directors and officers, including race, ethnicity, gender, disability status, veteran status, sexual orientation, and gender identity."  805 ILCS 105/114.15(a).  Such public disclosures must be made within 30 days after the not-for-profit organization files its mandatory

---

[1] "'Charitable organization' means any benevolent, philanthropic, patriotic, or eleemosynary person or one purporting to be such which solicits and collects funds for charitable purposes . . ."  225 ILCS 460/1(a).  "'Charitable purpose' means any charitable, benevolent, philanthropic, patriotic, or eleemosynary purpose."  225 ILCS 460/1(f).

SA2

AG990-IL Charitable Organization Annual Report with the Office of the Illinois Attorney General.
*Id.*

SB 2930, which went into effect in January 2025, provides that, "[i]n collecting the aggregated demographic information of its directors and officers, a [not-for-profit organization] shall allow for an individual to decline to disclose any or all personal demographic information to the [not-for-profit organization]." 805 ILCS 105/114.15(c). All information disclosed is required to be accessible on the not-for-profit organization's website for at least three years after it is posted. 805 ILCS 105/114.15(a).

SB 2930 directs the Illinois Department of Human Rights to "work with community partners to prepare and publish a standardized list of demographic classifications to be used by [not-for-profit organizations] for the reporting of the aggregated demographic information of a [not-for-profit organization's] directors and officers, including race, ethnicity, gender, disability status, veteran status, sexual orientation, and gender identity." 805 ILCS 105/114.15(b). SB 2930 specifies that "[t]he Department of Human Rights shall periodically review and update the list." *Id.*

According to Defendants and Intervenor-Defendants, no standardized list of demographic classifications has yet been published. During oral argument on May 23, 2025, Defendants and Intervenor-Defendants were unable to provide the Court with a definitive timetable for their publication despite approaching fiscal period reporting deadlines, but indicated their expectation to publish the categories by the end of June 2025.[2] *See* Dkt. 95, May 23, 2025 Tr. 80:9–10; 54:11–21 ("The State is undergoing processes now to implement the law. . . [The Illinois Department of Human Rights] is in the process of communicating with stakeholders, including an organization that represents

---

[2] Although the United States asserts that reporting deadlines have already passed for not-for-profits with fiscal year-ends falling in the summer, the Court has been presented with no evidence supporting this claim. (*See* United States' Mem. in Supp. of Mot. for Prelim. Inj., Dkt. 50 at *3 ("Nonprofits whose fiscal years end in the summer or fall would have already been required, or will have soon approaching deadlines, to post the race and other demographic data.").) Indeed, as far as the Court is aware, no categories have been published by the date of this Order.

SA3

nonprofits and foundations to understand . . . the appropriate categories that the State should use, and that process is ongoing.").

American Alliance, a nationwide membership organization consisting of more than 280 members, alleges that it is dedicated to ending racial and other unlawful preferences nationwide. (Am. Compl., Dkt. 59 ¶ 6.) American Alliance initiated this action on January 21, 2025 on behalf of Member A and Member B, both of which are not-for-profit organizations registered in Illinois that contribute $1 million annually in grants to other charitable organizations. (*Id.* ¶ 23.) Members A and B will file their AG990-IL Charitable Organization Annual Report in November 2025, making their deadline to publish reported officer and director demographic information on their websites 30 days thereafter. (*Id.* ¶ 24.) American Alliance seeks a declaration that SB 2930 violates the First and Fourteenth Amendments of the U.S. Constitution.

On March 4, 2025, the United States moved to intervene based on the U.S. Attorney General certifying this case as one of "general public importance" in "seeking relief from the alleged denial of equal protection of the laws under the Fourteenth Amendment to the United States Constitution on account of race[.]" (Dkt. 17-1; Dkt. 17 ¶ 5.) *See also* Fed. R. Civ. P. 24(a)(1); 42 U.S.C. § 2000h-2. Neither Defendants nor Intervenor-Defendants opposed the United States' proposed intervention. (Dkt. 22.) The United States thereafter filed its Complaint in Intervention, which it later amended, alleging that SB 2930 violates the Equal Protection Clause of the Fourteenth Amendment. (Dkts. 28, 74.) American Alliance and the United States seek to preliminarily enjoin Defendants and Intervenor-Defendants, respectively, from enforcing SB 2930. (Dkts. 44, 49.)

