No. 25-2461

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

AMERICAN ALLIANCE FOR EQUAL RIGHTS,

*Plaintiff-Appellant*

v.

STATE OF ILLINOIS, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Northern District of Illinois, No. 1:25-cv-669 (Coleman, J.)

## OPENING BRIEF OF PLAINTIFF-APPELLANT
## AMERICAN ALLIANCE FOR EQUAL RIGHTS

Thomas R. McCarthy
Cameron T. Norris
R. Gabriel Anderson
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Plaintiff-Appellant*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2461

Short Caption: American Alliance for Equal Rights v. State of Illinois

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 American Alliance for Equal Rights

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Consovoy McCarthy PLLC

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and
     None

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
     None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
 N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
 N/A

Attorney's Signature: /s/ Cameron T. Norris          Date: October 20, 2025

Attorney's Printed Name:  Cameron T. Norris

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [✔]  **No** [ ]

Address:  1600 Wilson Blvd

    Arlington, VA 22209

Phone Number:  (703) 243-9423          Fax Number:  N/A

E-Mail Address: cam@consovoymccarthy.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2461

Short Caption: American Alliance for Equal Rights v. State of Illinois

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

American Alliance for Equal Rights

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Thomas R. McCarthy    Date: October 20, 2025

Attorney's Printed Name: Thomas R. McCarthy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: 1600 Wilson Blvd

Arlington, VA 22209

Phone Number: (703) 243-9423    Fax Number: N/A

E-Mail Address: tom@consovoymccarthy.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2461

Short Caption: American Alliance for Equal Rights v. State of Illinois

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    American Alliance for Equal Rights

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Consovoy McCarthy PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ R. Gabriel Anderson    Date: October 20, 2025

Attorney's Printed Name:  Richard Gabriel Anderson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** [ ]  **No** [✔]

Address:  1600 Wilson Blvd

    Arlington, VA 22209

Phone Number: (703) 243-9423    Fax Number:  N/A

E-Mail Address: gabe@consovoymccarthy.com

# TABLE OF CONTENTS

Table of Authorities.................................................................................. ii

Introduction..............................................................................................1

Jurisdictional Statement............................................................................3

Statement of the Issues ............................................................................3

Statement of the Case...............................................................................3

    I.    Illinois enacts SB2930, a first-of-its-kind law that requires nonprofits to post their leaders' race and other demographics on their websites. ...................................................................4

    II.   The Alliance has at least two members that are directly regulated by SB2930..............................................................8

    III.  The district court denies a preliminary injunction and partially dismisses the Alliance's complaint, but temporarily stays enforcement of SB2930 against the Alliance's members. ................11

Summary of Argument.............................................................................17

Argument.................................................................................................18

    I.    The district court should not have partially dismissed the Alliance's complaint for lack of standing. .........................................19

    II.   The district court should have granted a preliminary injunction..35

        A.   The Alliance is likely to succeed on the merits......................36

            1.   SB2930 likely violates the First Amendment by compelling speech. ..........................................................36

            2.   SB2930 likely violates the Fourteenth Amendment by encouraging racial discrimination. ................................41

        B.   Without a preliminary injunction, the Alliance will suffer irreparable harm. .......................................................46

        C.   The balance of harms and public interest overwhelmingly favor the Alliance....................................................48

Conclusion...............................................................................................51

Certificate of Compliance .......................................................................52

Certificate of Service ..............................................................................52

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ...............................................................37, 39

*AAER v. Fearless Fund,*
   103 F.4th 765 (11th Cir. 2024) .......................................19, 20, 48

*AAER v. Pritzker,*
   2025 WL 2229995 (C.D. Ill. Aug. 5)..........................................20

*ACLU of Ill. v. Alvarez,*
   679 F.3d 583 (7th Cir. 2012)....................................19, 34, 35, 48

*Adarand Constructors, Inc. v. Pena,*
   515 U.S. 200 (1995).....................................................................41

*Advocs. for Highway & Auto Safety v. FMCSA,*
   41 F.4th 586 (D.C. Cir. 2022) ....................................................20

*AFBR v. SEC,*
   125 F.4th 159 (5th Cir. 2024) ....................................................40

*AFBR v. Weber,*
   2023 WL 3481146 (E.D. Cal. May 15)..................................41, 45

*Airbnb v. N.Y.C.,*
   373 F. Supp. 3d 467 (S.D.N.Y. 2019) ........................................46

*Alpine Sec. Corp. v. FINRA,*
   2023 WL 4703307 (D.C. Cir. July 5) ...........................................5

*Am. Farm Bureau Fed'n v. EPA,*
   792 F.3d 281 (3d Cir. 2015)........................................................21

*Anderson v. Martin,*
   375 U.S. 399 (1964) ............................................36, 42, 43, 44, 45

*Apex Digital v. Sears, Roebuck & Co.,*
   572 F.3d 440 (7th Cir. 2009)......................................................18

*Araneta v. United States,*
   478 U.S. 1301 (1986) ..................................................................49

*Arc of Calif. v. Douglas,*
   757 F.3d 975 (9th Cir. 2014)..................................................3, 34

*Arreola v. Godinez,*
   546 F.3d 788 (7th Cir. 2008).......................................................32

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) ................................................37, 45

*Backpage.com v. Dart,*
807 F.3d 229 (7th Cir. 2015).........................................46

*Baird v. Bonta,*
81 F.4th 1036 (9th Cir. 2023) ..................................35, 46

*Bell v. Publix Super Markets,*
982 F.3d 468 (7th Cir. 2020)....................................26, 29

*Brewer v. W. Irondequoit Cent. Sch. Dist.,*
212 F.3d 738 (2d Cir. 2000).........................................46

*Brown v. Kemp,*
86 F.4th 745 (7th Cir. 2023) .......................................32

*Bufkin v. Collins,*
604 U.S. 369 (2025) ...................................................30

*California v. Kennedy,*
2025 WL 2807729 (D. Mass. Oct. 1).............................48

*Carman v. Yellen,*
112 F.4th 386 (6th Cir. 2024) ..................................20, 21

*Carson v. Simon,*
978 F.3d 1051 (8th Cir. 2020)......................................35

*Cath. Healthcare Int'l v. Genoa Charter Twp.,*
82 F.4th 442 (6th Cir. 2023) .........................................3

*Cavel Int'l v. Madigan,*
500 F.3d 544 (7th Cir. 2007)....................................49, 50

*Chamber of Com. v. CFPB,*
691 F. Supp. 3d 730 (E.D. Tex. 2023).........................20

*Clapper v. Amnesty Intern.,*
568 U.S. 398 (2013) ...................................................13

*Clarke v. CFTC,*
74 F.4th 627 (5th Cir. 2023) .......................................47

*Comm. for Freedom of the Press v. Rokita,*
147 F.4th 720 (7th Cir. 2025) ..................................19, 20

*Commodity Trend Serv. v. CFTC,*
233 F.3d 981 (7th Cir. 2000)........................................41

*Conn. Dental Ass'n v. Anthem Health Plans*,
   591 F.3d 1337 (11th Cir. 2009)....................................................48

*Cook Cnty. v. McAleenan*,
   417 F. Supp. 3d 1008 (N.D. Ill. 2019), *aff'd on standing*, 962 F.3d 208
   (7th Cir. 2020) ............................................................................27

*Diamond Alternative Energy v. EPA*,
   145 S.Ct. 2121 (2025) ............................................................21, 28

*Do No Harm v. Lee*,
   2024 WL 3730623 (M.D. Tenn. Aug. 8) ....................................20

*Do No Harm v. NAEMT*,
   2025 WL 973614 (S.D. Miss. Mar. 31) ......................................20

*Duke Power Co. v. Carolina Env't Study Grp.*,
   438 U.S. 59 (1978) ................................................................27, 33

*Elrod v. Burns*,
   427 U.S. 347 (1976) .....................................................................26

*Ent. Software Ass'n v. Blagojevich*,
   469 F.3d 641 (7th Cir. 2006)................................................38, 39

*Ezell v. Chicago*,
   651 F.3d 684 (7th Cir. 2011).......................................................46

*FAIR v. Rumsfeld*,
   291 F. Supp. 2d 269 (D.N.J. 2003), *aff'd on standing*, 390 F.3d 219 (3d
   Cir. 2004), *aff'd on standing*, 547 U.S. 47 (2006) .........................20

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) .....................................................................21

*Food & Water Watch v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ....................................................26

*Free the Nipple v. Ft. Collins*,
   916 F.3d 792 (10th Cir. 2019)......................................................46

*Geinosky v. Chicago*,
   675 F.3d 743 (7th Cir. 2012).......................................................29

*Georgia v. President*,
   46 F.4th 1283 (11th Cir. 2022) ...................................................47

*Gillespie v. Indianapolis*,
   185 F.3d 693 (7th Cir. 1999)........................................................33

*Goss v. Bd. of Educ.*,
    373 U.S. 683 (1963) ..............................................42

*Grand River Enters. Six Nations v. Boughton*,
    988 F.3d 114 (2d Cir. 2021)....................................21

*Gresham v. Peterson*,
    225 F.3d 899 (7th Cir. 2000)..................................39

*Grote v. Sebelius*,
    708 F.3d 850 (7th Cir. 2013)..................................50

*Henderson ex rel. Henderson v. Shinseki*,
    562 U.S. 428 (2011) ..............................................34

*Hobby Lobby Stores v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013), *aff'd*, 573 U.S. 682 (2014)....................19, 35

*Hoosier Energy Rural Elec. Co-op. v. John Hancock Life Ins. Co.*,
    582 F.3d 721 (7th Cir. 2009)..................................50

*Hurley v. Irish-Am. GLB Grp. of Bos.*,
    515 U.S. 557 (1995) ..........................................36, 38

*In re Copley Press*,
    518 F.3d 1022 (9th Cir. 2008)................................47

*Indep. Party of Fla. v. Fla. Sec'y*,
    967 F.3d 1277 (11th Cir. 2020)..............................23

*Int'l Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996)..................................37, 41

*Janus v. AFSCME*,
    585 U.S. 878 (2018) ..........................................36, 40

*Joelner v. Vill. of Wash. Park*,
    378 F.3d 613 (7th Cir. 2004)..............................48, 49

*John Doe Agency v. John Doe Corp.*,
    488 U.S. 1306 (1989) ............................................49

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022) ................................21

*Korte v. Sebelius*,
    528 F. App'x 583 (7th Cir. 2012) ..........................50

*Krislov v. Rednour*,
    226 F.3d 851 (7th Cir. 2000)..................................20

*LaRoque v. Holder,*
650 F.3d 777 (D.C. Cir. 2011) ...................................................23

*Lawrence v. Dunbar,*
919 F.2d 1525 (11th Cir. 1990) ...............................................18

*Life Spine v. Aegis Spine,*
8 F.4th 531 (7th Cir. 2021) .......................................................47

*Lutheran Church-Missouri Synod v. FCC,*
141 F.3d 344 (D.C. Cir. 1998) ........................................8, 37, 42

*Mahmoud v. Taylor,*
145 S.Ct. 2332 (2025) ........................................................24, 46

*Maness v. Meyers,*
419 U.S. 449 (1975) ..................................................................47

*Mangual v. Rotger-Sabat,*
317 F.3d 45 (1st Cir. 2003) .......................................................35

*McComb v. Weinman,*
2025 WL 1153803 (7th Cir. Apr. 21) .......................................26

*MD/DC/DE Broad. Ass'n v. FCC,*
236 F.3d 13 (D.C. Cir. 2001) .............................................42, 45

*Meland v. Weber,*
2 F.4th 838 (9th Cir. 2021) ................................................21, 26

*Meriwether v. Hartop,*
992 F.3d 492 (6th Cir. 2021) ...................................................40

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop,*
839 F. Supp. 68 (D. Me. 1993) .................................................47

*Minn-Chem, Inc. v. Agrium, Inc.,*
683 F.3d 845 (7th Cir. 2012) ...................................................33

*Monterey Mech. Co. v. Wilson,*
125 F.3d 702 (9th Cir. 1997) ...............................35, 36, 42, 46

*Moody v. NetChoice,*
603 U.S. 707 (2024) ..................................................................36

*NAACP v. Trump,*
298 F. Supp. 3d 209 (D.D.C. 2018), *aff'd*, 140 S.Ct. 1891 (2020)...............20

*NAM v. SEC,*
800 F.3d 518 (D.C. Cir. 2015) ...........................................38, 40

*Nanko Shipping, USA v. Alcoa, Inc.*,
    850 F.3d 461 (D.C. Cir. 2017) ...................................................41

*Nat'l Coal. of Prayer v. Carter*,
    455 F.3d 783 (7th Cir. 2006)......................................................39

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
    116 F.4th 488 (5th Cir. 2024) .............................................27, 28

*Nat'l Religious Broadcasters v. FCC*,
    138 F.4th 282 (5th Cir. 2025) ...................................................21

*New York v. Dep't of Com.*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd on standing*, 588 U.S. 752
    (2019)...........................................................................................20

*New York v. Ferber*,
    458 U.S. 747 (1982) ...................................................................33

*NIFLA v. Becerra*,
    585 U.S. 755 (2018) ...............................................36, 37, 38, 39, 41

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................48

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ...................................................................42

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ...................................................................40

*Odebrecht Const. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013)..................................................48

*Owner-Operator Indep. Drivers Ass'n v. FMCSA*,
    656 F.3d 580 (7th Cir. 2011).......................................................28

*Pathways, Inc. v. Dunne*,
    329 F.3d 108 (2d Cir. 2003)..........................................................3

*PDE v. Olentangy*,
    684 F. Supp. 3d 684 (S.D. Ohio 2023)........................................20

*Pennell v. San Jose*,
    485 U.S. 1 (1988) .......................................................................19

*People v. Warren*,
    173 Ill. 2d 348 (1996) ................................................................45

*Philip Morris USA Inc. v. Scott*,
    561 U.S. 1301 (2010) ........................................................49

*Pit Row v. Costco Wholesale Corp.*,
    101 F.4th 493 (7th Cir. 2024) .......................................32

*Project Vote/Voting for Am. v. Long*,
    682 F.3d 331 (4th Cir. 2012)........................................30

*Recht v. Morrisey*,
    32 F.4th 398 (4th Cir. 2022) .........................................39

*Reitman v. Mulkey*,
    387 U.S. 369 (1967) .........................................................42

*Remijas v. Neiman Marcus Grp.*,
    794 F.3d 688 (7th Cir. 2015)....................................26, 29

*Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989) .........................................................45

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
    487 U.S. 781 (1988) ...............................................36, 37, 38, 39

*S.C. NAACP v. Alexander*,
    2022 WL 453533 (D.S.C. Feb. 14) ...............................20

*SFFA v. Harvard*,
    600 U.S. 181 (2023) ............................................19, 40, 42, 45

*SFFA v. U.S. Naval Acad.*,
    707 F. Supp. 3d 486 (D. Md. 2023) .............................20

*SFFA v. West Point*,
    709 F. Supp. 3d 118 (S.D.N.Y. 2024) .........................20

*Siemens USA Holdings v. Geisenberger*,
    17 F.4th 393 (3d Cir. 2021)..............................................3

*Speech First v. Shrum*,
    92 F.4th 947 (10th Cir. 2024) .......................................20

*Staffing Servs. Ass'n of Ill. v. Flanagan*,
    720 F. Supp. 3d 627 (N.D. Ill. 2024) ...........................47

*State Nat. Bank of Big Spring v. Lew*,
    795 F.3d 48 (D.C. Cir. 2015) .........................................21

*Taxman v. Bd. of Educ. of Piscataway*,
    91 F.3d 1547 (3d Cir. 1996)...........................................42

