In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 25-2461 & 25-2487

AMERICAN ALLIANCE FOR EQUAL RIGHTS,

*Plaintiff-Appellant*,

and

UNITED STATES OF AMERICA,

*Intervening Plaintiff-Appellant*,

*v.*

STATE OF ILLINOIS, *et al.*,

*Defendants-Appellees*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 25 CV 00669 — **Sharon Johnson Coleman**, *Judge*.

ARGUED SEPTEMBER 11, 2026 — DECIDED NOVEMBER 18, 2026

Before HAMILTON, KIRSCH, and MALDONADO, *Circuit Judges*.

KIRSCH, *Circuit Judge*. In 2024, Illinois enacted Senate Bill 2930 (S.B. 2930), which requires certain nonprofit

organizations to compile demographic information from their directors and officers and post the collected demographic information on their respective websites. The American Alliance for Equal Rights (the Alliance) challenged S.B. 2930, alleging that the law compels speech and induces unlawful discrimination in violation of the First and Fourteenth Amendments. The United States intervened, bringing the same Fourteenth Amendment claim. Both the Alliance and the United States moved for preliminary injunctions. Defendants moved to dismiss both complaints for lack of standing and for failure to state a claim on which relief can be granted. The district court resolved all the motions by finding that the Alliance lacked standing for some of its claims and the United States lacked standing entirely, denying injunctive relief on those grounds. Because we disagree with the district court's standing analysis, we reverse the district court's dismissal of both complaints, vacate the denial of injunctive relief, and remand for further proceedings.

I

Effective January 1, 2025, Illinois S.B. 2930 mandates that any charitable organization reporting grants of $1,000,000 or more to other charitable organizations "shall post" on its website "the aggregated demographic information of the corporation's directors and officers." 805 Ill. Comp. Stat. 105/114.15(a). This demographic information includes "race, ethnicity, gender, disability status, veteran status, sexual orientation, and gender identity" and must remain on the organization's website for at least three years. *Id.* While the demographic categories are set by law, the Illinois Department of Human Rights is tasked with preparing and publishing a "standardized list of demographic classifications" to be used

in complying with the law. 805 Ill. Comp. Stat. 105/114.15(b). The Department published its first standardized list of demographic classifications in July 2025. See Ill. Dep't of Hum. Rts., *Requirements for Charitable Organizations*, https://perma.cc/9TBA-T3DK. When collecting this demographic data, S.B. 2930 mandates that covered organizations "shall allow for an individual to decline to disclose any or all personal demographic information." 805 Ill. Comp. Stat. 105/114.15(c).

On January 21, 2025, the American Alliance for Equal Rights brought a pre-enforcement challenge against S.B. 2930 on behalf of its pseudonymous member organizations, Members A and B, against the Attorney General of Illinois, the Director of the Illinois Department of Human Rights, and the Secretary of State of Illinois. The Alliance argued that S.B. 2930 violates the Fourteenth Amendment's Equal Protection Clause by inducing unlawful discrimination and the First Amendment's Free Speech Clause by compelling speech, and it sought declaratory and injunctive relief.

The United States then intervened by the procedures set forth in 42 U.S.C. § 2000h-2, making the same Fourteenth Amendment claim and seeking the same relief. The United States added the Governor of Illinois and the State of Illinois as defendants. Because of the limited scope of § 2000h-2, the United States did not bring a First Amendment challenge.

Both the Alliance and the United States moved for preliminary injunctions against Illinois's enforcement of S.B. 2930. Defendants opposed the motions and moved to dismiss the United States' and the Alliance's complaints under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defendants argued that the law could be separated into two components—the collection of demographic data and the posting of that

data—and that neither the Alliance nor the United States had standing to challenge either component.

The district court ruled on all these motions at once, entering an order that (1) dismissed the portion of the Alliance's complaint that dealt with the posting of director and officer demographic information for lack of standing; (2) dismissed the United States' amended complaint in its entirety for lack of standing; (3) denied the Alliance's motion for a preliminary injunction; and (4) denied the United States' motion for a preliminary injunction as moot. The Alliance and the United States each appealed the district court's standing determinations as well as its denial of their requests for preliminary injunctions. We consolidated the appeals for briefing and disposition.

II

Before addressing appellants' claims, we must assure ourselves of jurisdiction. See *Abelesz v. OTP Bank*, 692 F.3d 638, 646 (7th Cir. 2012). Generally, a district court must issue a final order before an appellate court has jurisdiction to hear an appeal. See 28 U.S.C. § 1291. As an exception to that rule, this case merits interlocutory review because the district court denied a preliminary injunction. See 28 U.S.C. § 1292(a)(1). In addition, the Alliance and the United States ask us to exercise pendent appellate jurisdiction to expand the scope of our review beyond just the denial of injunctive relief. They request that we also review the district court's standing determinations in its ruling on the motions to dismiss.