American Alliance and the United States contend that SB 2930's disclosure requirement violates the Equal Protection Clause of the Fourteenth Amendment because it encourages covered not-for-profit organizations to consider race—rather than merit and other factors relevant to the organizations' goals and purposes—when selecting officers and directors in order to achieve some

SA4

"ideal level of proportional representation" in leadership to avoid "public shaming" for what some may see as an inadequate level of diversity. American Alliance and the United States allege that qualified candidates for officer and director positions whose race is not viewed as contributing to the overall racial diversity of a not-for-profit organization's leadership will not be hired in order to avoid "adverse consequences" for failure to have what the public may view as "sufficiently diversified leadership." Such adverse consequences include the risk of loss of partnership opportunities and being subject to criticism or harassment.

In support of its First Amendment violation claim, American Alliance alleges that SB 2930 compels covered not-for-profit organizations, including Members A and B, to confer with their officers and directors and publicly post on their websites about a host of "controversial" demographic issues, including race and gender identity, that those organizations do not wish to discuss, advertise, or endorse.

## II.  Legal Standard

A motion to dismiss for lack of subject matter jurisdiction may be made pursuant to Federal Rule of Civil Procedure 12(b)(1) for failure to establish Article III standing. *See Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017). The plaintiff has the burden of establishing standing. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). In the context of a facial challenge to subject matter jurisdiction, the Court "does not look beyond the allegations in the complaint" to assess whether the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, *id.*, and "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93–94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per

SA5

curiam). A complaint must contain factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)). A complaint is facially plausible when the plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

A preliminary injunction is an extraordinary remedy that is never awarded as a matter of right. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). To obtain a preliminary injunction, the moving party has the burden to demonstrate that (1) it has some likelihood of success on the merits, (2) traditional legal remedies would be inadequate, and (3) without such relief, it will suffer irreparable harm. *Valencia v. City of Springfield,* 883 F.3d 959, 965 (7th Cir. 2018). If these elements are met, the court "proceeds to the balancing phase of the analysis," during which it "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* at 966 (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008)). The court should also, where appropriate, consider any effects that granting or denying a preliminary injunction would have on nonparties, or the public interest. *Id.* When ruling on a preliminary injunction, "all of the well-pleaded allegations [in the movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).

SA6

## III. Discussion

### A. Defendants' Motion to Dismiss American Alliance's Amended Complaint

Defendants move to dismiss American Alliance's Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

#### 1. Standing

Defendants challenge American Alliance's standing on two grounds. First, Defendants argue that American Alliance has not established associational standing because it fails to identify by name any member of its organization that would otherwise have standing to sue in its own right. Second, Defendants contend that American Alliance has not demonstrated injury-in-fact for either its First Amendment or Fourteenth Amendment claim.

##### a. Associational Standing

The question of whether a plaintiff has standing within the meaning of Article III of the Constitution is a threshold issue that must be addressed before turning to the merits. *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016). To establish standing, a plaintiff must show that it has "(1) suffered an [actual or imminently threatened] injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)). The alleged injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Defenders of Wildlife*, 504 U.S. at 560). A harm is particularized when it "affect[s] the plaintiff in a personal and individual way." *Defenders of Wildlife*, 504 U.S. at 559 n.1. The standing doctrine ensures that a plaintiff has "'alleged

SA7

such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Federal Election Comm'n*, 554 U. S. 724, 734, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008) (quoting *Friends of the Earth, Inc.*, at 185) (internal quotation marks omitted).

Associational standing permits an organization to initiate a lawsuit on behalf of its members "even without a showing of injury to the association itself." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552, 116 S. Ct. 1529, 134 L. Ed. 2d 758 (1996)). An organization suing on behalf of its members must show that "(a) at least one of its members would have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members." *Id.* (quoting *Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)) (internal quotations omitted).