*Telescope Media Grp. v. Lucero,*
936 F.3d 740 (8th Cir. 2019) ........................................................37

*Thomas More L. Ctr. v. Obama,*
651 F.3d 529 (6th Cir. 2011) ........................................................23

*TikTok v. Garland,*
604 U.S. 56 (2025) ........................................................................28

*United States v. Raines,*
362 U.S. 17 (1960) ........................................................................48

*USAID v. All. for Open Soc'y Int'l,*
570 U.S. 205 (2013) ......................................................................36

*Va. Coal. for Imm. Rights v. Beals,*
2025 WL 2345822 (E.D. Va. Aug. 12) .........................................20

*Vette v. K-9 Unit Deputy Sanders,*
989 F.3d 1154 (10th Cir. 2021) ....................................................25

*Virginia v. Am. Booksellers Ass'n.,*
484 U.S. 383 (1988) ................................................................21, 33

*Vitolo v. Guzman,*
999 F.3d 353 (6th Cir. 2021) ........................................................46

*Vt. Right to Life Comm. v. Sorrell,*
221 F.3d 376 (2d Cir. 2000) .........................................................34

*W.H. Scott Const. Co., Inc. v. Jackson,*
199 F.3d 206 (5th Cir. 1999) ........................................................42

*Wabash Valley Power Ass'n v. Rural Electrification Admin.,*
903 F.2d 445 (7th Cir. 1990) ........................................................27

*Watkins v. Mohan,*
144 F.4th 926 (7th Cir. 2025) .......................................................29

*Waukesha v. EPA,*
320 F.3d 228 (D.C. Cir. 2003) ......................................................33

*Wis. Right to Life State PAC v. Barland,*
664 F.3d 139 (7th Cir. 2011) ........................................................34

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio,*
471 U.S. 626 (1985) ......................................................................38

**Statutes**

805 ILCS §105/101.35 ....................................................................5

20 ILCS §50/5 ...........................................................................11

28 U.S.C. §1292(a)(1) ...................................................................3

28 U.S.C. §1331 ..........................................................................3

42 U.S.C. §2000h ........................................................................12

225 ILCS §460/4 ....................................................................10, 23

730 ILCS §5/5-4.5-65 ....................................................................5

805 ILCS §105/112.50 ....................................................................5

805 ILCS §105/114.15 .....5, 8, 9, 10, 11, 12, 16, 20, 22, 23, 28, 30, 31, 36, 38, 39, 43, 44

805 ILCS §105/116.05 ....................................................................5

**Rules**

Fed. R. App. Pro. 12(b)(6) ..............................................................33

Fed. R. App. Pro. 32(a)(7) ..............................................................52

Fed. R. Civ. Pro. 12(b)(1) ...............................................................33

Fed. R. Civ. Pro. 32(a)(5) ...............................................................52

**Other Authorities**

*Governor JB Pritzker Approves Nation-Leading Policy Regarding Diversity of Nonprofit Boards*, Equality Illinois (July 1, 2024) ........................................7

*Posting Standards for Charitable Corporations re. Public Act 103-0635*, Ill. Dep't. of Human Rights (July 2025), perma.cc/L3G3-UE2X.................15

Wright & Miller, 11A Fed. Prac. & Proc. Civ. §2951 (3d ed.) ........................46

## INTRODUCTION

In 2025, Illinois became the first—and only—State to require charities to disclose the race of their officers and directors. Not just race, but also "gender identity," "sexual orientation," and several other demographics using Illinois' state-mandated categories (including contested terms like "cisgender" and "nonbinary"). And not just disclose, but also publish the demographics on the nonprofit's *own* website and maintain it there for years.

This law, Senate Bill 2930, is likely unconstitutional. Under the First Amendment, Illinois cannot conscript private organizations to publicize the State's arbitrary demographic categories as their own or to promote its controversial worldview about the relevance of proportional representation. And under the Fourteenth Amendment, Illinois cannot encourage nonprofits to use race when picking leaders or weaponize private actors to punish nonprofits that refuse. This latter claim caused the United States, using its statutory authority to stop States from violating equal protection, to intervene in this case as a plaintiff. Both it and the Alliance moved for preliminary injunctions, aiming to freeze Illinois' disclosure requirement before nonprofits would have to start posting their leaders' demographics in late 2025.

But the district court ignored these crucial questions. It completely dismissed the United States for lack of standing. And it partially dismissed the Alliance for lack of standing. Though it agreed that two of the Alliance's

members are directly regulated by SB2930, and though it agreed that those members face imminent injuries, it said they didn't face the right *kind* of injuries. They needed to prove that SB2930 required them to post their leaders' demographics, but that prediction was "speculative" because SB2930 might require no posting if every officer and director declined to answer every demographic question that SB2930 requires nonprofits to ask.

The district court erred. Plaintiffs can base their standing on reasonable predictions about human behavior. The Alliance supported its predictions with first-hand knowledge, testimony, and other evidence, while Illinois submitted no evidence at all. And the Alliance's predictions are *the same predictions* that Illinois made when passing and defending SB2930. Illinois can hardly disagree that the Alliance's members faced an imminent risk of disclosure in late 2025: To avoid the Alliance's motion for an injunction pending appeal, Illinois agreed to give the Alliance's members temporary relief from SB2930 until its preliminary-injunction motion is finally decided.

This Court should reverse. And because this appeal turns on questions of law, this Court should remand with instructions to enter an Alliance-specific preliminary injunction. That relief would simply extend the status quo that Illinois has already agreed to. And the Alliance meets the criteria, under both the traditional and the sliding-scale approaches to preliminary injunctions.

## JURISDICTIONAL STATEMENT

The district court had statutory jurisdiction under 28 U.S.C. §1331 because the Alliance alleges violations of the First and Fourteenth Amendments. This Court has appellate jurisdiction under 28 U.S.C. §1292(a)(1) because the Alliance appeals from the denial of a preliminary injunction. This Court also has pendent appellate jurisdiction to review the partial dismissal of the Alliance's complaint because the district court denied the Alliance's preliminary injunction for the same reasons it partially dismissed. App.7-15, 20; *see Cath. Healthcare Int'l v. Genoa Charter Twp.*, 82 F.4th 442, 447-48 (6th Cir. 2023); *Pathways, Inc. v. Dunne*, 329 F.3d 108, 113 (2d Cir. 2003); *Arc of Calif. v. Douglas*, 757 F.3d 975, 992-93 (9th Cir. 2014); *Siemens USA Holdings v. Geisenberger*, 17 F.4th 393, 410-11 (3d Cir. 2021).

## STATEMENT OF THE ISSUES

**I.**   Should this Court reverse the partial dismissal of the Alliance's amended complaint because it plausibly alleged Article III standing?

**II.**   Should this Court reverse the denial of the Alliance's motion for a preliminary injunction and remand with instructions to enter a preliminary injunction that protects the Alliance's members?

## STATEMENT OF THE CASE

Illinois passed SB2930 in June 2024, a novel law that requires qualifying nonprofits to publicize a host of "demographic information" about their officers and directors on their websites. The Alliance sued under the First

and Fourteenth Amendments, the United States intervened, and both moved for preliminary injunctions. The district court denied the Alliance's motion after partially dismissing its complaint for lack of standing, deeming it too speculative that the Alliance's members must post their leaders' demographics in 2025. But after Illinois published the demographic categories and the Alliance threatened to seek an injunction pending appeal, both Illinois and the district court agreed to stay enforcement of SB2930 against the Alliance's members until its preliminary-injunction motion is finally resolved.

I.   **Illinois enacts SB2930, a first-of-its-kind law that requires nonprofits to post their leaders' race and other demographics on their websites.**

Illinois passed SB2930 in June 2024, with an effective date of January 1, 2025. The law has three sections. Section (a) requires certain charities to post demographic information about their officers and directors on their own websites:

> (a) Within 30 days after filing its annual AG990-IL Charitable Organization Annual Report, a corporation that reports grants of $1,000,000 or more to other charitable organizations shall post on its publicly available website, if one exists, the aggregated demographic information of the corporation's directors and officers, including race, ethnicity, gender, disability status, veteran status, sexual orientation, and gender identity. The aggregated demographic information shall be accessible on the corporation's publicly available website for at least 3 years after it is posted.

4

Section (b) instructs the Illinois Department of Human Rights to create the demographic categories that nonprofits must use:

> (b) The Department of Human Rights shall work with community partners to prepare and publish a standardized list of demographic classifications to be used by corporations for the reporting of the aggregated demographic information of a corporation's directors and officers, including race, ethnicity, gender, disability status, veteran status, sexual orientation, and gender identity. The Department of Human Rights shall periodically review and update the list.

And section (c) requires nonprofits to let their officers and directors decline to disclose their personal demographic information to the corporation:

> (c) In collecting the aggregated demographic information of its directors and officers, a corporation shall allow for an individual to decline to disclose any or all personal demographic information to the corporation.

805 ILCS §105/114.15.

Compliance with SB2930 is mandatory. Violations are a "class C misdemeanor," 805 ILCS §105/116.05(d), punishable by prison, probation, and fines, 730 ILCS §5/5-4.5-65(a)-(e). Illinois' secretary of state can also enforce SB2930 in various ways, including by sending "interrogatories" to nonprofits. App.17 (citing 805 ILCS §105/101.35). And Illinois' attorney general can "dissolve" a nonprofit that fails to comply, 805 ILCS §105/112.50(a)(2)—the "'corporate'" equivalent of the "'death penalty,'" *Alpine Sec. Corp. v. FINRA*, 2023 WL 4703307, at *1 (D.C. Cir. July 5) (Walker, J., concurring).

No State has ever had a law like SB2930, and the supporters of SB2930 were not shy about its purpose. By forcing nonprofits to publish their

leaders' demographics, SB2930 would let the world see which nonprofits were insufficiently diverse and pressure them to become more diverse. This purpose and intended effect were confirmed by every key actor.

**Senate**: When the law's main senate sponsor, Adriane Johnson, introduced SB2930, she said it would "encourage more diversity," App.24 ¶3, by "nudg[ing] foundations and big nonprofits to diversify their boards," D.Ct.Doc.44-4 at 5, 23; Ill. Sen. Trans., 2024 Reg. Sess. No. 96 (Apr. 10, 2024). SB2930 nudged nonprofits, Senator Johnson observed, because it required them "to report the[ir] aggregate demographic data … on their public facing website." Ill. Sen. Trans., 2024 Reg. Sess. No. 96 (Apr. 10, 2024); *Johnson Law Highlights Diversity*, Sen. Johnson (July 1, 2024), perma.cc/V5QJ-ARY3 (cited at App.24 ¶3). SB2930 would promote "leadership diversity" by encouraging nonprofits that weren't sufficiently diverse "to consider others for leadership," Ill. Sen. Trans., 2024 Reg. Sess. No. 96 (Apr. 10, 2024)—an effect that Senator Johnson reiterated several times. *E.g.*, D.Ct.Doc.50 at 3-4 & nn.6-7; App.30 ¶21*.

**House**: The law's main house sponsor, Edgar Gonzalez, made the same observations. According to Representative Gonzalez, SB2930 encourages nonprofits to "prioritize" diverse officers and directors. D.Ct.Doc.74 at 1-2. The law encourages that behavior because it lets "elected officials and community organizations" "see the data" and then push nonprofits to

"prioritize the recruitment" of officers and directors from "diverse communities." *Id*. (cleaned up). The government and private industry likewise would "be better partners to those nonprofit organizations that want to prioritize the recruitment of … diverse" directors. *Id*.; *accord Governor JB Pritzker Approves Nation-Leading Policy Regarding Diversity of Nonprofit Boards*, Equality Illinois (July 1, 2024), perma.cc/AJ47-NRGX (*Equality Illinois Article*) (cited in D.Ct.Doc.74 at 2 n.1). The result would be that "[t]he diverse range of communities [that] nonprofits serve [w]ould be handled by a diverse range of people." D.Ct.Doc.44-4 at 14.

**Governor**: Governor Pritzker made the same points when he signed SB2930. According to him, "SB2930 requires nonprofits to publicly report the[ir] aggregated demographic information … to encourage nonprofits to reflect the diversity of the communities they support." *Id.* at 12. The law's disclosure requirements accomplish that goal, the governor explained, because they let the public "assess each nonprofit's leadership strengths and opportunities for growth." *Id.* at 13. So SB2930 would "ensure that nonprofit boards better reflect the populations they serve." *Id*. at 28.

**Others**: The law's other supporters made the same observations. Equality Illinois, the advocacy organization that drafted SB2930 and shepherded it through the legislative process, *see* Ill. Sen. Trans., 2024 Reg. Sess. No. 96 (Apr. 10, 2024), said that SB2930 was designed "to encourage

diversity [in] the private and public sectors," *Equality Illinois Article* (cited in D.Ct.Doc.50 at 2 n.2). And the means for accomplishing that diversity were the obvious ones: "With this legislation," Equality Illinois stressed, "grantees, community organizations, and leaders can assess the diversity of foundation boards of directors and collaborate with them to ensure that their leadership aligns with community demographics." D.Ct.Doc.44-4 at 24. That effect wasn't lost on the public either, who understood that SB2930 was designed to "encourage nonprofits to reflect the diversity of the[ir] communities." D.Ct.Doc.44-4 at 38; *see also* App.30 ¶21* (collecting examples).

These repeated references to "diversity" mainly meant—as the word typically does—*racial* diversity. *See Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 356 (D.C. Cir. 1998). SB2930 requires nonprofits to report seven specific demographics, and "race [and] ethnicity" are the first two listed. 805 ILCS §105/114.15(a). SB2930's sponsors stressed that the law would encourage nonprofits to focus on selecting, for example, "Latines." *Equality Illinois Article* (cited in D.Ct.Doc.50 at 2 n.2).

## II. The Alliance has at least two members that are directly regulated by SB2930.

The American Alliance for Equal Rights is a membership association that strives to end illegal and divisive discrimination throughout society. App.25 ¶6, 57 ¶3. It brought this suit on behalf of its members, including nonprofits "A" and "B." App.30-31 ¶¶22-23.

A and B are directly regulated by SB2930. They file AG990-IL reports every year. App.31 ¶23, 64-65 ¶4, 69-70 ¶4. On those reports, they list grants of at least $1 million to other charities. App.31 ¶23, 58 ¶7, 64-65 ¶4, 69-70 ¶4. And they have public websites. App.32 ¶27, 60 ¶11, 65-66 ¶9, 71 ¶9.

SB2930 thus requires A and B to collect and post their members' demographics—against their will. App.65 ¶¶6-8, 70 ¶¶6-8, 31-32 ¶¶25-27. They object to asking their officers and directors these intrusive personal questions about their ethnic background, sex lives, medical conditions, and more. App.65 ¶8, 70 ¶8, 32 ¶26. They also disagree with the State's arbitrary categories. App.70-71 ¶¶8-9, 65-66 ¶9, 33 ¶29. Member B, for example, does not believe in "gender identity" as something that exists separately from "gender." 805 ILCS §105/114.15(a); *see* App.70 ¶8, 33 ¶29. Most fundamentally, both A and B strongly object to the philosophy that the aggregate demographics of a nonprofit's leadership have any relevance. App.65-66 ¶¶6-9, 70 ¶¶6-9, 31-32 ¶¶25-27. Adding this information would alter the messages they currently express on their websites, which contain articles that reject racial classifications, "promote colorblindness," and claim "that demographic mandates like §105/114.5 offend America's founding principles." App.65-66 ¶9, 71 ¶9.