Under the pendent appellate jurisdiction doctrine, appellate courts may "review an otherwise unappealable interlocutory order if it is inextricably intertwined with an appealable

one." *Abelesz*, 692 F.3d at 647. We have called this a "narrow doctrine" because resolving appeals from nonfinal decisions is generally incompatible with the final judgment rule. *Id.* (citing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 43–51 (1995)). Accordingly, we have looked for those "extraordinary circumstances" in which it is "practically indispensable" that the court "address the merits of the unappealable order in order to resolve the properly-taken appeal." *Id.* (quotation omitted). We have exercised this limited authority when two orders "concern the same single issue." *Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010).

Here, the district court based its denial of the United States' motion for a preliminary injunction entirely on its jurisdictional determination, finding the question moot once the complaint had been dismissed. The district court concluded that because S.B. 2930 does not interfere with activities carried out by the federal government, the United States has not alleged an adequate injury in fact to confer Article III standing. Similarly, the district court used its determination on the Alliance's standing as the key consideration for denying the Alliance's motion for a preliminary injunction. While the district court found that the Alliance had standing as to S.B. 2930's requirement for Members A and B to *collect* demographic information, the district court determined that the Alliance did not have standing regarding the law's mandate for Members A and B to *publish* the collected information. Once the district court dismissed the Alliance's complaint as it related to the publication of demographic information, it denied their motion for a preliminary injunction on those grounds. Because the district court's preliminary injunction rulings were ultimately based on its standing determinations alone,

the pendent appellate jurisdiction test is satisfied for the standing issues raised by both appellants.

For the United States, the analysis is straightforward. The district court's sole reason for denying the United States' motion was its determination that the United States lacked standing. The decision to dismiss the United States' complaint was thus inextricably intertwined with the decision to deny the preliminary injunction. The appealable denial of injunctive relief concerns the same issue as the decision to dismiss the United States' complaint, and we must resolve the standing question to properly assess the appealable order.

For the Alliance, the analysis is similar. The district court determined that the Alliance's arguments in favor of a preliminary injunction centered on the posting of demographic data, but because it had already dismissed any claims related to that alleged harm, the district court rejected the motion in its entirety. Again, the standing determination was inextricably intertwined with the decision to deny the preliminary injunction, and our analysis of the appealable preliminary injunction order would be meaningless without first addressing the standing issue.

The decisions of several of our sister circuits bolster our conclusion. The Second, Third, and Sixth Circuits have all exercised pendent appellate jurisdiction when a district court denies a preliminary injunction based on its analysis of standing or the related issue of ripeness. See *Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 371–73 (2d Cir. 2004) (standing); *Siemens USA Holdings Inc v. Geisenberger*, 17 F.4th 393, 406–07, 410–12 (3d Cir. 2021) (ripeness); *Cath. Healthcare Int'l, Inc. v. Genoa Charter Township*, 82 F.4th 442, 447–48 (6th Cir. 2023) (ripeness). In sum, we are satisfied that we may

reach the standing issues presented in this case by both the United States and the Alliance.

III

Generally, Article III standing requires a plaintiff to demonstrate (1) that it has "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) that "the injury was likely caused" by the challenged conduct; and (3) that "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). An injury in fact may be "a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples." *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1556 (2024). Further, "[g]overnment regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *Id.* Plaintiffs seeking prospective relief "must establish a sufficient likelihood of future injury." *Id.*

The district court made three determinations on standing that are challenged by the parties. First, as noted above, it found that the United States lacked Article III standing to intervene. Second, the district court found that the Alliance lacked standing to challenge the portion of the law that requires covered organizations to post their collected demographic information. Third, the district court found that the Alliance's decision to keep Members A and B pseudonymous did not impact its Article III standing analysis. We address each issue in turn.

A

The United States intervened in this case pursuant to 42 U.S.C. § 2000h-2, which states that the U.S. Attorney General may intervene "for or in the name of the United States" in any federal lawsuit "seeking relief from the denial of equal protection of the laws under the fourteenth amendment to the Constitution on account of race." 42 U.S.C. § 2000h-2. We do not need to decide whether this statutory authority under § 5 of the Fourteenth Amendment overrides Article III's case or controversy requirement—an issue the Supreme Court has not taken up—to conclude that the United States has standing here. Cf. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) (holding that legislation under § 5 of the Fourteenth Amendment could override states' Eleventh Amendment immunity).