Defendants challenge the first factor, asserting that American Alliance fails to name a litigant who would have standing to sue in its own right. Relying almost entirely on *Summers v. Earth Island Institute*, Defendants argue that American Alliance's use of pseudonyms to identify "Member A" and "Member B," on behalf of whom American Alliance brings this action, is insufficient to confer associational standing.

In *Summers*, the Supreme Court reiterated that an organizational plaintiff seeking to invoke associational standing must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." 555 U.S. 488 at 498. The Supreme Court held that the plaintiffs, environmental organizations that sought to preliminarily enjoin enforcement of certain regulations,

SA8

lacked standing because they failed to identify any specific member who had suffered the requisite harm. Instead, the plaintiffs relied on purported harm to organizational membership generally, as well as an affidavit from one of their members, Jim Bensman, claiming past injuries unrelated to the challenged regulations and speculative future injury. *Id.* at 495–96.

*Summers* turned on the "absence of any showing of concrete injury," not on the organizational plaintiffs' failure to identify any of their members by name. *Id.* at 497 (quoting *Defenders of Wildlife*, 504 U.S. at 580–81 (Kennedy, J., concurring in part and concurring in judgment)). Indeed, this Court has not found a single case holding that an organization seeking to invoke associational standing must not only identify in its complaint a specific member with standing, but also divulge the member's real name.[3] *See, e.g.*, *Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024); *Students for Fair Admissions v. U.S. Mil. Acad. at W. Point*, 709 F. Supp. 3d 118, 131–32 (S.D.N.Y. 2024); *Students for Fair Admissions v. United States Naval Acad.*, 707 F. Supp. 3d 486, 501 (D. Md. 2023). Rather, the existing body of case law successfully challenging the propriety of proceeding pseudonymously involves instances in which a *party* sought to litigate anonymously. *See, e.g.*, *Doe v. Young*, 2025 WL 927320, at *2–*3 (7th Cir. Mar. 27, 2025).

To be clear, this Court has its doubts about whether an organizational plaintiff *should* be able to mask the true identity of its injured members on whom it alleges Article III standing rests without

---

[3] The majority (if not all) of these types of cases involving challenges to the anonymity of organizational members have been brought by American Alliance and Students for Fair Admissions, both membership organizations with shared leadership purportedly dedicated to ending racial and ethnic classifications and preferences in this country through litigation. *See, e.g.*, *Students for Fair Admissions v. United States Naval Acad.*, 707 F. Supp. 3d 486, 491 (D. Md. 2023) (noting the plaintiff's self-described mission of "support[ing] and participat[ing] in litigation that will restore the original principles of our nation's civil rights movement: *A student's race and ethnicity should not be factors that either harm or help that student to gain admission to a competitive university*") (emphasis in original). The Court notes the apparent general strategy by these organizations to shield the identity of their members on behalf of whom they bring these lawsuits. Indeed, American Alliance's website, which offers a lifetime membership for $10, promises that "[t]he identities of our members will never be disclosed." About Us, *American Alliance for Equal Rights*, available at https://americanallianceforequalrights.org/about/.

SA9

demonstrating that the balance of potential harms (*e.g.*, status as a minor, substantial risk of harm or retaliation from a third party) justifies anonymization. *See id.* at 2 (holding that a plaintiff "may not proceed anonymously merely to avoid reputational damage or embarrassment"). In any event, no such balancing test currently exists in this context, and *Summers* does not compel this Court to hold as much.

### b. Injury-In-Fact

The Court now turns to Defendants' argument that American Alliance lacks standing because Member A and Member B's alleged impending injuries—the *collection* of voluntarily-provided demographic information and *posting* of aggregated responses on their websites—do not rise to the level of a cognizable injury-in-fact.