SB2930 also threatens A's and B's finances and reputation. Most immediately, A and B must spend time and resources asking their leaders the

State's demographic questions, collecting and aggregating their responses, and paying someone to update and maintain that information on their websites. *See* App.67 ¶13, 72 ¶13, 58 ¶¶5-7. And once that information is posted, A and B will face backlash from officials, nonprofit watchdogs, donors, and others who deem their leaders not racially diverse. App.34-35 ¶¶32-34, 66-67 ¶11, 71-72 ¶11. A and B will either be pressured to consider race when picking their leaders, or they will be penalized in the form of decreased goodwill and donations. App.59-60 ¶¶8-10, 66-67 ¶11, 71-72 ¶11.

Because A and B file their AG990-IL reports in November, SB2930 would make them post their leaders' demographics for the first time in December 2025 (and require them to collect and compile the information before then). App.4, 65 ¶5, 70 ¶5; *see also* 805 ILCS §105/114.15(a). When the statute became effective in January 2025, the Illinois Department of Human Rights still had not completed the "standardized list of demographic classifications" for SB2930. 805 ILCS §105/114.15(b). But the Alliance predicted that the Department would publish those categories well before December 2025, since nonprofits must file their AG990-IL reports "within six months of the organization's fiscal or calendar year end," Att'y Gen. Raoul, *Checklist for Illinois Charitable Organizations* 5 (archived Oct. 18, 2025), perma.cc/Z666-6FFN—meaning the first AG990-IL reports are due in "June 30," *e.g.*, 225 ILCS §460/4(a), and the first disclosures under SB2930 would occur 30 days

later in July, 805 ILCS §105/114.15(a). Or, if the Department published no categories, nonprofits would use the default definitions under Illinois law. 20 ILCS §50/5(a); App.33 ¶28; *e.g.*, *Illinois Public Act 103-0635 for Directors and Officers*, MacArthur Found. (June 24, 2025), archive.is/7hqUP (publishing its demographic categories under SB2930 even with "no guidance from … IDHR"). The Alliance also predicted, based on its nonprofit experience and the testimony of its members, that "most" of A's and B's leaders would provide demographic information to A and B. App.35-36 ¶35, 45 ¶4.

### III. The district court denies a preliminary injunction and partially dismisses the Alliance's complaint, but temporarily stays enforcement of SB2930 against the Alliance's members.

The Alliance sued the same month that SB2930 went into effect. D.Ct.Doc.1. Given its members' impending disclosure deadline in December, the Alliance also moved for a preliminary injunction. It argued that SB2930 likely violates the First and Fourteenth Amendments because the law compels speech and encourages discrimination. D.Ct.Doc.44 at 3-4, 8-14; App.1-2, 4. And it ultimately supported its motion with an amended verified complaint, App.23-45; three corrected declarations from its president and two members, App.57-73; and many pages of exhibits, D.Ct.Doc.44-4 at 1-38; *see* App.19 (denying motion to strike).

The United States intervened a few weeks later. D.Ct.Doc.17. It invoked the statute that gives it the right to intervene when States violate equal

protection. 42 U.S.C. §2000h-2; *see* App.22. Like the Alliance, the United States moved for a preliminary injunction and sought relief by July 2025. D.Ct.Doc.49 at 1; D.Ct.Doc.50 at 11.

Illinois opposed both motions and moved to dismiss both complaints. Illinois introduced zero evidence of its own. And its briefs waived any argument that SB2930 could satisfy heightened scrutiny. D.Ct.Doc.73 at 16 n.2 & 19 n.5; D.Ct.Doc.69 at 15 n.5. Illinois instead focused on various standing objections and defended SB2930 only under rational-basis scrutiny. *See* D.Ct.Doc.73 at 7-16 & nn.2, 5; D.Ct.Doc.69 at 6-15 & n.5.

The district court heard oral argument in May 2025. At the hearing, the court repeatedly asked Illinois' lawyers when the Department of Human Rights would publish SB2930's "standardized list of demographic classifications," 805 ILCS §105/114.15(b); *see, e.g.*, Tr.50:16-17 ("What categories are the nonprofits supposed to use?"); Tr.54:13 ("How long is that going to take…?"); Tr.59:14 ("you all haven't figured out the categories yet, have you?"); Tr.61:3-4 (similar); Tr.78:13-14 ("What are the subcategories? That's what I need to [know]."); Tr.79:25–80:2 ("as to the subcategories, you … can't tell me when those might be reached and available or even how they're chosen?"). The most definitive answer from Illinois' lawyers was that "IDHR expects to have that information soon. Hopefully by June." Tr.54:9-10; *accord* App.3. The Alliance's counsel emailed Illinois' counsel two times asking for

an update on the categories—first in early July and again in early August. Its second email was never responded to.

On August 20, 2025, the district court issued its opinion. It dismissed the United States for lack of standing, partially dismissed the Alliance's complaint for lack of standing, and denied both preliminary-injunction motions. App.10-20. With respect to the Alliance, the court rejected most of Illinois' threshold arguments. App.10-15. And it agreed that the Alliance has standing to the extent SB2930 makes A and B collect their leaders' demographics—an "imminent injury in fact." App.15. But the court said the Alliance lacks standing to the extent SB2930 makes A and B post that information. Rejecting the Alliance's reading of the statute, the court assumed that SB2930 requires a nonprofit to post "only the aggregated demographic information it actually collects"; so if a nonprofit "does not receive *any* demographic information" from any leader, then it need not "post anything." App.12. The court deemed it merely "speculative" that any officer of A or B would disclose any demographic in response to A's and B's collection efforts. App.12-15 (citing *Clapper v. Amnesty Intern.*, 568 U.S. 398, 414 n.5 (2013)). With no obligation to post, A and B lacked "standing" to bring a "Fourteenth Amendment claim" or a "First Amendment claim as it relates to public disclosure." App.14. And for the same reason, the Alliance could not get a preliminary

injunction. *See* App.20 (denying that relief based on its "standing" analysis "above").

At the end of its opinion, the district court expressed its "disappoint[ment]" that the Alliance and the United States had sought an expedited ruling. App.21. That expedition was unwarranted because "so far as this Court is aware, the Illinois Department of Human Rights has yet to publish a standardized list of demographic classifications." App.21; *see also* App.3 & n.2. Without that list, the district court thought no covered nonprofit "could reasonably be expected to … comply with SB 2930." App.21.

Come to find out—and unbeknownst to the Alliance, the United States, or the district court—the Illinois Department of Human Rights *had* published the list of demographic categories three weeks earlier. The list was quietly posted on the Department's webpage on July 28, 2025. App.75 ¶2; D.Ct.Doc.109 ¶8. Yet Illinois' lawyers never told the Alliance's counsel (despite multiple requests) or the district court (despite multiple inquiries). And the Department's categories are even worse than the Alliance predicted. They require nonprofits to use categories that are notoriously arbitrary and terms that are highly controversial; and they give nonprofits a template to use that doesn't list "decline to answer" as an explicit option for their leaders to select:

| CATEGORY | CLASSIFICATIONS |
|---|---|
| **RACE / ETHNICITY** | • Asian or Asian American<br>• Black or African American<br>• Hispanic or Latino<br>• Middle Eastern or North African<br>• Native American, Alaskan Native, or Indigenous<br>• Native Hawaiian or Pacific Islander<br>• White or Caucasian<br>• Multi-Racial and/or Multi-Ethnic<br>• Not listed (write in if desired) |
| **GENDER** | • Woman<br>• Man<br>• Nonbinary<br>• Not listed (write in if desired) |
| **GENDER IDENTITY** | • Transgender<br>• Cisgender<br>• Not listed (write in if desired) |
| **SEXUAL ORIENTATION** | • Straight or Heterosexual<br>• Gay or Lesbian<br>• Bisexual<br>• Not listed (write in if desired) |
| **DISABILITY STATUS** | • Disabled<br>• Not Disabled |
| **VETERAN STATUS** | • Veteran<br>• Not a Veteran |

*Posting Standards for Charitable Corporations re. Public Act 103-0635,* Ill. Dep't. of Human Rights (July 2025), perma.cc/L3G3-UE2X.

Once these categories were published, nonprofits had to use them. The Caterpillar Foundation, for example, made the "following disclosure of certain aggregated demographic information of [its] directors and officers":

> 13% are white and 87% declined to disclose their race/ethnicity; 13% are female and 87% declined to disclose their gender/gender identity; 13% are not veterans of the armed services and 87% declined to disclose their veteran status; 13% are not disabled and 87% declined to disclose their disability status; and all directors and officers declined to disclose their sexual orientation.

*805 ILCS 105/114.15 Demographic Disclosure*, Caterpillar Found. (July 30, 2025), perma.cc/SNP5-EL5S (*Caterpillar Disclosures*).

The Alliance discovered these new categories shortly after the district court issued its opinion. A and B then knew for certain that, barring an emergency injunction pending appeal, they would have to use these categories and otherwise comply with SB2930 soon. They will file this year's AG990-IL report on "November 17, 2025." D.Ct.Doc.109 ¶8; App.75 ¶2. So to comply with SB2930, they would have to send Illinois' template to their officers and directors on November 17, collect the leaders' answers and aggregate the data, and then pay someone to post the information on their websites by "December 17, 2025." D.Ct.Doc.109 ¶8; App.75 ¶2.

After conferring over a possible injunction pending appeal, Illinois agreed not to enforce SB2930 against A and B while their preliminary-injunction motion is pending (including any interlocutory appeals). In exchange, the Alliance agreed not to seek an injunction pending appeal or to expedite

this appeal. App.75-76 ¶¶4-5; D.Ct.Doc.109 ¶5. After the parties apprised the district court of all the new facts, the court "enter[ed]" the parties' stipulation as its own order. App.78. It "stay[ed] enforcement" of SB2930 "against Members A and B until Plaintiff's motion for preliminary injunction has been finally resolved, as defined in the stipulation." App.78.

## SUMMARY OF ARGUMENT

**I.** Because the Alliance plausibly alleged standing, this Court should reverse the partial dismissal of its amended complaint. The district court said it was speculative to think the Alliance's members must post their leaders' demographics, since all their officers and directors might decline to answer any demographic questions. But *that* prediction was speculative, not the Alliance's—the latter of which was supported by personal experience and common sense, was met with no contrary evidence from Illinois, and mirrors the same predictions that SB2930 itself makes. The district court's logic also rests on a misreading of SB2930, since it wrongly assumes that nonprofits need not post even if everyone declines to answer. And it treats what should have been losing merits arguments as winning standing arguments.

**II.** Though this Court could simply resolve standing and remand, it should reach the Alliance's motion for a preliminary injunction—sparing the parties another interlocutory appeal by resolving questions that, in a constitutional case, are reviewed de novo anyway. The Alliance meets the criteria

for a preliminary injunction. SB2930 likely violates the First Amendment because it compels nonprofits to post the State's controversial speech on their websites. SB2930 also likely violates the Fourteenth Amendment because it pressures nonprofits to illegally consider race when selecting leaders. Based on SB2930's likely unconstitutionality, the other preliminary-injunction factors necessarily favor the Alliance. In fact, they heavily favor the Alliance, since its members face the irreparable harm of disclosure while Illinois faces only the temporary loss of information for which it disclaims any interest. So even if the merits were uncertain, a preliminary injunction would be proper under this circuit's sliding-scale approach. That relief is especially appropriate here because it would simply extend the plaintiff-specific relief that's already in place, protecting the Alliance's members through final judgment instead of just the interlocutory appeals.

## ARGUMENT

This Court should first reverse the dismissal of the Alliance's amended complaint for lack of standing. It reviews that dismissal de novo, since Illinois introduced no evidence and challenged the Alliance's standing only on the face of the complaint. *Apex Digital v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

After reversing that partial dismissal, this Court should also reverse the denial of the Alliance's motion for a preliminary injunction. Because the

district court denied a preliminary injunction based solely on its erroneous legal analysis of standing, this Court reviews that denial de novo. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012); *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 729 (7th Cir. 2025). In fact, in constitutional cases like this one, the Court reviews everything de novo, since the merits are purely legal and dictate the other preliminary-injunction factors. *Alvarez*, 679 F.3d at 589; *accord Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1145 & n.21 (10th Cir. 2013) (en banc) (collecting cases), *aff'd*, 573 U.S. 682 (2014).

All told, this Court should reverse the district court and remand with instructions to enter a preliminary injunction prohibiting the enforcement of SB2930 against the Alliance's members.

**I.    The district court should not have partially dismissed the Alliance's complaint for lack of standing.**

The Alliance has standing if one of its members has standing, the case is germane to its mission, and the members needn't participate. *SFFA v. Harvard*, 600 U.S. 181, 199 (2023). The second and third requirements are concededly met. This challenge to a racial classification is germane to the Alliance's mission of ending racial classifications. *AAER v. Fearless Fund*, 103 F.4th 765, 771 (11th Cir. 2024). And the Alliance's facial challenges and requests for forward-looking relief do not require excessive participation from its members. *Id.*; *Pennell v. San Jose*, 485 U.S. 1, 7 n.3 (1988). Neither the district court nor Illinois ever suggested otherwise.

The Alliance also has at least one member with standing. SB2930 requires a nonprofit to collect, post, and maintain information about its leaders' demographics if the nonprofit has a "publicly available website," files an "AG990-IL," and "reports grants of $1,000,000 or more" to other charities. 805 ILCS §105/114.15(a). Two of the Alliance's members, A and B, are nonprofits who meet those criteria. They have public websites. App.32 ¶¶26-27, 30; App.65 ¶7; App.70 ¶7. They consistently file AG990-IL reports. App.31 ¶23; App.65 ¶4; App.70 ¶4. And they consistently grant over $1,000,000 to other charities. App.31 ¶23; App.64 ¶4; App.69 ¶4. They do not currently collect or post all their leaders' demographics, but SB2930 now makes them. App.31 ¶¶25-26; App.65 ¶¶6-8; App.70 ¶¶6-8. Because they wouldn't take these actions without SB2930, causation is satisfied. *Carman v. Yellen*, 112 F.4th 386, 407-08 (6th Cir. 2024). And because an order declaring SB2930 unconstitutional or enjoining its enforcement would relieve them of these obligations, redressability is satisfied. *Krislov v. Rednour*, 226 F.3d 851, 858 (7th Cir. 2000); *Rokita*, 147 F.4th at 728.[1]

---

[1] That the Alliance currently refers to its members with pseudonyms does not implicate Article III standing. App.9 (citing *Fearless Fund*, 103 F.4th at 773; *SFFA v. West Point*, 709 F. Supp. 3d 118, 131-32 (S.D.N.Y. 2024); and *SFFA v. U.S. Naval Acad.*, 707 F. Supp. 3d 486, 501 (D. Md. 2023)). Though the Alliance has defeated the contrary argument many times, *see* App.9 & n.3, so have the NAACP, ACLU, and an array of associations representing voters, immigrants, unions, regulated businesses, parents, students, and more. *See, e.g.*, *S.C. NAACP v. Alexander*, 2022 WL 453533, at *3 (D.S.C. Feb. 14) (voters); *Va. Coal. for Imm. Rights v. Beals*, 2025 WL 2345822, at *7 (E.D. Va. Aug. 12)

Because A and B are the "object" of SB2930, there is "little question" it injures them. *Diamond Alternative Energy v. EPA*, 145 S.Ct. 2121, 2134 (2025). Being "require[d]" to do "some action" is an injury. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024); *accord Meland v. Weber*, 2 F.4th 838, 845 (9th Cir. 2021); *Nat'l Religious Broadcasters v. FCC*, 138 F.4th 282, 290 (5th Cir. 2025). The compelled disclosure of information is an injury. *Carman*, 112 F.4th at 407-08. So are the time and money spent on compliance—collecting the demographic responses, reviewing and aggregating them, posting on the website, and maintaining the website for at least three years. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988); *Grand River Enters. Six Nations v. Boughton*, 988 F.3d 114, 121 (2d Cir. 2021) (collecting cases); *Kentucky v. Yellen*, 54 F.4th 325, 342-43 (6th Cir. 2022); *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 293 (3d Cir. 2015); *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48,

_____

(voters); *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 & n.10 (D.D.C. 2018) (DACA recipients), *aff'd*, 140 S.Ct. 1891, 1916 (2020); *New York v. Dep't of Com.*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y.) (immigrants), *aff'd on standing*, 588 U.S. 752, 766-68 (2019); *Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 594 & n.2 (D.C. Cir. 2022) (labor unions); *Chamber of Com. v. CFPB*, 691 F. Supp. 3d 730, 738-39 (E.D. Tex. 2023) (regulated businesses); *PDE v. Olentangy*, 684 F. Supp. 3d 684, 696 n.2 (S.D. Ohio 2023) (parents); *Speech First v. Shrum*, 92 F.4th 947 (10th Cir. 2024) (college students); *AAER v. Pritzker*, 2025 WL 2229995, at *3-5 (C.D. Ill. Aug. 5) (college students); *Do No Harm v. NAEMT*, 2025 WL 973614, at *3 (S.D. Miss. Mar. 31) (trade-school students); *Do No Harm v. Lee*, 2024 WL 3730623, at *2-3 (M.D. Tenn. Aug. 8) (doctors); *FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 274-75 (D.N.J. 2003) (law schools), *aff'd on standing*, 390 F.3d 219, 228 n.7 (3d Cir. 2004), *aff'd on standing*, 547 U.S. 47, 52 n.2 (2006).