The district court dismissed the United States' complaint by applying traditional private-plaintiff standing doctrine. But when the government brings a case to enforce its laws, the analysis for injury in fact works differently than for private individuals. As a general proposition, it is "beyond doubt" that an alleged violation of federal laws "asserts an injury to the United States." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). This "injury to its sovereignty" explains why the federal government may bring criminal lawsuits without alleging any specific injury in fact. *Id.*

The Supreme Court has reaffirmed this general principle. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Court rejected a private individual's generalized grievance that alleged "only harm to his and every citizen's interest in proper application of the Constitution and laws." *Id.* at 573–74. The Court highlighted that "[v]indicating the *public* interest (including the public interest in Government observance of the

Constitution and laws) is the function of Congress and the Chief Executive." *Id.* at 576. Most clearly, the Court articulated this principle in *TransUnion*:

> A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority. We accept the "displacement of the democratically elected branches when necessary to decide an actual case." But otherwise, the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys). Private plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law.

141 S. Ct. at 2207 (citation omitted) (quoting John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1230 (1993)). The premise underlying these two cases is clear: The federal government may bring a suit to enforce its laws even when a private individual cannot.

The Supreme Court's Fourteenth Amendment jurisprudence confirms how the statements in *Lujan* and *TransUnion* work in practice. In *United States v. Virginia*, 518 U.S. 515 (1996), the Supreme Court struck down gender-restricted admissions at the Virginia Military Institute after the federal government sued to protect the Fourteenth Amendment rights of its citizens. *Id.* at 519. That VMI's policy did not interfere in activities carried out by the federal government did not enter the analysis. Further, in *Pasadena City Board of*

*Education v. Spangler*, 427 U.S. 424 (1976), which dealt directly with 42 U.S.C. § 2000h-2, the Supreme Court held that even though the case would ordinarily have been moot after the original plaintiffs were removed, the United States' presence as an intervenor under § 2000h-2 preserved Article III jurisdiction. *Id.* at 430–31.

Put simply, the Supreme Court has consistently found that the United States has standing to enforce the rights of its citizens under the Equal Protection Clause of the Constitution, especially when it has clear statutory authority to do so. And there is no doubt that the United States has standing to intervene here. To find otherwise would call into question the ability of the United States to defend its laws and the mandates of the Constitution. Cf. U.S. Const. amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."); *United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights, and we think it perfectly competent for Congress to authorize the United States to be the guardian of that public interest in a suit for injunctive relief."). And indeed, defendants conceded at oral argument that if we have appellate jurisdiction to reach standing, the United States would have standing here to intervene.

B

We turn now to the Alliance's standing. An organization may bring claims on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). When determining whether a sufficient injury in fact has occurred for an organization's members, the Supreme Court has required "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Further, while an allegation of a future injury in fact will not suffice if it rests on "a highly attenuated chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), Article III standing for preliminary relief can be based on "commonsense inferences" about "third party behavior," *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026) (quoting *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2136 (2025)).

1

We first address whether Members A and B have alleged a sufficient injury in fact to have standing in their own right. We conclude that they have. At the outset, we agree with the district court that the injury with regard to the collection of data is clear. It is undisputed that Members A and B will have to go through the effort to at least attempt to collect demographic data, which establishes a sufficient likelihood of future injury to find an injury in fact as to that element of the law. See *All. for Hippocratic Med.*, 144 S. Ct. at 1556.

The question whether the Alliance has a sufficiently imminent injury in fact regarding the posting of demographic information, however, requires further discussion. All parties agree that there are two ways for the Alliance to satisfy standing here. It is undisputed that if S.B. 2930 requires Members A and B to post what they have collected even if no officers or

directors respond (e.g., "100% of officers and directors declined to respond"), the standing analysis would be over. The Alliance's members would be required to post something, creating an injury in fact for the same reasons that the collection of data does. Alternatively, even if S.B. 2930 does not require Members A and B to post nonresponses, both parties agree that if even one officer or director provides any demographic information, the organizations would have to post at least that information, conferring standing.

The district court mistakenly concluded that the Alliance does not have standing by determining that S.B. 2930 does not require Members A and B to post anything if all officers and directors refuse to answer the demographic questions. It then reasoned that because the submitted declarations of Members A and B indicated that their officers and directors would decline to submit any data, there would be no publication requirement under S.B. 2930 and no injury in fact.

Specifically, the district court relied on declarations by Officers A and B for their respective member organizations. Officer A stated, "Member A, its board, its staff, and I do not want to be forced to promote these messages." Officer B in turn stated, "Member B, and many if not all its officers and directors, do not believe in 'gender identity' and object to suggesting that someone can identify as a gender that's different from their biological sex," continuing that Member B believes "concepts like racial consciousness, proportional representation, and gender identity" are "incoherent, immoral, and wrong." From those statements, the district court concluded that there is no imminent injury in fact because there is no real risk of disclosure if all the officers and directors of Members A and B refuse to submit their demographic information.