### i. Online Publication

*First*, Defendants assert that because, "under Illinois law, an organization and its board are one and the same," the demographic information that not-for-profit organizations are required to solicit from their officers and directors is the organization's "*own* data[.]" (Dkt. 69 at **8–9.) But Defendants' reliance on *Willmschen v. Trinity Lakes Improvement Association*, 362 Ill. App. 3d 546 (Ill. App. Ct. 2005), the sole case Defendants cite to support this assertion, is misplaced. That case said nothing about a corporation's right to collect data from its board members, but rather addressed whether Illinois law permits a plaintiff to sue a corporation's board of directors as a collective entity, separate and distinct from the corporation. *Id.* at 551–52. Moreover, from a practical standpoint, the conclusion Defendants urge this Court to reach—that *any* information held by an organization's officers and directors, including private, personal information, correspondingly belongs to the organization—is ridiculous and would have sweeping, and frankly perilous, implications. That stance is untenable.

SA10

*Second*, Defendants argue that the alleged injury stemming from posting aggregated demographic information is conjectural and hypothetical, not actual or imminent, because SB 2930 makes it *optional* and *voluntary* for officers and directors to disclose their demographic information. Defendants claim that "if the directors and officers provide no such information, then the statute does not require the organizations to post anything at all on their websites, and there is no injury to the anonymous organizations." (Dkt. 69 at *9.) American Alliance responds that even if every officer and director of Member A and Member B declined to disclose any and all information, SB 2930 still requires Members A and B to make a posting on their websites regarding their *lack* of collected information, "by, for example, reporting that 100% of [their] officers and directors are [sic] 'prefer not to say' for each category." (Dkt. 80 at *4.) American Alliance also argues that the Amended Complaint's allegations that most of Members A and B's officers and directors "will answer" questions about their demographic information—which American Alliance contends must be accepted as true at the motion to dismiss stage—are sufficient to establish injury-in-fact. (Am. Compl., Dkt. 59 ¶ 35.)

In the past fifteen or so years, the Supreme Court has established that, where no actual injury is alleged, a plaintiff may establish injury-in-fact by demonstrating that a future, threatened injury is "certainly impending"—in other words, imminent. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013) (quoting *Defenders of Wildlife*, 504 U.S. at 564 n.2). Imminence requires a showing that "there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767, 139 S. Ct. 2551, 2565, 204 L. Ed. 2d 978 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U. S. 149, 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)). The Supreme Court has stated that, "[o]ur cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5. Still, a plaintiff is neither permitted to rely

11

SA11

on a "highly attenuated chain of possibilities," *id.* at 410, nor on speculation about "'the unfettered choices made by independent actors not before the courts.'" *Id.* at 414 n.5 (quoting *Defenders of Wildlife*, 504 U.S., at 562).

The Court finds that American Alliance has failed to demonstrate the imminence of any purported future harm to Members A and B resulting from the posting of demographic information on their websites. SB 2930 gives officers and directors the voluntary option to disclose or decline to disclose personal identifying information. On its face, SB 2930's plain language suggests that a covered not-for-profit organization is required to post on its website only the aggregated demographic information it actually collects. *See* 805 ILCS 105/114.15 (a) & (c). Nothing in SB 2930 appears to explicitly require an organization to post anything on its website if it does not receive *any* demographic information from its officers and directors. It follows that a not-for-profit organization whose officers and directors provide no demographic information can suffer no injury directly tied to actual posting.

American Alliance has made no allegation that Members A and B have received demographic information that they now are obligated to aggregate and post on their websites. Instead, American Alliance relies on speculations that Members A and B *will* face imminent harm as a result of being required to post because "[m]ost officers and directors will answer" the demographic questions posed to them. (Am. Compl., Dkt. 59 ¶ 35.) It surmises:

> Most officers and directors will answer because their nonprofit is asking and they are good team players. Women, the disabled, veterans, and other minorities will feel obligated to answer because, as fiduciaries of the organization, they do not want to harm the nonprofit by making it appear discriminatory, not inclusive, or not "diverse." Others will answer to avoid the assumptions that come with declining to answer demographic questions, like with "sexual orientation." And the law's very purpose rests on the assumption that officers and directors will answer these questions. If Illinois thought the law would not reliably reveal information about the demographics of nonprofits, then it would irrationally burden nonprofits for no purpose whatsoever.