53 (D.C. Cir. 2015). Deprivations of constitutional rights, like free speech and equal protection, are also concrete injuries. *Hippocratic Med.*, 602 U.S. at 38.

The district court disagreed, partially. It agreed that SB2930 makes A and B "collec[t]" demographic information that they otherwise wouldn't— an "imminent injury-in-fact." App.15. But it disagreed that SB2930 makes A and B "publish" anything on their websites. App.13-14. In the court's view, SB2930 requires a nonprofit to post "only" the demographic information it "actually collects." App.12. And because the statute lets officers and directors "decline to disclose" their demographics, 805 ILCS §105/114.15(c), a nonprofit would have no obligation to publish "if it does not receive *any* demographic information from its officers and directors," App.12. Per the district court, the prospect that even one officer or director of A or B would answer even one demographic question was "too speculative." App.13-14. And if A and B need not publish, then the Alliance has no "standing" to bring its "Fourteenth Amendment claim" because A and B will face no pressure to discriminate. App.14. And the Alliance has no "standing" to bring its "First Amendment claim as it relates to public disclosure" because A and B won't have to post anything on their websites. App.14.

This analysis is legally erroneous, for three main reasons. It overstates the test for standing based on future harms. It misreads SB2930. And it conflates standing with the merits.

**1.** The district court misapplied the law on standing for future harms. The Alliance sued in January 2025, three weeks after SB2930's effective date, and amended its complaint in April 2025. App.44. That same year, for the first time ever, SB2930 would require all covered nonprofits to post their leaders' demographics "[w]ithin 30 days after filing" their "annual AG990-IL." 805 ILCS §105/114.15(a). Those reports are generally due six months after the end of a nonprofit's fiscal year. 225 ILCS §460/4(a). For the Alliance's members A and B, their AG990-IL reports are due in November; so their duty to post their leaders' demographics would arise for the first time in December 2025. App.31 ¶24; App.65 ¶5; App.70 ¶5; D.Ct.Doc.109 at 4. That looming injury, which would occur in "only months," was "'certainly impending.'" *Indep. Party of Fla. v. Fla. Sec'y*, 967 F.3d 1277, 1281 (11th Cir. 2020); *accord LaRoque v. Holder*, 650 F.3d 777, 788 (D.C. Cir. 2011) (injury that's "nineteen months away" is "imminent"); *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 537 (6th Cir. 2011) (injuries caused by statutes that were "three years," "six years," and even "over thirteen years" away were imminent).

That A and B would have to "post" information on their websites was not "speculative." *Cf.* App.11-14. Under the district court's reading of SB2930, a nonprofit would have no duty to post only if *every* officer and director declined to answer *every* demographic question *every* time the nonprofit asked. *See* App.12. So if *one* officer or director disclosed *one*

demographic *one* time, the nonprofit must post the aggregate information of *all* officers and directors for *all* demographics—even if, for some categories, the post says only that "100% of officers and directors declined to answer." Even on this reading, the Alliance had standing if it faced a "'substantial risk'" that at least one officer or director would reveal at least one demographic to A or B. *Mahmoud v. Taylor*, 145 S.Ct. 2332, 2358 (2025). That risk was not "speculat[ive]," even though it turns somewhat on the actions of individuals not before the court, if those actions are "predictable." *Dep't of Com. v. New Yor*k, 588 U.S. 752, 768 (2019) (distinguishing *Clapper*).

It was predictable that at least one officer or director, when asked by A and B, would have reported at least one piece of demographic information. While each leader has the right not to disclose, SB2930 would not allow A and B to *choose* that option for their leaders or to *encourage* their leaders not to disclose. (If SB2930 allowed this, then the law would fail even rational-basis scrutiny. *See* D.Ct.Doc.79 at 3.) So when A and B send Illinois' form to their leaders and ask them to return their responses by the due date, D.Ct.Doc.109 at 4 ¶8; D.Ct.Doc.108 at 2 ¶2, it is predictable that at least one "will answer" at least one question, App.36 ¶35. Officers and directors are "team players" who do not ignore or evade questions from their nonprofit. App.36 ¶35, 41 ¶54, 32 ¶26, 65 ¶8, 70 ¶8. Though A and B don't believe Illinois' demographics are relevant to choosing leaders and object to posting

this data, *cf.* App.13, "most" of their leaders would divulge at least some personal information to the nonprofit, App.36 ¶35. For A's and B's nonminorities, declining to answer is unattractive because it creates false impressions—that their sexual orientation is ambiguous, that they do not see themselves as male or female, that they have an undisclosed disability, that they are unwilling to disclaim false credit for serving in the military, and the like. *See* App.35-36 ¶35. For A's and B's minorities, declining to answer is unattractive too. It can falsely suggest they are ashamed of their minority status or military service. App.35-36 ¶35. And as "fiduciaries," these leaders understand that declining to disclose their minority status would hurt the nonprofit by leading others to think it's not sufficiently diverse—risking the nonprofit's "donations," "reputation," and "standing." App.32 ¶26, 65 ¶8, 70 ¶8, 34 ¶32, 36 ¶35.

These basic points cannot be dismissed as "generalizations." *Cf.* App.13. They come from A's and B's experiences, knowledge, and "conversations" with their specific "leadership." App.45 ¶4. The Alliance supported them with multiple exhibits, three declarations, and a verified complaint (which counts as a declaration, *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021)). *See* App.23-45, 57-73; D.Ct.Doc.44-4 at 1-38. And they were uncontested. Because Illinois submitted zero evidence of its own, the Alliance's evidence should have been accepted as true for purposes of

the preliminary injunction. *See Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976); *McComb v. Weinman*, 2025 WL 1153803, at *2 (7th Cir. Apr. 21). And the Alliance's factual allegations had to be accepted as true for purposes of the motion to dismiss, with all reasonable inferences made in its favor. *Meland*, 2 F.4th at 846 & n.2; *Remijas v. Neiman Marcus Grp.*, 794 F.3d 688, 691 (7th Cir. 2015). *See generally Food & Water Watch v. Vilsack*, 808 F.3d 905, 912-13 (D.C. Cir. 2015) (noting that, even if a plaintiff fails to prove likely standing for a preliminary injunction, courts cannot dismiss the complaint unless the plaintiff also fails to allege standing under the pleading standard).

Especially on a motion to dismiss, the Alliance has standing because "it is plausible to infer … a substantial risk of harm," regardless whether the Alliance "may eventually not be able to provide an adequate factual basis for the inference." *Remijas*, 794 F.3d at 693-94; *accord id.* at 696 ("'Should discovery fail to bear out Plaintiffs' allegations, [Defendant] may move for summary judgment on [standing].'"). Questions about how officers and directors "actually behave" are "matters of fact" that "cannot be resolved on the pleadings," "even if as judges we might be tempted to debate and speculate further about them." *Bell v. Publix Super Markets*, 982 F.3d 468, 481-83 (7th Cir. 2020). Indeed, the district court's assumption that no officer or director would report even one category was far more speculative. The Alliance had

no duty to dispel such remote possibilities. *See Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 78 (1978).

Even if the Alliance's predictions were generalizations, plaintiffs can ground their standing in general observations about human behavior and organizational incentives. *See, e.g.*, *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 500 (5th Cir. 2024) (crediting predictions based on "self-interest"). Courts have credited more speculative predictions about how government action might influence third parties:

- Adding a citizenship question could cause noncitizens to not answer the census, even though not answering is a federal crime and even though federal law bars the government from using people's answers against them. *Dep't of Com.*, 588 U.S. at 766-68.

- Expanding the definition of "public charge" could cause immigrants to disenroll from public health insurance for fear of being deported, which will cause them not to get checkups or vaccines, which will cause them to develop emergency medical issues and not repay the hospital or diseases that spread throughout the county. *Cook Cnty. v. McAleenan*, 417 F. Supp. 3d 1008, 1017 (N.D. Ill. 2019), *aff'd on standing*, 962 F.3d 208, 218-19 (7th Cir. 2020).

- Removing civil immunity for nuclear power plants would make two specific plants no longer economically viable, which would halt their construction, which would benefit residents in "potentially dangerous proximity" to the future plants. *Duke Power*, 438 U.S. at 67, 72-78; *see Wabash Valley Power Ass'n v. Rural Electrification Admin.*, 903 F.2d 445, 451 (7th Cir. 1990) (crediting a theory of standing as "no thinner" than the one in *Duke Power*).

The Alliance's predictions could not be dismissed as speculative, since they are *the same predictions* that Illinois makes. When SB2930 passed, its

supporters repeatedly predicted that the law would "nudge" nonprofits "to diversify their boards," "encourage nonprofits to reflect the diversity of the[ir] communities," and let the public "assess the diversity of foundation boards." D.Ct.Doc.44-4 at 5, 12, 24; *accord* App.28-30 ¶¶19-22 (collecting examples). And in this litigation, Illinois repeatedly stated that SB2930 will "hel[p] donors see" whether a charity's leaders are sufficiently diverse. App.29 ¶20; *e.g.*, D.Ct.Doc.73 at 19 n.5 (SB2930 "puts consumers on notice about the diversity or lack thereof of the organizations they are considering making donations to."); D.Ct.Doc.73 at 22 ("[E]njoining SB2930 would decrease the amount of information the public has regarding the charities it supports."). Courts usually give "'substantial deference" to such "'predictive judgments" by legislatures. *TikTok v. Garland*, 604 U.S. 56, 75 (2025). And for purposes of "standing," Illinois cannot dismiss "the very idea that it advances to justify adopting the [law] in the first place." *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 656 F.3d 580, 586 (7th Cir. 2011); *accord Nat'l Infusion*, 116 F.4th at 500 n.9 (relying on government's own "estimate" as "strong evidence" of plaintiff's standing); *Diamond*, 145 S.Ct. at 2137-38 (similar).

The Alliance's predictions also turned out to be true, further confirming they were never speculative to begin with:

- In late July, Illinois published the "standardized list of demographic classifications" that nonprofits must use under SB2930. 805 ILCS §105/114.15(b); *see* D.Ct.Doc.108 ¶2. Those categories require

nonprofits to use controversial labels like "Asian," "Hispanic," "Nonbinary," and "Cisgender." *Posting Standards*. And though the State's website reiterates that leaders "may decline to disclose" their demographic information, its template does not list "prefer not to say" as an option for leaders to select. *See id*.

- After these categories were published, sophisticated nonprofits *did* post their aggregate demographic information—including for categories where 100% of their leaders declined to disclose. *E.g.*, *Caterpillar Disclosures*.

- The publication of the categories in July 2025 confirmed that A and B would need to ask their leaders these questions in November 2025 and post any responses by December 2025. D.Ct.Doc.108 ¶2; D.Ct.Doc.109 ¶8. Illinois apparently agrees, which is why in August 2025 it gave A and B the equivalent of an injunction pending appeal. D.Ct.Doc.108 at 1; D.Ct.Doc.109 ¶8; *see Remijas*, 794 F.3d at 694 (that defendant offered plaintiff protection against a harm helped prove that the risk of that harm was not speculative).

Though these events occurred after the Alliance amended its complaint in April 2025, this Court can consider them because they confirm that the predictions in the Alliance's complaint were plausible. *See Geinosky v. Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Bell*, 982 F.3d at 480 n.2; *Watkins v. Mohan*, 144 F.4th 926, 939 n.7 (7th Cir. 2025).

**2.** Separately, the district court erred because its analysis of standing rests on an impermissible reading of SB2930. Contra the district court, a nonprofit whose leaders all refuse to disclose any demographic still has a duty to post information on its website.

Under section (a) of the statute, covered nonprofits "shall post" on their websites "the aggregated demographic information" of their leaders,

"including race, ethnicity, gender, disability status, veteran status, sexual orientation, and gender identity." 805 ILCS §105/114.15(a). The word "shall" is mandatory, and the word "including" is restrictive. *Bufkin v. Collins*, 604 U.S. 369, 379 (2025); *Project Vote/Voting for Am. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012). So for each of the seven listed categories, nonprofits *must* post "the aggregated demographic information" of their officers and directors.

This duty to post in section (a) has no exceptions. The words "except," "unless," "notwithstanding," and the like appear nowhere in SB2930. Section (c) states that, "[i]n collecting" its leaders' demographic information, a nonprofit "shall" let individuals "decline to disclose" their information "to the corporation." 805 ILCS §105/114.15(c). But section (c) is an *additional* obligation on nonprofits. It does not reference section (a), create any exception to (a)'s duty to post, or narrow what the *nonprofit* must disclose to the *public*. So as a state senator stressed, nonprofits in this situation "would still be required on the website to disclose that the[ir] [leaders] declined" to answer. Ill. Sen. Trans. 2024 Reg. Sess. No. 96 (Apr. 10, 2024) (remarks of Sen. Tracy); *accord, e.g.*, *id.* ("[Y]ou have to post that you didn't disclose."); *id.* ("[Y]ou have an obligation to" report the non-disclosures "on your website.").

The district court reasoned that, if the nonprofit does not "actually collec[t]" any information under (c) because all its leaders decline to disclose anything, then the nonprofit cannot have a duty to "post" under (a), App.12;

but that logic doesn't hold up. A nonprofit whose leaders decline to disclose has "actually collec[ted]" information—namely, its leaders' "decline to disclose" responses to every question. *Cf.* App.12. So it has "aggregated demographic information" to "post": It must post that, for each of the seven listed demographic categories, 100% of officers and directors declined to disclose. 805 ILCS §105/114.15(a). If the district court were right that collecting specific answers is a prerequisite to posting, then a nonprofit shouldn't have to post information about *any* category for which 100% of its leaders decline to respond. But neither the district court, nor Illinois, nor sophisticated nonprofits think *that* reading of SB2930 is right. *See* App.12; D.Ct.Doc.69 at 11; D.Ct.Doc.73 at 8; *e.g.*, *Caterpillar Disclosures* (reporting that "all directors and officers declined to disclose" their "sexual orientation").