We find that the district court erred in its analysis. We do not need to reach the correct reading of S.B. 2930's requirements under Illinois law because even if the district court's reading of the statute is correct, we may make the commonsense inference that at least some officers and directors of the Alliance's members are highly likely to fill out the demographic survey. The Supreme Court's analysis in *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), is instructive. There, New York challenged the addition of a citizenship question on the census, alleging that it would cause noncitizens to refrain from answering the census entirely. *Id.* at 2565. The Court found standing, even though declining to answer the census is a federal crime, because New York had demonstrated that "third parties will likely react in predictable ways." *Id.* at 2566. So too here. The statements that the officers and directors of Members A and B do "not want" to promote the messages implied by S.B. 2930 is not enough to defeat standing. Just as the Supreme Court was willing to assume that noncitizens might not *want* to violate federal law but might still do so given the circumstances, we can assume that the officers and directors of Members A and B may not want to reveal their demographic information but still might do so. Further, the statement from Officer B explicitly acknowledges the possibility that not all of Member B's officers and directors share Officer B's convictions, indicating that some officers and directors may well answer at least some of the demographic questions despite the contents of the declarations.

This conclusion does not require mere speculation or conjecture but rather is rooted in basic reality: When the law tells corporate officers and directors to do something, they typically comply. Especially given that S.B. 2930 asks about several demographic categories, many of them uncontroversial,

it seems highly unlikely that not a single officer or director would respond with, say, their gender or veteran status. Then, if even one officer or director responds, the organization would be required to post that information, conferring standing.

2

Finally, defendants have asked us to review the portion of the district court's order that addresses the Alliance's decision to keep its members pseudonymous in its complaint. The district court rejected defendants' argument that members need to be identified by name to proceed with associational standing at the motion to dismiss stage, noting that it had not found a single case holding as much. We agree.

Defendants' arguments stem from two sources. First is the Supreme Court's language in *Summers v. Earth Island Institute*, requiring that "at least one identified member … would suffer harm." 555 U.S. at 498. Second, defendants point to our circuit's precedents regarding pseudonymous parties in which we typically disfavor pseudonymity as "contrary to the rights of the public" and require "exceptional circumstances" for the privilege. *Doe v. Village of Deerfield*, 819 F.3d 372, 376–77 (7th Cir. 2016) (quotation omitted).

We have yet to address the question of whether *Summers*'s "identified member" requirement mandates that an organization specifically name its members. See *Satanic Temple, Inc. v. Rokita*, 163 F.4th 1061, 1069 & n.10 (7th Cir. 2026). Our case law preceding *Summers* plainly allowed organizations to keep their members pseudonymous, but we have previously reserved the question of whether that case law survives *Summers* for another day. *Id.*

Today we find that our prior case law is not disturbed by *Summers* and that the Alliance's decision to use pseudonyms for its members in its complaint does not defeat its organizational standing. All the other circuits that have faced this question have permitted pseudonymity at this stage of litigation. See, e.g., *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024); *Speech First, Inc. v. Shrum*, 92 F.4th 947, 951–52 (10th Cir. 2024). And the only circuit to even temporarily find that *Summers* contains a naming requirement at the pleading stage vacated that portion of its opinion on rehearing. See *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 115–19 (2d Cir. 2024), vacated on reh'g, 126 F.4th 109 (2d Cir. 2025). Most tellingly, in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 143 S. Ct. 2141 (2023), the Supreme Court found that Students for Fair Admissions is "indisputably a voluntary membership organization with identifiable members," despite the fact that those members remained anonymous in the complaint. *Id.* at 2157–58.

Defendants' other arguments fail because our cases about pseudonymous parties are inapplicable here. All parties in this case are named. It's the *members* of the Alliance that have been kept pseudonymous, and the law is clear that Article III associational standing is not significantly threatened by an organization's decision to keep individual members pseudonymous.

* * *

Having now concluded that both the United States and the Alliance have standing to bring their challenges to S.B. 2930 and that the district court erred in denying their motions for a preliminary injunction on those grounds, we decline to go

further. The parties raise several issues on the merits, including the proper level of scrutiny for both the First and the Fourteenth Amendment claims, that would benefit from first review at the district court. We thus REVERSE the district court's dismissal of the United States' and the Alliance's complaints, VACATE the denial of both parties' preliminary injunctions, and REMAND for further proceedings consistent with this opinion.