(*Id.*)

SA12

It is true that "when standing is challenged on the basis of the pleadings, [the Court] 'accept[s] as true all material allegations of the complaint, and . . . construe[s] the complaint in favor of the complaining party.'" *Pennell v. San Jose*, 485 U.S. 1, 7, 108 S. Ct. 849, 99 L. Ed. 2d 1 (1988) (quoting *Warth*, 422 U. S. at 501). But American Alliance's statements about how it believes officers and directors generally, or even the officers and directors of Members A and B, will conduct themselves are unsupported by underlying factual allegations and instead rely on generalizations amounting to "unadorned speculation." *Id.* at 8. The Court is "not obligated to accept 'sheer speculation, bald assertions, and unsupported conclusory statements' on a motion to dismiss." .*Lanahan v. Cnty. of Cook*, 41 F.4th 854, 862 (7th Cir. 2022) (quoting *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020)).

Indeed, declarations submitted by the Chief Executive Officer of Member A (signed "Officer A") and Chairman of Member B (signed "Officer B") attest that each of the member organizations, "its board, its staff, and I do not want to be forced to promote these messages," including ones that "will make users think that [the organization] endorses controversial concepts like race-based employment practices and proportional representation." (Dkt. 44-2 ¶ 9; Dkt. 44-3 ¶ 9; Dkt. 75-2 ¶ 9, Dkt. 75-3 ¶ 9.) If the Court were to incorporate these declarations by reference, and thus view the statements therein as true, the Court might deduce that Members A and B face no real prospect or substantial risk of disclosure, and thus no cognizable injury based on disclosure at all, because their officers and directors do not intend to disclose any demographic information about themselves. Although American Alliance does not need to show literal certainty that Members A and B will be required to publish demographic information on their websites, it has not alleged facts plausibly establishing that the risk of being required to post is imminent. The purported injury American Alliance puts forth based on the prospect of being required to post demographic information relies

on actions by independent actors (*i.e.*, officers and directors) that may never materialize. *See Clapper*, 568 U.S. at 414, 414 n.5. Such harm is too speculative for Article III purposes.[4]

American Alliance's equal protection challenge hinges on online publication of officer and director demographic information. "By forcing charities to publicize the demographics of their senior leadership," it claims, "the law pushes them to hire candidates based on race. Groups whose posted demographics are perceived as insufficient will be subjected to 'public shaming' by activist groups and other members of the public . . . So nonprofits will start discriminating to avoid that type of harassment." (Am. Compl., Dkt. 59 at ¶ 45.) Based on the Court's reading of the Amended Complaint, American Alliance does not contend that Member A and B's *collection* of demographic information from their officers and directors, alone (*i.e.*, absent online publication), poses a threat of injury rooted in the Fourteenth Amendment. Therefore, American Alliance's failure to sufficiently plead injury-in-fact as it relates to public disclosure necessitates dismissal of its Fourteenth Amendment claim for lack of Article III standing. Additionally, American Alliance lacks standing to proceed on its First Amendment claim as it relates to public disclosure.

The Court does not suggest that a plaintiff could not, at present, sufficiently show injury-in-fact as it relates to publication. In particular, the Court recognizes that SB 2930 may have the effect of altering the behavior of covered not-for-profit organizations *now*. *See Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 586 (7th Cir. 2011) (rejecting argument that injury was speculative where rule at issue "aim[ed] to alter truck drivers' behavior now to avoid a

---

[4] American Alliance also argues that its diversion of resources (*i.e.*, time and money) to comply with SB 2930 is enough to satisfy the injury-in-fact requirement. First, for the reasons previously discussed, any purported spending to comply with SB 2930's disclosure requirement is speculative. Second, because nothing in SB 2930 requires not-for-profit organizations to interview employees, as the Amended Complaint alleges, (Am. Compl., Dkt. 59 ¶ 7), allegations about time and money that may be spent on interviewing staff cannot form the basis for injury-in-fact. *See Prop. Cas. Insurers Ass'n of Am. v. Todman*, 725 F. Supp. 3d 810, 826 (N.D. Ill. 2024) (Pallmeyer, J.) ("[A] plaintiff cannot claim standing to challenge a regulation based on a misreading of what that regulation permits or requires[.]").

remedial directive in the future"). But the Amended Complaint, as currently pleaded, does not allege that Members A or B, specifically, currently feel or will feel pressured by SB 2930's disclosure requirements to consider race or other non-merit-based characteristics in their officer and director hiring decisions. As a result, American Alliance has not established that either Member A or Member B have standing to sue in their own right as it relates to any alleged injury based on public disclosure.