Because A and B must post even in the highly unlikely scenario that 100% of their leaders disclose 0% of their demographics, the district court's standing analysis fails on its own terms. Under the First Amendment, speech is still compelled if A and B must alter their websites to post that, for each of Illinois' demographic categories, their leaders all declined to disclose. App.65 ¶9, 71 ¶9. And under the Fourteenth Amendment, A and B are still pressured to discriminate if they must post that 100% of their leaders declined to disclose their race and ethnicity. Declining to disclose creates the impression that a nonprofit's leaders are *not* diverse. App.35 ¶35, 66-67 ¶11,

71-72 ¶11. So even in that scenario, nonprofits would be pressured by donors, watchdogs, and others to consider race when selecting their leaders or punished for their refusal. App.66-67 ¶11, 71-72 ¶11.

**3.** The district court also erred by "conflat[ing] the standing inquiry with … the merits." *Pit Row v. Costco Wholesale Corp.*, 101 F.4th 493, 503 (7th Cir. 2024). "Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing." *Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008). The district court impermissibly blurred them in at least two ways.

Its first error was not heeding this Court's instruction that, "[w]hen deciding questions of standing, courts must look at the case as a whole, rather than picking apart its various components to separate the claims for which the plaintiff will be entitled to relief from those for which he will not." *Id.* The district court agreed that the Alliance had standing to bring "the case as a whole," *id.*, since SB2930 injures A and B by requiring them to collect demographic information under Illinois' categories, App.15. A declaration that SB2930 is facially unconstitutional and an injunction prohibiting its enforcement would redress those injuries. *Brown v. Kemp,* 86 F.4th 745, 770 (7th Cir. 2023).

Illinois might argue that the Alliance's facial challenge fails because SB2930 does not compel the speech of A and B or pressure them to

discriminate; but those arguments would go to the merits, not standing, and they would be wrong. Under First Amendment overbreadth, a statute can be facially unconstitutional even if does not violate the plaintiff's rights. *Virginia v. Am. Booksellers Ass'n.*, 484 U.S. 383, 392-93 (1988). And under the Fourteenth Amendment, A and B have a right not to be injured by a statute that is facially unconstitutional because its purpose is racial or because it encourages discrimination by the nonprofits that must post. *New York v. Ferber*, 458 U.S. 747, 768 n.21 (1982); *Duke Power*, 438 U.S. at 79. Any suggestion that A or B must have "First or Fourteenth Amendment injuries" to bring First or Fourteenth Amendment claims is not the law. *See Gillespie v. Indianapolis*, 185 F.3d 693, 701-03 (7th Cir. 1999).

The district court's second error was not crediting the Alliance's reading of SB2930. The Alliance contends that SB2930 requires nonprofits to post even if 100% of their leaders disclose nothing. D.Ct.Doc.80 at 6; App.35-36 ¶35. As explained, that reading is the better one. But even if it weren't, the Alliance's reading is arguable, so the district court had to credit it for purposes of standing. *Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). What the statute *actually* covers goes to the merits under Rule 12(b)(6), not to jurisdiction under Rule 12(b)(1). *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 852-53 (7th Cir. 2012) (en banc). Yet Illinois did not move to dismiss for failure to state a claim based on the proper reading of SB2930—an argument

that would have made Illinois publicly commit to a narrower reading of SB2930, and a judgment on the merits that nonprofits could then rely on as a matter of preclusion. *See Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) (refusing to resolve the correct interpretation of the statute when the state argued it only as a matter of standing). So rejecting the Alliance's reading of SB2930 would have been improper on the merits, and it was certainly improper when deciding standing. *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) (unlike jurisdiction, unraised jurisdictional arguments can be forfeited).

\*　　\*　　\*

Because the district court erred on standing, its partial dismissal of the Alliance's complaint should be reversed. *E.g.*, *Arc of Calif.*, 757 F.3d at 994. The district court gave no other reason for denying the Alliance's motion for a preliminary injunction: Its analysis of the likely "merits" and "irreparable harm" just repeat its conclusion that the Alliance lacks standing. App.20. Because that conclusion was wrong as a matter of law, the district court necessarily abused its discretion. *Alvarez*, 679 F.3d at 589-90; *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 149-50 (7th Cir. 2011). So this Court should at least vacate the denial of the Alliance's preliminary-injunction motion and remand for the district court to reconsider that motion, free from its

erroneous rulings on standing. *E.g.*, *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 706-15 (9th Cir. 1997).[2]

## II.   The district court should have granted a preliminary injunction.

This Court should not stop with standing. On appeal from the denial of a preliminary injunction, this Court can consider the Alliance's whole motion, including some or all of the preliminary-injunction factors. *Alvarez*, 679 F.3d at 589-90; *accord Hobby Lobby*, 723 F.3d at 1145 & n.21 (collecting cases). Exercising that discretion is appropriate when it would conserve resources, provide useful guidance on remand, or resolve key questions that are purely legal. *E.g.*, *Alvarez*, 679 F.3d at 589-90; *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020); *Mangual v. Rotger-Sabat*, 317 F.3d 45, 64 (1st Cir. 2003); *Hobby Lobby*, 723 F.3d at 1145.

All those factors are present here. In constitutional cases, the other preliminary-injunction factors are met if a claim has likely merit, and this Court reviews those likely merits de novo anyway. *Alvarez*, 679 F.3d at 589-90; *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). A decision from this Court on the Alliance's motion could also save resources by avoiding further litigation in the district court and preventing a second interlocutory appeal. *Mangual*, 317 F.3d at 64. At a minimum, this Court should address the likely merits of the

---

[2] On remand (and through any second interlocutory appeal), A and B will not have to comply with SB2930. *See* App.75-76 ¶4, ¶6.

Alliance's First and Fourteenth Amendment claims—purely legal questions on which the district court receives no deference—and remand the other factors. *E.g.*, *Wilson*, 125 F.3d at 715; *Moody v. NetChoice*, 603 U.S. 707, 726 (2024).

### A.    The Alliance is likely to succeed on the merits.

SB2930 likely compels speech and encourages discrimination. It likely violates the First Amendment, *see NIFLA v. Becerra*, 585 U.S. 755 (2018), and the Fourteenth Amendment, *see Anderson v. Martin*, 375 U.S. 399 (1964).

### 1.    SB2930 likely violates the First Amendment by compelling speech.

Because the freedom of speech "'includes … the right to refrain from speaking,'" *Janus v. AFSCME*, 585 U.S. 878, 892 (2018), it "'prohibits the government from telling people what they must say,'" *USAID v. All. for Open Soc'y Int'l*, 570 U.S. 205, 213 (2013). This ban on compelled speech applies to both "statements of fact" and "expressions of value, opinion, or endorsement." *Hurley v. Irish-Am. GLB Grp. of Bos.*, 515 U.S. 557, 573 (1995); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 797-98 (1988).

SB2930 compels speech. It forces nonprofits to "post" words on their "website[s]" and maintain them there for years. 805 ILCS §105/114.15(a). Nonprofits must use the State's "standardized list of demographic classifications." §105/114.15(b). And they must ask their leaders how they fit into these categories (and ask again each time they bring in someone new), §105/114.15(c)—still more compelled speech. The district court did not

disagree that, at least for nonprofits with one leader who answers one question, SB2930 compels speech. *See NIFLA*, 585 U.S. at 766-69 (requiring posts on plaintiff's premises compels speech); *303 Creative LLC v. Elenis*, 600 U.S. 570, 587-89 (2023) (requiring creation of websites compels speech). Neither did Illinois. In fact, its legislature rejected an earlier version of SB2930 that would have let nonprofits *choose* whether to report their leaders' demographics. *See* 2023 Ill. S.B. 2930 (103d Gen. Assem., 2d Reg. Sess.) ("allow[ing] a corporation to report, at its discretion, the aggregated demographic information of its directors and officers").

Because SB2930 compels speech, it must satisfy at least "strict scrutiny," *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 754 (8th Cir. 2019) (collecting cases)—a test that Illinois concededly fails. Below, Illinois waived any defense under strict scrutiny by deliberately refusing to argue that SB2930 could satisfy it. *See* D.Ct.Doc.73 at 16 n.2; D.Ct.Doc.69 at 15 n.5. Because Illinois "bears the burden" to prove SB2930's constitutionality under strict scrutiny, its waiver means the Alliance "must be deemed likely to prevail" for purposes of a "preliminary injunction." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Illinois had no good argument anyway. Neither an interest in "diversity" nor "transparency" is compelling enough to justify compelling the speech of private parties. *Lutheran Church-Missouri Synod*, 141 F.3d 344, 354 (D.C. Cir. 1998); *Riley*, 487 U.S. at 798; *Int'l Dairy Foods Ass'n v. Amestoy*, 92

F.3d 67, 73 (2d Cir. 1996). And SB2930 is not narrowly tailored because Illinois can promote its interests without compelling nonprofits' speech—by, for example, better enforcing its antidiscrimination laws, *Riley*, 487 U.S. at 800, or collecting the information from the leaders confidentially, *Ent. Software Ass'n*, 469 F.3d at 652.

Strict scrutiny is the standard here, not *Zauderer*'s test for compelled disclosures of "purely factual and uncontroversial information." *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985). That test applies only to "commercial" speech—specifically, commercial "advertising" about "the terms under which services will be available." *NIFLA*, 585 U.S. at 768-69; *Hurley*, 515 U.S. at 573; *accord NAM v. SEC*, 800 F.3d 518, 523-24 & n.14 (D.C. Cir. 2015) ("[T]he Supreme Court has refused to apply *Zauderer* when the case before it did not involve voluntary commercial advertising."). Even for commercial speech, *Zauderer* applies only when the compelled disclosures concern "purely factual and uncontroversial information." *NIFLA*, 585 U.S. at 768-69 (quoting *Hurley*, 515 U.S. at 573). Neither condition holds here.

SB2930 regulates charitable speech, not commercial advertising. By its terms, the law regulates entities that file "Charitable Organization" reports and give "grants" to "other charitable organizations." 805 ILCS §105/114.15(a). Charities, including when they solicit donations, engage in

speech that "the Supreme Court [has] unambiguously held … is not commercial," *Nat'l Coal. of Prayer v. Carter*, 455 F.3d 783, 792 (7th Cir. 2006) (Williams, J., concurring) (collecting cases); *accord Gresham v. Peterson*, 225 F.3d 899, 904 (7th Cir. 2000); *Riley*, 487 U.S. at 787-88. And the aggregate demographics of these entities' leaders have nothing to do with "the terms under which services will be available." *NIFLA*, 585 U.S. at 768-69. Even if charities engaged in commercial speech, SB2930 compels them to post this demographic information "on [their] publicly available website for at least 3 years"—constantly and for all purposes, not just in their commercial speech. 805 ILCS §105/114.15(a); *see NIFLA*, 585 U.S. at 768-69; *Recht v. Morrisey*, 32 F.4th 398, 416-17 (4th Cir. 2022).

Independently, SB2930's disclosures are not "purely factual and uncontroversial." *NIFLA*, 585 U.S. at 768. By making nonprofits post any "aggregated demographic information" on their own websites, SB2930 makes them either promote the controversial worldview that the demographic balance of a nonprofit's leadership is somehow relevant, *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 653 (7th Cir. 2006); *303 Creative*, 600 U.S. at 589, or alter their speech by adding disclaimers denying that message, *NIFLA*, 585 U.S. at 766; *Riley*, 487 U.S. at 795. The questions that SB2930 makes nonprofits ask their leaders are also sensitive and intrusive, like who they have sex with and whether they have disabilities. Like a law requiring businesses "to

disclose … the political ideologies of their board members," SB2930 is "obviously repugnant to the First Amendment." *NAM*, 800 F.3d at 555.

Consider also the State's categories. SB2930 makes nonprofits ask their leaders to use, and then post on their own websites, racial categories like "Asian" and "Latino." *Posting Standards*. These categories are the same ones that the Supreme Court has called "'incoherent,'" "'irrational,'" "arbitrary," and "imprecise." *Harvard,* 600 U.S. at 216 (citing *id.* at 291-93 (Gorsuch, J., concurring)). SB2930 also requires nonprofits to ask and post about "gender identity" and "sexual orientation," the very existence of which is controversial. *Janus*, 585 U.S. at 913-14; *AFBR v. SEC*, 125 F.4th 159, 165, 181 (5th Cir. 2024) (en banc). Illinois' standardized list makes things worse by requiring nonprofits to use categories like "cisgender," "transgender," "bisexual," and "nonbinary," *Posting Standards*—terms that, for many, are ideologically loaded and contradict their "core religious and philosophical beliefs." *Meriwether v. Hartop*, 992 F.3d 492, 509, 510-12 (6th Cir. 2021); *accord Obergefell v. Hodges*, 576 U.S. 644, 657 (2015). The list even makes nonprofits let leaders "write in" their own demographic categories, presumably forcing the nonprofit to post that information on its website too. *Posting Standards*. No case applies *Zauderer* to anything like these sensitive, subjective, and open-ended disclosures.

Even assuming *Zauderer* applied, SB2930 would still likely be unconstitutional. Under *Zauderer*, Illinois "has the burden to prove that the [SB2930] is neither unjustified nor unduly burdensome." *NIFLA*, 585 U.S. at 776. To make that showing, the State must prove that SB2930 is "no broader than necessary to prevent … deceptive or misleading advertising." *Commodity Trend Serv. v. CFTC*, 233 F.3d 981, 994 (7th Cir. 2000). Illinois never tried below, forfeiting the point by defending SB2930 "only" under "rational basis scrutiny." D.Ct.Doc.73 at 18-19. Its only asserted interest in giving the public "informatio[n]" is not "strong enough" under *Zauderer*. *Int'l Dairy*, 92 F.3d at 74. And SB2930's sweeping requirement that nonprofits "post [Illinois'] precise notice, no matter what," is "unduly" burdensome. *NIFLA*, 585 U.S. at 777. SB2930 thus likely violates the First Amendment, even under Illinois' preferred standard.

### 2. SB2930 likely violates the Fourteenth Amendment by encouraging racial discrimination.

If Illinois passed a law fining nonprofits whose leaders did not reflect the racial demographics of the State, that law would easily violate the Fourteenth Amendment. *See, e.g.*, *AFBR v. Weber*, 2023 WL 3481146, at *2 (E.D. Cal. May 15). That law would get strict scrutiny because it punishes corporations based on the race of their leaders. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995); *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017). And it would fail because "diversity" in corporate

leadership is not a compelling interest, *Lutheran Church*, 141 F.3d at 354; *Taxman v. Bd. of Educ. of Piscataway*, 91 F.3d 1547, 1560-61 (3d Cir. 1996) (en banc), and seeking proportional representation is "'patently unconstitutional,'" *Harvard*, 600 U.S. at 223.

Yet under the Fourteenth Amendment, "'what cannot be done directly cannot be done indirectly.'" *Id.* at 230; *accord Anderson v. Martin*, 375 U.S. 399, 404 (1964). If States cannot engage in discrimination directly, then they cannot "induce, encourage or promote private persons" to engage in that same discrimination. *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). So a state law cannot "encourag[e]" or "induc[e]" a private employer to "hire with an eye toward … race." *W.H. Scott Const. Co., Inc. v. Jackson*, 199 F.3d 206, 215 (5th Cir. 1999). And a law cannot "create pressure to focus" private "recruiting efforts" on hiring racial "minorities." *MD/DC/DE Broad. Ass'n v. FCC*, 236 F.3d 13, 17-19 (D.C. Cir. 2001). Again, the "relevant question" is "not whether a statute requires the use of [race-based] measures, but whether it authorizes or encourages them." *Jackson*, 199 F.3d at 215; *accord, e.g.*, *Anderson*, 375 U.S. at 402-04 (cannot "encourage"); *Reitman v. Mulkey*, 387 U.S. 369, 375-79 (1967) (same); *Wilson*, 125 F.3d at 711 (same); *Goss v. Bd. of Educ.*, 373 U.S. 683, 688 (1963) (cannot "promote").