<em>ii. Collection</em>

American Alliance sufficiently alleges that Members A and B will be imminently harmed by asking their officers and directors "intrusive questions" about sensitive demographic issues that Members A and B would rather not discuss. (Am. Compl., Dkt. 59 ¶¶ 26–27.) Although the Illinois Department of Human Rights has not yet published its list of identity classifications, it is well-established that a court may entertain a pre-enforcement challenge. *See, e.g.*, *Anheuser-Busch, Inc. v. Schnorf*, 738 F. Supp. 2d 793, 800 (N.D. Ill. 2010) (Dow, Jr., J.) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat — for example, the constitutionality of a law threatened to be enforced[.]") (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)). The Amended Complaint alleges that Members A and B "don't want to talk about any of that information [regarding sensitive demographic issues] . . . [including] with their staff . . ." (Am. Compl., Dkt. 59 ¶ 27.) At the pleading stage, these allegations are sufficient to show that Members A and B will suffer an imminent injury-in-fact as a result of their collection of demographic information. Such alleged injury is fairly traceable to the implementation of SB 2930 and could be redressed by an injunction. *See Spokeo*, 578 U.S. at 338.

<em>2. Secretary Giannoulias as a Proper Defendant</em>

Next, the Court addresses Defendants' contention that Secretary Giannoulias lacks the requisite connection to SB 2930's enforcement to be a proper defendant to this suit.

15

A state official may be sued in his official capacity when a plaintiff seeks to enjoin an allegedly unconstitutional statute. *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 644 (7th Cir. 2006). In such cases, the Supreme Court has held that, "such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party." *Ex parte Young*, 209 U.S. 123, 157, 28 S. Ct. 441, 52 L. Ed. 714 (1908). "Any official with enforcement power – even if shared with others – satisfies the 'some connection' standard." *Eason v. Pritzker*, 2020 WL 6781794, at *8 (N.D Ill. Nov. 18, 2020) (Seeger, J.). The Court looks to the state official's "duties and powers under state law" to determine whether the official has some enforcement power over the challenged statute. *Ruiz v. Pritzker*, 2024 WL 1283703, at *2 (N.D. Ill. Mar. 26, 2024) (Blakey, J.) (citing *Sherman v. Cmty. Consol. Sch. Dist. 21*, 980 F.2d 437, 441 (7th Cir. 1992)).

Defendants challenge whether Secretary Giannoulias is a proper defendant. First, Defendants argue that SB 2930 assigns the Illinois Secretary of State no enforcement or regulatory role as it relates to the statute. Second, they contend that the Illinois Secretary of State's "power 'to administer'" the General Not-For-Profit Corporations Act, 805 ILCS 105/101.05, is of no importance, given that SB 2930 requires no administration by the State. Defendants claim that, as a result, the harm American Alliance alleges is neither traceable to any actions or duties of the Illinois Secretary of State nor redressable by an injunction prohibiting the Illinois Secretary of State from enforcing SB 2930. (Dkt. 69 at *15; Dkt. 86 at *11.)

At this stage in the litigation, the Court sees no compelling reason to dismiss Secretary Giannoulias. Illinois law gives the Illinois Secretary of State broad authority to promulgate rules and regulations to assist in the efficient administration of various statutes, including SB 2930. *See, e.g.*, 805 ILCS 105/101.55 ("The Secretary of State shall have the power to promulgate, amend or repeal rules and regulations deemed necessary to efficiently administer this Act."); 805 ILCS 105/101.05 ("The

SA16

Secretary of State shall have the power and authority reasonably necessary to administer this Act efficiently and to perform the duties therein imposed."). That authority appears to include prescribing how SB 2930 should be interpreted and applied.