Public disclosure requirements can violate this rule. In *Anderson v. Martin*, for example, two Louisianans challenged a state law requiring

primary candidates to disclose their race. 375 U.S. at 400 & 401 n.1. The State made candidates disclose, and the parties certify, whether "each candidate" was "of the Caucasian race, Negro race or other specified race." *Id.* at 401 n.1. The State would then put that information on the ballot, in "parentheses () beside the [candidate's] name." *Id.* Though this scheme did not violate the right to "vote," it did violate "the Fourteenth Amendment's Equal Protection Clause." *Id.* at 402. The law "encourag[ed]" voters to discriminate based on race by "directing [their] attention to" race, "furnish[ing] a vehicle" for them to consider race, and "influenc[ing]" their decision by "indicat[ing]" through "the power of the State" that a candidate's race is "important." *Id.* The law's "purpose" was also racial, since "the race of the candidate" has no "bearing upon his qualifications for office." *Id.* at 403. In short, "[r]ace is the factor upon which the statute operates and its involvement promotes the ultimate discrimination which is sufficient to make it invalid." *Id.* at 404.

Though Illinois is not Jim Crow Louisiana, its disclosure requirement violates the same constitutional principle. *Cf. id.* at 402 (stressing that Louisiana's law was illegal not just because it let whites vote for whites, but also because it let blacks vote for blacks "in a State or voting district where [blacks] predominate"). SB2930 requires nonprofits to post their leaders' "race" and "ethnicity" for the "publi[c]" to see. 805 ILCS §105/114.15(a). It thus "direct[s] the attention" of officials, donors, watchdogs, the press, and

everyone else to race. *Anderson*, 375 U.S. at 402. And it "furnishes a vehicle" for them to pressure nonprofits who aren't sufficiently diverse—through investigations, public shaming, withholding donations, and the like. *Id.*; *see* App.59-60 ¶¶8-10, 66-67 ¶11, 71-72 ¶11, 28-30 ¶¶19-22. SB2930 thus encourages private parties to discriminate against nonprofits based on their leaders' race and encourages nonprofits to change how they select leaders based on race—doing "by indirection" what it could not do by "express statutory prohibition." *Anderson*, 375 U.S. at 404.

The statute's "'racial character and purpose'" is evident, since a person's "race" has no "bearing upon his qualifications" to help lead a nonprofit. *Id.* But if doubts remained, the law's sponsors, supporters, and signatory all admitted this unlawful purpose. SB2930 would "nudge foundations … to diversify their boards" along the statute's identified demographics—with "race" and "ethnicity" topping the list. 805 ILCS §105/114.15(a); *see, e.g.*, D.Ct.Doc.44-4 at 5, 14, 12-13; D.Ct.Doc.59 ¶21. That effect would come from the public being able to "assess" a nonprofit's racial breakdown and pressure it to become more racially "diverse." *E.g.*, D.Ct.Doc.44-4 at 13, 24; D.Ct.Doc.74 at 1-2; Ill. Sen. Trans., 2024 Reg. Sess. No. 96 (Apr. 10, 2024) (Sen. Johnson) (explaining that SB2930 "support[s] diversity" by "requiring nonprofit organizations … to report the aggregate demographic data of their board," which will "give organizations … an

opportunity to consider others for leadership"). Below, Illinois offered no contrary evidence and suggested no alternative purpose for SB2930. *See, e.g.*, D.Ct.Doc.86 at 9-10 (conceding that SB2930 lets "potential donors … exercise their consumer choice in a way that benefits" corporations based on the "divers[ity]" of their "board[s]").

For these reasons, SB2930 must at least satisfy strict scrutiny, *MD/DC/DE*, 236 F.3d at 20-21, but it cannot. As explained, Illinois waived that argument below. D.Ct.Doc.73 at 16 n.2; D.Ct.Doc.69 at 15 n.5; *see Ashcroft*, 542 U.S. at 666. And the argument would have failed. Any interest in "informing" the public about nonprofits' racial breakdown is not "legitimate," since race has no "bearing" on a leader's "qualifications." *Anderson*, 375 U.S. at 403. Illinois has never suggested that nonprofits are illegally discriminating when selecting their leaders. *Cf. Harvard*, 600 U.S. at 207; *Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989). Even if some were, Illinois' sweeping requirement for all nonprofits, as well as the "arbitrary" categories it makes them employ, are not narrowly tailored. *Harvard*, 600 U.S. at 215-19; *MD/DC/DE*, 236 F.3d at 21. And given the statutory structure and prominence of race, this defect likely dooms all of SB2930. *E.g.*, *Weber*, 2023 WL 3481146, at *3; *accord People v. Warren*, 173 Ill. 2d 348, 372 (1996) ("[T]he entire statute" must fall "[i]f the legislature would not have passed [it] with the invalid portion eliminated.").

**B.** **Without a preliminary injunction, the Alliance will suffer irreparable harm.**

Without a preliminary injunction, the Alliance will suffer at least three irreparable harms. Its members' constitutional rights will likely be violated. Their confidential information will be publicly disclosed. And their time and money spent on compliance will be forever lost.

**1.** The "'deprivation of a constitutional right'" is itself "irreparable." *Ezell v. Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *accord Baird*, 81 F.4th at 1042. Likely violations of the First Amendment are "'unquestionably'" irreparable. *Mahmoud v. Taylor*, 145 S.Ct. 2332, 2364 (2025); *accord Backpage.com v. Dart*, 807 F.3d 229, 238-39 (7th Cir. 2015). As are likely violations of equal protection. *E.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 365 (6th Cir. 2021); *Free the Nipple v. Ft. Collins*, 916 F.3d 792, 806 (10th Cir. 2019). Because constitutional rights are intangible, "money damages" can't adequately "remedy" deprivations. *Monterey Mech.*, 125 F.3d at 715; *accord Free the Nipple*, 916 F.3d at 806; *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744-45 (2d Cir. 2000).

**2.** The "disclosure of private, confidential information" is also "'the quintessential type of irreparable harm.'" *Airbnb v. N.Y.C.*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019); *accord* Wright & Miller, 11A Fed. Prac. & Proc. Civ. §2951 & n.18 (3d ed.) (explaining that "the disclosure of confidential information" is an "illustrative" example of an "irreparable injury"). Once

confidential information "is published, it cannot be made secret again." *In re Copley Press*, 518 F.3d 1022, 1025 (9th Cir. 2008). And there's "no way to recapture and remove" it "from the knowledge of others." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 72 (D. Me. 1993); *accord Maness v. Meyers*, 419 U.S. 449, 460 (1975). Especially when the information is posted online. App.67 ¶12, 72 ¶12, 60 ¶11. Disclosure is not only itself irreparable, but also will cause reputational harms to A and B that are irreparable. App.66-67 ¶¶11-12, 71-72 ¶¶11-12, 59-60 ¶¶9-11; *see Life Spine v. Aegis Spine*, 8 F.4th 531, 546 (7th Cir. 2021).

**3.** Forced compliance with a likely unconstitutional law "almost *always* produces the irreparable harm of nonrecoverable compliance costs," *Clarke v. CFTC*, 74 F.4th 627, 643 (5th Cir. 2023) (cleaned up), and this case is no exception, *see* App.67 ¶13, 72 ¶13; Ill. Sen. Trans., 2024 Reg. Sess. No. 96 (Apr. 10, 2024) (Sen. Tracy) ("[T]hey're going to have to hire staff to put this all together, to get the disclosures, and the like."); D.Ct.Doc.69 at 5 (Illinois conceding the point); D.Ct.Doc.86 at 3 (same). What matters is not the size of the costs, but their irreparability. *See Georgia v. President*, 46 F.4th 1283, 1302 (11th Cir. 2022); *Staffing Servs. Ass'n of Ill. v. Flanagan*, 720 F. Supp. 3d 627, 641 (N.D. Ill. 2024) (collecting in-circuit cases).

The compliance costs here are irreparable because they cannot be reliably recovered at the end of the case via damages. Associations usually lack

prudential standing to seek compensatory damages for their members. *Conn. Dental Ass'n v. Anthem Health Plans*, 591 F.3d 1337, 1354 (11th Cir. 2009). And forcing the members to seek damages in their own individual suits would make them disclose their confidential identities to the public and sacrifice their First Amendment associational rights—recreating the irreparable harms identified above. No monetary relief would be reliably available to them anyway, given the state defendants' immunities from damages. *See Odebrecht Const. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (sovereign immunity renders compliance costs irreparable); *California v. Kennedy*, 2025 WL 2807729, at *6 (D. Mass. Oct. 1) (same for qualified immunity).

### C. The balance of harms and public interest overwhelmingly favor the Alliance.

The equities—which "merge" because state officials are "the opposing party"—also cut in the Alliance's favor. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Enjoining likely unconstitutional conduct serves "the highest public interest." *United States v. Raines*, 362 U.S. 17, 27 (1960); *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004). That principle applies to injunctions that "'protec[t] First Amendment freedoms,'" *Alvarez*, 679 F.3d at 590 & n.1, and that alleviate "race discrimination," *Fearless Fund*, 103 F.4th at 780.

Pausing enforcement of SB2930 will not meaningfully harm anyone. No State is harmed "when it is prevented from enforcing an unconstitutional

statute." *Joelner*, 378 F.3d at 620. And Illinois' primary interest—letting the public view A's and B's aggregate demographic information—is not "irreparable." *John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1309 (1989) (Marshall, J., in chambers); *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1305 (2010) (Scalia, J., in chambers). That information will be disclosed at the end of this case if Illinois wins, so "the injury to the Government will likely be no more than the inconvenience of delay." *Araneta v. United States*, 478 U.S. 1301, 1305 (1986) (Burger, C.J., in chambers). Any harm from that "brief delay" is nonexistent. *Cavel Int'l v. Madigan*, 500 F.3d 544, 546-47 (7th Cir. 2007). The public has gone without this information for more than 200 years. Illinois declined to argue below that its interest in this information is compelling (or anything more than minimally rational). D.Ct.Doc.73 at 16-19 & n.2; D.Ct.Doc.56 at 13 & n.5. And Illinois has already stipulated to not receiving A's and B's information during this and any second interlocutory appeal, no matter how long that takes. D.Ct.Doc.108 at 1-3. A preliminary injunction for the Alliance would simply maintain the status quo.

One final, but related, point. This Court treats the preliminary-injunction factors as a "'sliding scale,'" where a stronger showing on the equities can offset a weaker showing on the merits. *Joelner*, 378 F.3d at 619. The "more the balance of harms tips in favor of an injunction, the lighter the burden on the party seeking the injunction to demonstrate that it will ultimately

prevail." *Grote v. Sebelius*, 708 F.3d 850, 853 n.2 (7th Cir. 2013); *accord Korte v. Sebelius*, 528 F. App'x 583, 586 (7th Cir. 2012). So if the plaintiff faces irreparable harm, but "the defendant would not suffer substantial harm," *Cavel*, 500 F.3d at 547, then the plaintiff can get a preliminary injunction with only "a plausible claim on the merits." *Hoosier Energy Rural Elec. Co-op. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009); *accord Cavel*, 500 F.3d at 547 ("some though not necessarily great merit").

The equities are so lopsided here that the Alliance is at least entitled to a preliminary injunction under the sliding-scale approach. As explained, the Alliance's members face at least the irreparable harms of compelled disclosure and unrecoverable compliance costs. And Illinois faces only the temporary loss of information about A and B that the public has never had, that Illinois does not defend as important, and that Illinois has already stipulated can remain undisclosed while the parties litigate. The Alliance's claims have at least "some" or "plausible" merit. *Cavel*, 500 F.3d at 547; *Hoosier Energy*, 582 F.3d at 725. So even if this Court had doubts, or simply preferred to avoid deciding the merits now, the Alliance would still be entitled to a preliminary injunction.

## CONCLUSION

This Court should reverse the district court and remand with instructions to preliminarily enjoin enforcement of SB2930 against the Alliance's members.

Dated: October 21, 2025

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy
Cameron T. Norris
R. Gabriel Anderson
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 11,836 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Palatino font.

Dated: October 21, 2025                                     */s/ Cameron T. Norris*


## CERTIFICATE OF SERVICE

I filed this brief on the Court's e-filing system, which will email everyone requiring notice.

Dated: October 21, 2025                                     */s/ Cameron T. Norris*

# SHORT APPENDIX

## SHORT APPENDIX TABLE OF CONTENTS

Seventh Circuit Rule 30(d) Statement........................................................ SA1

Memorandum Opinion and Order (Aug. 20, 2025), D.Ct.Doc.100 .......... SA2

**SEVENTH CIRCUIT RULE 30(d) STATEMENT**

This Short Appendix contains all the materials required by Seventh Circuit Rule 30(a).  The Joint Appellants' Appendix, filed by the American Alliance for Equal Rights on October 20, 2025, contains all the materials required by Seventh Circuit Rule 30(a) and (b).

Dated: October 21, 2025                    /s/ Cameron T. Norris

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AMERICAN ALLIANCE FOR,<br>EQUAL RIGHTS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 25 CV 00669 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| KWAME RAOUL, JAMES BENNETT,<br>and ALEXI GIANNOULIAS, in their official<br>capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF ILLINOIS, JB PRITZKER,<br>JAMES BENNETT, KWAME RAOUL,<br>and ALEXI GIANNOULIAS, in their official<br>capacities, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

American Alliance for Equal Rights ("American Alliance") brings this action against Illinois

Attorney General Kwame Raoul, Illinois Department of Human Rights Director James Bennett, and

Illinois Secretary of State Alexi Giannoulias (collectively, "Defendants") seeking a declaration from

this Court that Senate Bill 2930, which the Illinois General Assembly passed into law, violates the First

and Fourteenth Amendments of the U.S. Constitution. The United States intervened in this action,

filing its own Complaint in Intervention against the State of Illinois, Governor Pritzker, Attorney



General Raoul, Director Bennett, and Secretary Giannoulias (collectively, "Intervenor-Defendants"), claiming that Senate Bill 2930 violates the Fourteenth Amendment.

Before the Court are Defendants' motion to dismiss American Alliance's Amended Complaint [68]; Intervenor-Defendants' motion to dismiss the United States' Amended Complaint in Intervention [85]; American Alliance and the United States' motions for preliminary injunction [44, 49], which seek to temporarily bar enforcement of Senate Bill 2930; and Defendants' motion to strike unsworn anonymous declarations from American Alliance's motion for preliminary injunction [71].

For the following reasons, the Court (1) grants in part and denies in part Defendants' motion to dismiss American Alliance's Amended Complaint; (2) grants Intervenor-Defendants' motion to dismiss the United States' Amended Complaint in Intervention; (3) denies Defendants' motion to strike; (4) denies American Alliance's motion for preliminary injunction; and (5) denies the United States' motion for preliminary injunction as moot.

## I. Background

On June 30, 2024, Illinois Governor JB Pritzker signed into law Senate Bill ("SB") 2930. *See* 805 Illinois Compiled Statutes ("ILCS") 105/114.15. This first-of-its-kind law requires each domestic not-for-profit corporation registered in Illinois that reports grants of $1,000,000 or more to other charitable organizations[1] to "post on its publicly available website, if one exists, the aggregated demographic information of [its] directors and officers, including race, ethnicity, gender, disability status, veteran status, sexual orientation, and gender identity." 805 ILCS 105/114.15(a). Such public disclosures must be made within 30 days after the not-for-profit organization files its mandatory

---

[1] "'Charitable organization' means any benevolent, philanthropic, patriotic, or eleemosynary person or one purporting to be such which solicits and collects funds for charitable purposes . . ." 225 ILCS 460/1(a). "'Charitable purpose' means any charitable, benevolent, philanthropic, patriotic, or eleemosynary purpose." 225 ILCS 460/1(f).