In addition, the Illinois Secretary of State is authorized to play an enforcement role in a more conventional sense: he may propound interrogatories to ascertain whether covered not-for-profit organizations have complied with SB 2930 and "shall certify to the Attorney General . . . all interrogatories and answers thereto which disclose a violation of any of the provisions of [the General Not-For-Profit Corporations Act]," which includes SB 2930. 805 ILCS 105/101.35. At the present juncture, this is more than enough to show that Secretary Giannoulias has "some connection" with the enforcement of SB 2930.

  B. *Intervenor-Defendants' Motion to Dismiss the United States' Amended Complaint in Intervention*

    1. *Standing*

Next, the Court turns to whether the United States has standing as an intervenor of right. "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439, 137 S. Ct. 1645, 198 L. Ed. 2d 64 (2017). Accordingly, "an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests." *Id.* (citing United States' *amicus curiae* brief taking the position that an intervenor must demonstrate its own standing if it "seek[s] damages" or "injunctive relief that is broader than or different from the relief sought by the original plaintiff(s)"). Although the United States may proceed as a party plaintiff in certain circumstances even if the original plaintiff disappears, it must in such circumstances establish its own standing. *See, e.g.*, *Summers*, 555 U.S. at 497 ("[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute.")

SA17

While the United States may seek the same *form* of injunctive relief as American Alliance, it seeks to enjoin two additional defendants—the State of Illinois and Illinois Governor JB Pritzker. Thus, the United States' requested relief is both broader than and different from the relief sought by American Alliance, and the United States, as intervenor, must establish its own Article III standing.

The United States insists that it has standing because it represents its citizens as *parens patriae* to enforce constitutional rights under the Equal Protection Clause. Intervenor-Defendants do not respond to this point, merely retorting that the United States "has not shown injury to the general welfare that would be sufficient to give the United States a standing in court." (Dkt. 86 at *7 (omitting internal citations).)

First, the United States cites only dicta and non-precedential out-of-circuit opinions for the proposition that it may invoke *parens patriae* in seeking to uphold a sovereign interest in preventing violations of its citizens' constitutional rights. *See, e.g.*, *La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512 (W.D. Tex. 2022); *United States v. Texas*, 566 F. Supp. 3d 605 (W.D. Tex. 2021). This Court is neither bound, nor persuaded, by the opinions in these cases.

Second, the Court cannot ignore the "indispensable" element of injury-in-fact to establish Article III standing. *Defenders of Wildlife*, 504 U.S. at 561. The judicial power of the United States extends only to "Cases" and "Controversies." U.S. Const. Art. III, § 2; *see Clapper v. Amnesty Int'l USA*, 568 U. S. 398, 408, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013). The Court has been presented with no binding authority stating that, where there is no case or controversy, the mere fact that the United States is a party is sufficient to bestow standing. And under current Article III standing jurisprudence, the United States has failed to allege injury-in-fact.[5]

---

[5] For example, the United States does not allege that SB 2930 interferes with certain activities carried out by the federal government. *See, e.g.*, *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1164–65 (10th Cir. 1996) (reversing district court's dismissal based on standing where the United States sufficiently alleged that two professional ethics rules governing all attorneys practicing in Colorado interfered with federal prosecutors' conduct in criminal proceedings and changed the nature of the

SA18

Accordingly, the Court finds it proper to grant Defendants' motion to dismiss the United States' Amended Complaint in Intervention for lack of standing.

### C. *Defendants' Motion to Strike*

Before resolving American Alliance's motion for preliminary injunction, the Court finds it necessary to first resolve Defendants' motion to strike. In support of its motion for preliminary injunction, American Alliance filed two declarations by anonymous declarants, "Officer A," the Chief Executive Officer of Member A, and "Officer B," the Chairman of Member B. The declarations, neither of which were notarized, were signed using aliases and do not contain language verifying under penalty of perjury that the contents therein are "true and correct," as required by 28 U.S.C. § 1746. *See Davis v. Wells Fargo Bank*, 685 F. Supp. 2d 838, 841–42 (N.D. Ill. 2010) (Aspen, J.). Defendants moved to strike these declarations from the record on May 6, 2025. (Dkt. 71.)