AG990-IL Charitable Organization Annual Report with the Office of the Illinois Attorney General. *Id.*

SB 2930, which went into effect in January 2025, provides that, "[i]n collecting the aggregated demographic information of its directors and officers, a [not-for-profit organization] shall allow for an individual to decline to disclose any or all personal demographic information to the [not-for-profit organization]." 805 ILCS 105/114.15(c). All information disclosed is required to be accessible on the not-for-profit organization's website for at least three years after it is posted. 805 ILCS 105/114.15(a).

SB 2930 directs the Illinois Department of Human Rights to "work with community partners to prepare and publish a standardized list of demographic classifications to be used by [not-for-profit organizations] for the reporting of the aggregated demographic information of a [not-for-profit organization's] directors and officers, including race, ethnicity, gender, disability status, veteran status, sexual orientation, and gender identity." 805 ILCS 105/114.15(b). SB 2930 specifies that "[t]he Department of Human Rights shall periodically review and update the list." *Id.*

According to Defendants and Intervenor-Defendants, no standardized list of demographic classifications has yet been published. During oral argument on May 23, 2025, Defendants and Intervenor-Defendants were unable to provide the Court with a definitive timetable for their publication despite approaching fiscal period reporting deadlines, but indicated their expectation to publish the categories by the end of June 2025.[2] *See* Dkt. 95, May 23, 2025 Tr. 80:9–10; 54:11–21 ("The State is undergoing processes now to implement the law. . . [The Illinois Department of Human Rights] is in the process of communicating with stakeholders, including an organization that represents

_____

[2] Although the United States asserts that reporting deadlines have already passed for not-for-profits with fiscal year-ends falling in the summer, the Court has been presented with no evidence supporting this claim. (*See* United States' Mem. in Supp. of Mot. for Prelim. Inj., Dkt. 50 at *3 ("Nonprofits whose fiscal years end in the summer or fall would have already been required, or will have soon approaching deadlines, to post the race and other demographic data.").) Indeed, as far as the Court is aware, no categories have been published by the date of this Order.

nonprofits and foundations to understand . . . the appropriate categories that the State should use, and that process is ongoing.").

American Alliance, a nationwide membership organization consisting of more than 280 members, alleges that it is dedicated to ending racial and other unlawful preferences nationwide. (Am. Compl., Dkt. 59 ¶ 6.) American Alliance initiated this action on January 21, 2025 on behalf of Member A and Member B, both of which are not-for-profit organizations registered in Illinois that contribute $1 million annually in grants to other charitable organizations. (*Id.* ¶ 23.) Members A and B will file their AG990-IL Charitable Organization Annual Report in November 2025, making their deadline to publish reported officer and director demographic information on their websites 30 days thereafter. (*Id.* ¶ 24.) American Alliance seeks a declaration that SB 2930 violates the First and Fourteenth Amendments of the U.S. Constitution.

On March 4, 2025, the United States moved to intervene based on the U.S. Attorney General certifying this case as one of "general public importance" in "seeking relief from the alleged denial of equal protection of the laws under the Fourteenth Amendment to the United States Constitution on account of race[.]" (Dkt. 17-1; Dkt. 17 ¶ 5.) *See also* Fed. R. Civ. P. 24(a)(1); 42 U.S.C. § 2000h-2. Neither Defendants nor Intervenor-Defendants opposed the United States' proposed intervention. (Dkt. 22.) The United States thereafter filed its Complaint in Intervention, which it later amended, alleging that SB 2930 violates the Equal Protection Clause of the Fourteenth Amendment. (Dkts. 28, 74.) American Alliance and the United States seek to preliminarily enjoin Defendants and Intervenor-Defendants, respectively, from enforcing SB 2930. (Dkts. 44, 49.)

American Alliance and the United States contend that SB 2930's disclosure requirement violates the Equal Protection Clause of the Fourteenth Amendment because it encourages covered not-for-profit organizations to consider race—rather than merit and other factors relevant to the organizations' goals and purposes—when selecting officers and directors in order to achieve some

"ideal level of proportional representation" in leadership to avoid "public shaming" for what some may see as an inadequate level of diversity. American Alliance and the United States allege that qualified candidates for officer and director positions whose race is not viewed as contributing to the overall racial diversity of a not-for-profit organization's leadership will not be hired in order to avoid "adverse consequences" for failure to have what the public may view as "sufficiently diversified leadership." Such adverse consequences include the risk of loss of partnership opportunities and being subject to criticism or harassment.

In support of its First Amendment violation claim, American Alliance alleges that SB 2930 compels covered not-for-profit organizations, including Members A and B, to confer with their officers and directors and publicly post on their websites about a host of "controversial" demographic issues, including race and gender identity, that those organizations do not wish to discuss, advertise, or endorse.

## II.    Legal Standard

A motion to dismiss for lack of subject matter jurisdiction may be made pursuant to Federal Rule of Civil Procedure 12(b)(1) for failure to establish Article III standing. *See Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017). The plaintiff has the burden of establishing standing. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). In the context of a facial challenge to subject matter jurisdiction, the Court "does not look beyond the allegations in the complaint" to assess whether the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, *id.*, and "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93–94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per

curiam). A complaint must contain factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)). A complaint is facially plausible when the plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

A preliminary injunction is an extraordinary remedy that is never awarded as a matter of right. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). To obtain a preliminary injunction, the moving party has the burden to demonstrate that (1) it has some likelihood of success on the merits, (2) traditional legal remedies would be inadequate, and (3) without such relief, it will suffer irreparable harm. *Valencia v. City of Springfield,* 883 F.3d 959, 965 (7th Cir. 2018). If these elements are met, the court "proceeds to the balancing phase of the analysis," during which it "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* at 966 (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008)). The court should also, where appropriate, consider any effects that granting or denying a preliminary injunction would have on nonparties, or the public interest. *Id.* When ruling on a preliminary injunction, "all of the well-pleaded allegations [in the movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).

SA7

### III.   Discussion

*A.   Defendants' Motion to Dismiss American Alliance's Amended Complaint*

Defendants move to dismiss American Alliance's Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

*1.   Standing*

Defendants challenge American Alliance's standing on two grounds.  First, Defendants argue that American Alliance has not established associational standing because it fails to identify by name any member of its organization that would otherwise have standing to sue in its own right.  Second, Defendants contend that American Alliance has not demonstrated injury-in-fact for either its First Amendment or Fourteenth Amendment claim.

*a.   Associational Standing*

The question of whether a plaintiff has standing within the meaning of Article III of the Constitution is a threshold issue that must be addressed before turning to the merits.  *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016).  To establish standing, a plaintiff must show that it has "(1) suffered an [actual or imminently threatened] injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)).  The alleged injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Spokeo*, 578 U.S. at 339 (quoting *Defenders of Wildlife*, 504 U.S. at 560).  A harm is particularized when it "affect[s] the plaintiff in a personal and individual way."  *Defenders of Wildlife*, 504 U.S. at 559 n.1.  The standing doctrine ensures that a plaintiff has "'alleged



such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Federal Election Comm'n*, 554 U. S. 724, 734, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008) (quoting *Friends of the Earth, Inc.*, at 185) (internal quotation marks omitted).

Associational standing permits an organization to initiate a lawsuit on behalf of its members "even without a showing of injury to the association itself." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552, 116 S. Ct. 1529, 134 L. Ed. 2d 758 (1996)). An organization suing on behalf of its members must show that "(a) at least one of its members would have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members." *Id.* (quoting *Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)) (internal quotations omitted).

Defendants challenge the first factor, asserting that American Alliance fails to name a litigant who would have standing to sue in its own right. Relying almost entirely on *Summers v. Earth Island Institute*, Defendants argue that American Alliance's use of pseudonyms to identify "Member A" and "Member B," on behalf of whom American Alliance brings this action, is insufficient to confer associational standing.

In *Summers*, the Supreme Court reiterated that an organizational plaintiff seeking to invoke associational standing must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." 555 U.S. 488 at 498. The Supreme Court held that the plaintiffs, environmental organizations that sought to preliminarily enjoin enforcement of certain regulations,

lacked standing because they failed to identify any specific member who had suffered the requisite harm. Instead, the plaintiffs relied on purported harm to organizational membership generally, as well as an affidavit from one of their members, Jim Bensman, claiming past injuries unrelated to the challenged regulations and speculative future injury. *Id.* at 495–96.

*Summers* turned on the "absence of any showing of concrete injury," not on the organizational plaintiffs' failure to identify any of their members by name. *Id.* at 497 (quoting *Defenders of Wildlife*, 504 U.S. at 580–81 (Kennedy, J., concurring in part and concurring in judgment)). Indeed, this Court has not found a single case holding that an organization seeking to invoke associational standing must not only identify in its complaint a specific member with standing, but also divulge the member's real name.[3] *See, e.g.*, *Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024); *Students for Fair Admissions v. U.S. Mil. Acad. at W. Point*, 709 F. Supp. 3d 118, 131–32 (S.D.N.Y. 2024); *Students for Fair Admissions v. United States Naval Acad.*, 707 F. Supp. 3d 486, 501 (D. Md. 2023). Rather, the existing body of case law successfully challenging the propriety of proceeding pseudonymously involves instances in which a *party* sought to litigate anonymously. *See, e.g.*, *Doe v. Young*, 2025 WL 927320, at *2–*3 (7th Cir. Mar. 27, 2025).

To be clear, this Court has its doubts about whether an organizational plaintiff *should* be able to mask the true identity of its injured members on whom it alleges Article III standing rests without

---

[3] The majority (if not all) of these types of cases involving challenges to the anonymity of organizational members have been brought by American Alliance and Students for Fair Admissions, both membership organizations with shared leadership purportedly dedicated to ending racial and ethnic classifications and preferences in this country through litigation. *See, e.g.*, *Students for Fair Admissions v. United States Naval Acad.*, 707 F. Supp. 3d 486, 491 (D. Md. 2023) (noting the plaintiff's self-described mission of "support[ing] and participat[ing] in litigation that will restore the original principles of our nation's civil rights movement: *A student's race and ethnicity should not be factors that either harm or help that student to gain admission to a competitive university*") (emphasis in original). The Court notes the apparent general strategy by these organizations to shield the identity of their members on behalf of whom they bring these lawsuits. Indeed, American Alliance's website, which offers a lifetime membership for $10, promises that "[t]he identities of our members will never be disclosed." About Us, *American Alliance for Equal Rights*, available at https://americanallianceforequalrights.org/about/.

**SA10**

demonstrating that the balance of potential harms (*e.g.*, status as a minor, substantial risk of harm or retaliation from a third party) justifies anonymization. *See id.* at 2 (holding that a plaintiff "may not proceed anonymously merely to avoid reputational damage or embarrassment"). In any event, no such balancing test currently exists in this context, and *Summers* does not compel this Court to hold as much.

### b.   Injury-In-Fact

The Court now turns to Defendants' argument that American Alliance lacks standing because Member A and Member B's alleged impending injuries—the *collection* of voluntarily-provided demographic information and *posting* of aggregated responses on their websites—do not rise to the level of a cognizable injury-in-fact.

### i.   Online Publication

*First*, Defendants assert that because, "under Illinois law, an organization and its board are one and the same," the demographic information that not-for-profit organizations are required to solicit from their officers and directors is the organization's "*own* data[.]" (Dkt. 69 at **8–9.) But Defendants' reliance on *Willmschen v. Trinity Lakes Improvement Association*, 362 Ill. App. 3d 546 (Ill. App. Ct. 2005), the sole case Defendants cite to support this assertion, is misplaced. That case said nothing about a corporation's right to collect data from its board members, but rather addressed whether Illinois law permits a plaintiff to sue a corporation's board of directors as a collective entity, separate and distinct from the corporation. *Id.* at 551–52. Moreover, from a practical standpoint, the conclusion Defendants urge this Court to reach—that *any* information held by an organization's officers and directors, including private, personal information, correspondingly belongs to the organization—is ridiculous and would have sweeping, and frankly perilous, implications. That stance is untenable.

*Second*, Defendants argue that the alleged injury stemming from posting aggregated demographic information is conjectural and hypothetical, not actual or imminent, because SB 2930 makes it *optional* and *voluntary* for officers and directors to disclose their demographic information. Defendants claim that "if the directors and officers provide no such information, then the statute does not require the organizations to post anything at all on their websites, and there is no injury to the anonymous organizations." (Dkt. 69 at *9.) American Alliance responds that even if every officer and director of Member A and Member B declined to disclose any and all information, SB 2930 still requires Members A and B to make a posting on their websites regarding their *lack* of collected information, "by, for example, reporting that 100% of [their] officers and directors are [sic] 'prefer not to say' for each category." (Dkt. 80 at *4.) American Alliance also argues that the Amended Complaint's allegations that most of Members A and B's officers and directors "will answer" questions about their demographic information—which American Alliance contends must be accepted as true at the motion to dismiss stage—are sufficient to establish injury-in-fact. (Am. Compl., Dkt. 59 ¶ 35.)

In the past fifteen or so years, the Supreme Court has established that, where no actual injury is alleged, a plaintiff may establish injury-in-fact by demonstrating that a future, threatened injury is "certainly impending"—in other words, imminent. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013) (quoting *Defenders of Wildlife*, 504 U.S. at 564 n.2). Imminence requires a showing that "there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767, 139 S. Ct. 2551, 2565, 204 L. Ed. 2d 978 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U. S. 149, 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)). The Supreme Court has stated that, "[o]ur cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5. Still, a plaintiff is neither permitted to rely

**SA12**

on a "highly attenuated chain of possibilities," *id.* at 410, nor on speculation about "'the unfettered choices made by independent actors not before the courts.'" *Id.* at 414 n.5 (quoting *Defenders of Wildlife*, 504 U.S., at 562).

The Court finds that American Alliance has failed to demonstrate the imminence of any purported future harm to Members A and B resulting from the posting of demographic information on their websites. SB 2930 gives officers and directors the voluntary option to disclose or decline to disclose personal identifying information. On its face, SB 2930's plain language suggests that a covered not-for-profit organization is required to post on its website only the aggregated demographic information it actually collects. *See* 805 ILCS 105/114.15 (a) & (c). Nothing in SB 2930 appears to explicitly require an organization to post anything on its website if it does not receive *any* demographic information from its officers and directors. It follows that a not-for-profit organization whose officers and directors provide no demographic information can suffer no injury directly tied to actual posting.

American Alliance has made no allegation that Members A and B have received demographic information that they now are obligated to aggregate and post on their websites. Instead, American Alliance relies on speculations that Members A and B *will* face imminent harm as a result of being required to post because "[m]ost officers and directors will answer" the demographic questions posed to them. (Am. Compl., Dkt. 59 ¶ 35.) It surmises:

> Most officers and directors will answer because their nonprofit is asking and they are good team players. Women, the disabled, veterans, and other minorities will feel obligated to answer because, as fiduciaries of the organization, they do not want to harm the nonprofit by making it appear discriminatory, not inclusive, or not "diverse." Others will answer to avoid the assumptions that come with declining to answer demographic questions, like with "sexual orientation." And the law's very purpose rests on the assumption that officers and directors will answer these questions. If Illinois thought the law would not reliably reveal information about the demographics of nonprofits, then it would irrationally burden nonprofits for no purpose whatsoever.