The following day, on May 7, 2025, American Alliance filed amended declarations, having "corrected" the "accidental omission" in its original declarations by inserting language attesting under penalty of perjury to the truth and accuracy of the statements. (Dkt. 78 at *2; *see* Dkt. 75.) Given that Defendants do not dispute that these amended declarations comport with statutory requirements, and in light of American Alliance's swift effort to amend (albeit without leave of Court), the Court finds that Defendants have not been prejudiced and sees no good reason to strike either the original or amended declarations of Officers A or B. Therefore, Defendants' motion to strike is denied. *See BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 876 F. Supp. 2d 1042, 1045 n.2 (N.D. Ind. 2012) (dismissing motion to strike unsworn declarations as moot where nonmovant amended timely filed original declaration to add penalty of perjury language).

---

federal grand jury in Colorado); *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 425, 45 S. Ct. 176, 69 L. Ed. 352 (1925) (holding that the United States had Article III standing where local government agency's withdrawal of water from Lake Michigan impacted the navigability of the Great Lakes and obstructed interstate and foreign commerce and the federal government's ability to carry out treaty obligations to foreign countries bordering the Lakes).

SA19

D. *American Alliance's Motion for Preliminary Injunction*

American Alliance contends in its motion for preliminary injunction that it is likely to succeed on the merits of its First Amendment claim. But all of its arguments—including that SB 2930 fails strict scrutiny because (a) the State of Illinois's interests in public transparency and diversity are not compelling and (b) SB 2930 is not narrowly tailored—focus on the statute's requirement to *disclose* demographic information. The Court, having concluded above that American Alliance lacks standing as it relates to its purported injuries stemming from public disclosure (*i.e.*, online publication), has been presented with no argument or case law indicating that American Alliance has some likelihood of success on the merits for its First Amendment claim based on the *collection* of demographic information alone. Similarly, American Alliance's arguments regarding irreparable harm concern the *disclosure* of private, confidential information, not the collection thereof. (Dkt. 44 at **14–15.)

Because American Alliance has demonstrated neither some likelihood of success on the merits for its First Amendment claim based on the collection of demographic information nor how it will be irreparably injured if an injunction is not entered, the Court need not address the possibility of serious adverse effects on others or whether an injunction is in the public interest. *See Kolz v. Board of Education*, 576 F.2d 747, 749 (7th Cir. 1978). The Court denies American Alliance's motion for a preliminary injunction.

## IV. Conclusion

For the foregoing reasons, the Court (1) grants in part and denies in part Defendants' motion to dismiss American Alliance's Amended Complaint [68]; (2) grants Intervenor-Defendants' motion to dismiss the United States' Amended Complaint in Intervention [85]; (3) denies Defendants' motion to strike [71]; (4) denies American Alliance's motion for preliminary injunction [44]; and (5) denies the United States' motion for preliminary injunction as moot [49]. The Court gives American Alliance and the United States 14 days to amend.

SA20

As a final note, the Court is disappointed in American Alliance and the United States' repeated insistence that time is of the utmost essence in adjudication of the motions for preliminary injunction because Members A and B face December 2025 reporting deadlines and are, purportedly, currently incurring costs to comply with SB 2930. On the contrary, so far as this Court is aware, the Illinois Department of Human Rights has yet to publish a standardized list of demographic classifications to be used by qualifying not-for-profit organizations. With no knowledge of the relevant classifications, no qualifying not-for-profit organization could reasonably be expected to collect any demographic information at present or otherwise comply with SB 2930. Despite over 300 active civil and criminal cases on its docket, as well as several trials, this matter has required significant attention by the Court and her chambers. The parties are placed on notice that this Court will assign priority to cases and motions as appropriate.

**IT IS SO ORDERED.**

_____
Sharon Johnson Coleman
United States District Judge

DATED: 8/20/2025

SA21