(*Id.*)

SA13

It is true that "when standing is challenged on the basis of the pleadings, [the Court] 'accept[s] as true all material allegations of the complaint, and . . . construe[s] the complaint in favor of the complaining party.'" *Pennell v. San Jose*, 485 U.S. 1, 7, 108 S. Ct. 849, 99 L. Ed. 2d 1 (1988) (quoting *Warth*, 422 U. S. at 501). But American Alliance's statements about how it believes officers and directors generally, or even the officers and directors of Members A and B, will conduct themselves are unsupported by underlying factual allegations and instead rely on generalizations amounting to "unadorned speculation." *Id.* at 8. The Court is "not obligated to accept 'sheer speculation, bald assertions, and unsupported conclusory statements' on a motion to dismiss." .*Lanahan v. Cnty. of Cook*, 41 F.4th 854, 862 (7th Cir. 2022) (quoting *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020)).

Indeed, declarations submitted by the Chief Executive Officer of Member A (signed "Officer A") and Chairman of Member B (signed "Officer B") attest that each of the member organizations, "its board, its staff, and I do not want to be forced to promote these messages," including ones that "will make users think that [the organization] endorses controversial concepts like race-based employment practices and proportional representation." (Dkt. 44-2 ¶ 9; Dkt. 44-3 ¶ 9; Dkt. 75-2 ¶ 9, Dkt. 75-3 ¶ 9.) If the Court were to incorporate these declarations by reference, and thus view the statements therein as true, the Court might deduce that Members A and B face no real prospect or substantial risk of disclosure, and thus no cognizable injury based on disclosure at all, because their officers and directors do not intend to disclose any demographic information about themselves. Although American Alliance does not need to show literal certainty that Members A and B will be required to publish demographic information on their websites, it has not alleged facts plausibly establishing that the risk of being required to post is imminent. The purported injury American Alliance puts forth based on the prospect of being required to post demographic information relies

on actions by independent actors (*i.e.*, officers and directors) that may never materialize.  *See Clapper*, 568 U.S. at 414, 414 n.5.  Such harm is too speculative for Article III purposes.[4]

American Alliance's equal protection challenge hinges on online publication of officer and director demographic information.  "By forcing charities to publicize the demographics of their senior leadership," it claims, "the law pushes them to hire candidates based on race.  Groups whose posted demographics are perceived as insufficient will be subjected to 'public shaming' by activist groups and other members of the public . . . So nonprofits will start discriminating to avoid that type of harassment."  (Am. Compl., Dkt. 59 at ¶ 45.)  Based on the Court's reading of the Amended Complaint, American Alliance does not contend that Member A and B's *collection* of demographic information from their officers and directors, alone (*i.e.*, absent online publication), poses a threat of injury rooted in the Fourteenth Amendment.  Therefore, American Alliance's failure to sufficiently plead injury-in-fact as it relates to public disclosure necessitates dismissal of its Fourteenth Amendment claim for lack of Article III standing.  Additionally, American Alliance lacks standing to proceed on its First Amendment claim as it relates to public disclosure.

The Court does not suggest that a plaintiff could not, at present, sufficiently show injury-in-fact as it relates to publication.  In particular, the Court recognizes that SB 2930 may have the effect of altering the behavior of covered not-for-profit organizations *now*.  *See Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 586 (7th Cir. 2011) (rejecting argument that injury was speculative where rule at issue "aim[ed] to alter truck drivers' behavior now to avoid a

---

[4] American Alliance also argues that its diversion of resources (*i.e.*, time and money) to comply with SB 2930 is enough to satisfy the injury-in-fact requirement.  First, for the reasons previously discussed, any purported spending to comply with SB 2930's disclosure requirement is speculative.  Second, because nothing in SB 2930 requires not-for-profit organizations to interview employees, as the Amended Complaint alleges, (Am. Compl., Dkt. 59 ¶ 7), allegations about time and money that may be spent on interviewing staff cannot form the basis for injury-in-fact.  *See Prop. Cas. Insurers Ass'n of Am. v. Todman*, 725 F. Supp. 3d 810, 826 (N.D. Ill. 2024) (Pallmeyer, J.) ("[A] plaintiff cannot claim standing to challenge a regulation based on a misreading of what that regulation permits or requires[.]").

remedial directive in the future"). But the Amended Complaint, as currently pleaded, does not allege that Members A or B, specifically, currently feel or will feel pressured by SB 2930's disclosure requirements to consider race or other non-merit-based characteristics in their officer and director hiring decisions. As a result, American Alliance has not established that either Member A or Member B have standing to sue in their own right as it relates to any alleged injury based on public disclosure.

*ii. Collection*

American Alliance sufficiently alleges that Members A and B will be imminently harmed by asking their officers and directors "intrusive questions" about sensitive demographic issues that Members A and B would rather not discuss. (Am. Compl., Dkt. 59 ¶¶ 26–27.) Although the Illinois Department of Human Rights has not yet published its list of identity classifications, it is well-established that a court may entertain a pre-enforcement challenge. *See, e.g.*, *Anheuser-Busch, Inc. v. Schnorf*, 738 F. Supp. 2d 793, 800 (N.D. Ill. 2010) (Dow, Jr., J.) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat — for example, the constitutionality of a law threatened to be enforced[.]") (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)). The Amended Complaint alleges that Members A and B "don't want to talk about any of that information [regarding sensitive demographic issues] . . . [including] with their staff . . ." (Am. Compl., Dkt. 59 ¶ 27.) At the pleading stage, these allegations are sufficient to show that Members A and B will suffer an imminent injury-in-fact as a result of their collection of demographic information. Such alleged injury is fairly traceable to the implementation of SB 2930 and could be redressed by an injunction. *See Spokeo*, 578 U.S. at 338.

*2. Secretary Giannoulias as a Proper Defendant*

Next, the Court addresses Defendants' contention that Secretary Giannoulias lacks the requisite connection to SB 2930's enforcement to be a proper defendant to this suit.

**SA16**

A state official may be sued in his official capacity when a plaintiff seeks to enjoin an allegedly unconstitutional statute. *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 644 (7th Cir. 2006). In such cases, the Supreme Court has held that, "such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party." *Ex parte Young*, 209 U.S. 123, 157, 28 S. Ct. 441, 52 L. Ed. 714 (1908). "Any official with enforcement power – even if shared with others – satisfies the 'some connection' standard." *Eason v. Pritzker*, 2020 WL 6781794, at *8 (N.D Ill. Nov. 18, 2020) (Seeger, J.). The Court looks to the state official's "duties and powers under state law" to determine whether the official has some enforcement power over the challenged statute. *Ruiz v. Pritzker*, 2024 WL 1283703, at *2 (N.D. Ill. Mar. 26, 2024) (Blakey, J.) (citing *Sherman v. Cmty. Consol. Sch. Dist. 21*, 980 F.2d 437, 441 (7th Cir. 1992)).

Defendants challenge whether Secretary Giannoulias is a proper defendant. First, Defendants argue that SB 2930 assigns the Illinois Secretary of State no enforcement or regulatory role as it relates to the statute. Second, they contend that the Illinois Secretary of State's "power 'to administer'" the General Not-For-Profit Corporations Act, 805 ILCS 105/101.05, is of no importance, given that SB 2930 requires no administration by the State. Defendants claim that, as a result, the harm American Alliance alleges is neither traceable to any actions or duties of the Illinois Secretary of State nor redressable by an injunction prohibiting the Illinois Secretary of State from enforcing SB 2930. (Dkt. 69 at *15; Dkt. 86 at *11.)

At this stage in the litigation, the Court sees no compelling reason to dismiss Secretary Giannoulias. Illinois law gives the Illinois Secretary of State broad authority to promulgate rules and regulations to assist in the efficient administration of various statutes, including SB 2930. *See, e.g.*, 805 ILCS 105/101.55 ("The Secretary of State shall have the power to promulgate, amend or repeal rules and regulations deemed necessary to efficiently administer this Act."); 805 ILCS 105/101.05 ("The

<span style="color: red;">**SA17**</span>

Secretary of State shall have the power and authority reasonably necessary to administer this Act efficiently and to perform the duties therein imposed."). That authority appears to include prescribing how SB 2930 should be interpreted and applied.

In addition, the Illinois Secretary of State is authorized to play an enforcement role in a more conventional sense: he may propound interrogatories to ascertain whether covered not-for-profit organizations have complied with SB 2930 and "shall certify to the Attorney General . . . all interrogatories and answers thereto which disclose a violation of any of the provisions of [the General Not-For-Profit Corporations Act]," which includes SB 2930. 805 ILCS 105/101.35. At the present juncture, this is more than enough to show that Secretary Giannoulias has "some connection" with the enforcement of SB 2930.

B. *Intervenor-Defendants' Motion to Dismiss the United States' Amended Complaint in Intervention*

1. *Standing*

Next, the Court turns to whether the United States has standing as an intervenor of right. "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439, 137 S. Ct. 1645, 198 L. Ed. 2d 64 (2017). Accordingly, "an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests." *Id.* (citing United States' *amicus curiae* brief taking the position that an intervenor must demonstrate its own standing if it "seek[s] damages" or "injunctive relief that is broader than or different from the relief sought by the original plaintiff(s)"). Although the United States may proceed as a party plaintiff in certain circumstances even if the original plaintiff disappears, it must in such circumstances establish its own standing. *See, e.g., Summers*, 555 U.S. at 497 ("'[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute.")

While the United States may seek the same *form* of injunctive relief as American Alliance, it seeks to enjoin two additional defendants—the State of Illinois and Illinois Governor JB Pritzker. Thus, the United States' requested relief is both broader than and different from the relief sought by American Alliance, and the United States, as intervenor, must establish its own Article III standing.

The United States insists that it has standing because it represents its citizens as *parens patriae* to enforce constitutional rights under the Equal Protection Clause. Intervenor-Defendants do not respond to this point, merely retorting that the United States "has not shown injury to the general welfare that would be sufficient to give the United States a standing in court." (Dkt. 86 at *7 (omitting internal citations).)

First, the United States cites only dicta and non-precedential out-of-circuit opinions for the proposition that it may invoke *parens patriae* in seeking to uphold a sovereign interest in preventing violations of its citizens' constitutional rights. *See, e.g.*, *La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512 (W.D. Tex. 2022); *United States v. Texas*, 566 F. Supp. 3d 605 (W.D. Tex. 2021). This Court is neither bound, nor persuaded, by the opinions in these cases.

Second, the Court cannot ignore the "indispensable" element of injury-in-fact to establish Article III standing. *Defenders of Wildlife*, 504 U.S. at 561. The judicial power of the United States extends only to "Cases" and "Controversies." U.S. Const. Art. III, § 2; *see Clapper v. Amnesty Int'l USA*, 568 U. S. 398, 408, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013). The Court has been presented with no binding authority stating that, where there is no case or controversy, the mere fact that the United States is a party is sufficient to bestow standing. And under current Article III standing jurisprudence, the United States has failed to allege injury-in-fact.[5]

---

[5] For example, the United States does not allege that SB 2930 interferes with certain activities carried out by the federal government. *See, e.g.*, *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1164–65 (10th Cir. 1996) (reversing district court's dismissal based on standing where the United States sufficiently alleged that two professional ethics rules governing all attorneys practicing in Colorado interfered with federal prosecutors' conduct in criminal proceedings and changed the nature of the

Accordingly, the Court finds it proper to grant Defendants' motion to dismiss the United States' Amended Complaint in Intervention for lack of standing.

C. *Defendants' Motion to Strike*

Before resolving American Alliance's motion for preliminary injunction, the Court finds it necessary to first resolve Defendants' motion to strike. In support of its motion for preliminary injunction, American Alliance filed two declarations by anonymous declarants, "Officer A," the Chief Executive Officer of Member A, and "Officer B," the Chairman of Member B. The declarations, neither of which were notarized, were signed using aliases and do not contain language verifying under penalty of perjury that the contents therein are "true and correct," as required by 28 U.S.C. § 1746. *See Davis v. Wells Fargo Bank*, 685 F. Supp. 2d 838, 841–42 (N.D. Ill. 2010) (Aspen, J.). Defendants moved to strike these declarations from the record on May 6, 2025. (Dkt. 71.)

The following day, on May 7, 2025, American Alliance filed amended declarations, having "corrected" the "accidental omission" in its original declarations by inserting language attesting under penalty of perjury to the truth and accuracy of the statements. (Dkt. 78 at *2; *see* Dkt. 75.) Given that Defendants do not dispute that these amended declarations comport with statutory requirements, and in light of American Alliance's swift effort to amend (albeit without leave of Court), the Court finds that Defendants have not been prejudiced and sees no good reason to strike either the original or amended declarations of Officers A or B. Therefore, Defendants' motion to strike is denied. *See BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 876 F. Supp. 2d 1042, 1045 n.2 (N.D. Ind. 2012) (dismissing motion to strike unsworn declarations as moot where nonmovant amended timely filed original declaration to add penalty of perjury language).

federal grand jury in Colorado); *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 425, 45 S. Ct. 176, 69 L. Ed. 352 (1925) (holding that the United States had Article III standing where local government agency's withdrawal of water from Lake Michigan impacted the navigability of the Great Lakes and obstructed interstate and foreign commerce and the federal government's ability to carry out treaty obligations to foreign countries bordering the Lakes).

D. *American Alliance's Motion for Preliminary Injunction*

American Alliance contends in its motion for preliminary injunction that it is likely to succeed on the merits of its First Amendment claim. But all of its arguments—including that SB 2930 fails strict scrutiny because (a) the State of Illinois's interests in public transparency and diversity are not compelling and (b) SB 2930 is not narrowly tailored—focus on the statute's requirement to *disclose* demographic information. The Court, having concluded above that American Alliance lacks standing as it relates to its purported injuries stemming from public disclosure (*i.e.*, online publication), has been presented with no argument or case law indicating that American Alliance has some likelihood of success on the merits for its First Amendment claim based on the *collection* of demographic information alone. Similarly, American Alliance's arguments regarding irreparable harm concern the *disclosure* of private, confidential information, not the collection thereof. (Dkt. 44 at **14–15.)

Because American Alliance has demonstrated neither some likelihood of success on the merits for its First Amendment claim based on the collection of demographic information nor how it will be irreparably injured if an injunction is not entered, the Court need not address the possibility of serious adverse effects on others or whether an injunction is in the public interest. *See Kolz v. Board of Education*, 576 F.2d 747, 749 (7th Cir. 1978). The Court denies American Alliance's motion for a preliminary injunction.

**IV. Conclusion**

For the foregoing reasons, the Court (1) grants in part and denies in part Defendants' motion to dismiss American Alliance's Amended Complaint [68]; (2) grants Intervenor-Defendants' motion to dismiss the United States' Amended Complaint in Intervention [85]; (3) denies Defendants' motion to strike [71]; (4) denies American Alliance's motion for preliminary injunction [44]; and (5) denies the United States' motion for preliminary injunction as moot [49]. The Court gives American Alliance and the United States 14 days to amend.

**SA21**

As a final note, the Court is disappointed in American Alliance and the United States' repeated insistence that time is of the utmost essence in adjudication of the motions for preliminary injunction because Members A and B face December 2025 reporting deadlines and are, purportedly, currently incurring costs to comply with SB 2930. On the contrary, so far as this Court is aware, the Illinois Department of Human Rights has yet to publish a standardized list of demographic classifications to be used by qualifying not-for-profit organizations. With no knowledge of the relevant classifications, no qualifying not-for-profit organization could reasonably be expected to collect any demographic information at present or otherwise comply with SB 2930. Despite over 300 active civil and criminal cases on its docket, as well as several trials, this matter has required significant attention by the Court and her chambers. The parties are placed on notice that this Court will assign priority to cases and motions as appropriate.

**IT IS SO ORDERED.**

Sharon Johnson Coleman
United States District Judge

DATED: 8/20/2025

**SA22**